IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SILICON KNIGHTS, INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 08 C 782 |
| | ) Judge Gettleman |
| vs. | ) Magistrate Judge Schenkier |
| | ) |
| EPIC GAMES, INC., | ) Case No. 5-07-00275-D |
| | ) (Eastern District of North Carolina, |
| Defendant. | ) Western Division) |

**MIDWAY GAMES INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO QUASH SUBPOENA**

Third-Party Subpoena Respondent, Midway Games Inc. ("Midway"), by and through its attorneys, Barnes & Thornburg LLP, submits this Memorandum and the Affidavit of Michael Weilbacher in support of Midway's motion to quash the subpoena issued by Silicon Knights, Inc. ("Silicon Knights") in connection with the lawsuit pending in the Eastern District of North Carolina between Silicon Knights and Epic Games, Inc. ("Epic").

**Introduction**

Midway's direct competitor, Silicon Knights, is unable to successfully build its own video games using a software product it licensed from Epic known as the Unreal Engine 3 ("UE3"). It sued Epic and served a subpoena on Midway to find out how Midway successfully developed several popular video games using UE3 in a form modified by Midway to accommodate Midway's particular genre of video games. The modifications and the nature of the modifications are proprietary trade secrets and have not been disclosed and are contractually protected from disclosure even to Epic.

Before Midway entered into its particular and distinct license agreement with Epic, modifications to UE3 were anticipated by Midway based on its independent analysis of UE3, the

1

then uncertain state of the final iteration of certain unreleased next generation video game hardware, and the types of video games Midway intended to make using Epic's software.

Silicon Knights has identified three categories of information requested in its modified subpoena. Midway does not have any information responsive to the first two of the three categories requested in Silicon Knights' modification to its subpoena.

Those categories are:

(1) Communications relating to the interpretation of the term 'Enhancements' in the Epic license agreement;

(2) Documents relating to complaints about the performance of the Unreal Engine 3; and

(3) The final, executed license agreement between Epic and Midway (or the Midway Home Entertainment division), including all amendments, revisions, terminations and/or contracts.

The information requested in the third category consists of trade secrets and protected confidential business information for which Silicon Knights cannot show the "substantial need" required by Federal Rule of Civil Procedure 45(c).

**Background Facts**

**I.    The parties.**

Midway is a publicly traded company that is a leading developer and publisher of video games for use on major video game platforms, such as Microsoft's Xbox 360, Nintendo's Wii and Nintendo DS and Sony's PlayStation 3 and PlayStation Portable. (Affidavit of Michael Weilbacher ("Weilbacher Aff."), attached as Exhibit A, ¶ 4.) Midway has developed best-selling video games including the *Mortal Kombat* series. (*Id.*, ¶ 5.) Silicon Knights is a developer and publisher of video games for use on major video game platforms and is a direct competitor to Midway. (Silicon Knights Complaint ("Compl."), attached as Exhibit B, ¶¶ 41-45; Weilbacher Aff., ¶ 6.)

Epic is also a developer and publisher of video games for use on major video game platforms. (Compl., ¶¶ 35-38 & 40.) In addition to developing video games, Epic develops video game engines. (Compl., ¶¶ 36, 38 & 40.) A video game engine is a reusable software platform that provides the core elements (*e.g.*, sound, animation, background artwork, etc.) needed to develop video games. (Compl., ¶¶ 30-33; Weilbacher Aff. ¶¶ 8-9.) Epic's latest video game engine is called Unreal Engine 3 ("UE3"). (Compl., ¶ 40.)

In January 2005, Midway Home Entertainment Inc., which is a subsidiary of Midway, entered into an Unreal Engine 3 License Agreement (the "License Agreement") with Epic related to Midway's use of UE3. (Weilbacher Aff, ¶ 10.) In May 2005, Silicon Knights entered into an unrelated and separate license agreement with Epic to use UE3. (Compl., ¶ 5.) The terms of the License Agreement entered into by Midway are materially different than the terms of the license agreement entered into by Silicon Knights. (Letter from Daniel Konieczny to Gerald O. Sweeney, Jr. dated March 3, 2008, attached as Exhibit C.)

**II.     Midway's development of popular video games using UE3.**

The video game industry is highly competitive. Midway's profit margins are partially dependent upon Midway's ability to timely produce and release new video games compatible with the rapidly changing hardware technology in the various video game platforms on which the games are played. Whether Midway can release new video games ahead of its competitors is a critical factor in its success. (Weilbacher Aff., ¶ 14.) In order to develop a video game utilizing a video game engine like UE3, Midway first evaluates whether it can achieve compatibility between the video game engine and the specific video game Midway intends to develop. (*Id.*, ¶ 12.) Achieving compatibility is a costly process that involves identifying potential compatibility issues, making adjustments to the video game engine's source code, integrating Midway's own

computer programs into the engine, and integrating computer programs developed by third-party middleware developers into the engine. (*Id.*, ¶ 13.)

The License Agreement refers to the term "Enhancements" and provides a definition for that term. (*Id.*, ¶ 35.) Midway has never been involved in a dispute with Epic regarding "Enhancements" that were made to UE3, nor has Midway communicated with Epic regarding the definition or interpretation of the term "Enhancements." (*Id.*, ¶ 37.) In fact, Midway has not disclosed the Enhancements it made to UE3 to Epic. (*Id.*, ¶ 36.)

Prior to entering into the License Agreement, Midway evaluated UE3 to determine whether Midway could achieve compatibility between UE3 and the specific video games Midway planned to develop. (*Id.*, ¶ 18.) One such compatibility issue Midway discovered was that UE3 was meant for the creation of multi-level games where a player cannot view or enter into sections of the video game world without advancing from one level to the next. (*Id.*) In contrast, Midway intended to develop open roaming games where a player is free to move around the entire video game world. (*Id.*) Midway's evaluation of UE3 did not reveal any issues related to UE3's performance. Midway did independently determine that UE3 would require some modifications to create compatibility with the specific types of games Midway intended to develop using UE3. (*Id.*) Prior to and at the time that Midway entered into the License Agreement, Midway anticipated, based on independent analysis and its particular and unique requirements, that it would need to make adjustments to UE3 and integrate Midway's source code, as well as the source code of third-party middleware developers, into UE3 in order to achieve compatibility between UE3 and the specific video games Midway intended to develop. (*Id.*, ¶ 19.)

Midway has expended tens of millions of dollars and employed approximately two-

hundred twenty-five (225) engineers to develop video games using UE3.  (*Id.*, ¶ 22.)  Popular video games Midway developed utilizing UE3 include *Stranglehold* and *Blacksite Area 51*.  (*Id.*, ¶ 23.)  A substantial amount of the time and money Midway expended to develop games utilizing UE3 was directed specifically toward evaluating UE3's potential compatibility with Midway's specific video games and achieving compatibility between UE3 and Midway's specific video games.  (*Id.*, ¶ 29.)  During Midway's development of video games using UE3, Midway did not encounter problems or have any complaints specific to UE3 that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games and unique applications.  (*Id.*, ¶ 24.)

The information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and Midway's specific video games is extremely valuable to Midway.  (*Id.*, ¶ 30.)  As a result, throughout Midway's use of UE3, Midway has undertaken substantial efforts to ensure that this information remains confidential.  (*Id.*, ¶¶ 31-34.)

Midway requires all of its employees to sign confidentiality agreements and only permits a limited number of employees that are integral to the development of Midway's video games to access information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and Midway's games.  (*Id.*, ¶ 31 & 33).  Subject only to signed confidentiality agreements and on an "as needed" basis, a limited number of third parties, such as middleware providers, have been permitted access for the limited purpose of assisting Midway in its evaluation of UE3's compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and its games. (*Id.*, ¶ 34.)

### III. Silicon Knights' lawsuit against Epic and Silicon Knights' subpoena for Midway's trade secrets and confidential information.

On November 13, 2007, Silicon Knights filed a twelve count[1] complaint against Epic in the United States District Court of the Eastern District of North Carolina, claiming that Epic violated its licensing agreement with Silicon Knights by failing to provide a working game engine, which allegedly caused Silicon Knights to experience losses and ultimately forced Silicon Knights to spend time and resources building its own game engine to develop its video games. (Compl. at 1.) Midway is not a party to the underlying lawsuit between Silicon Knights and Epic.

On January 16, 2008, Silicon Knights served Midway with a subpoena requesting documents that contain trade secrets related to Midway's use of UE3 to develop video games. Midway's counsel advised Silicon Knights' counsel that Midway would not produce the documents because they contained Midway's confidential information and trade secrets. Silicon Knights insisted that Midway produce documents in response to the subpoena and Midway moved to quash the subpoena.

During a hearing before this Court on March 6, 2008, Silicon Knights indicated that it modified the subpoena as a result of Midway's Motion to Quash. This Court entered a briefing schedule on Midway's Motion to Quash and ordered Silicon Knights' counsel to send a letter to Midway's counsel indicating how exactly Silicon Knights modified the subpoena. After the hearing, Silicon Knights' counsel advised Midway's counsel that Silicon Knights has modified the subpoena to request the following three categories of documents:

---

[1] Silicon Knights' complaint alleges the following claims for relief: (1) Fraud; (2) Negligent Misrepresentation; (3) Intentional Interference with Contractual Relations; (4) Intentional Interference with Prospective Economic Advantage; (5) Breach of Warranty; (6) Violation of North Carolina's Unfair and Deceptive Trade Practices Act; (7) Common Law Unfair Competition; (8) Unjust Enrichment; (9) Rescission or Reformation of Alleged Contract; (10) Breach of Contract; (11) Statutory Breach of Contract; and (12) Declaratory Relief.

6

>   (1) Communications relating to the interpretation of the term 'Enhancements' in the Epic license agreement;
>
>   (2) Documents relating to complaints about the performance of the Unreal Engine 3; and
>
>   (3) The final, executed license agreement between Epic and Midway (or the Midway Home Entertainment division), including all amendments, revisions, terminations and/or contracts. (*See* Exhibits C & D.)

In the underlying action, Silicon Knights served Epic with similar discovery, which requests Epic to produce: (1) "Any and all correspondence, memoranda, emails and/or other documents referring or relating to any License Agreement entered into between Epic and Midway Games Inc.;" (2) "All documents relating to all "Enhancements" -- as that term is used in the license agreement for any and all of the Unreal Engines -- of the Unreal Engines by any licensees of the Unreal Engines;" (3) "Any and all License Agreements entered into between Epic and Midway Games Inc." (*See* Request Nos. 25, 26 & 134 to Silicon Knights' Third Request for Production of Documents and Things to Defendant Epic Games, attached as Exhibit E). Epic objected to producing the documents and information requested and Silicon Knights filed a motion to compel. (Exhibits F & G.) Silicon Knights' motion to compel, which also concerns issues regarding whether Silicon Knights' discovery is relevant and proper, is now fully briefed in the underlying action in the forum court. (*Id.*)

**Argument**

**I.      Midway does not have any documents responsive to the first two categories of Silicon Knights' modified subpoena.**

The first two categories of Silicon Knights' modified subpoena ask Midway to produce (1) "Communications relating to the interpretation of the term 'Enhancements' in the Epic license agreement" and (2) "Documents relating to complaints about the performance of the Unreal Engine 3." Midway does not have any documents responsive to these two categories of

7

documents.

With respect to the first category (communications relating to the interpretation of the term "Enhancements" in the License Agreement) Midway has never communicated with Epic regarding the definition or interpretation of the term "Enhancements." (Weilbacher Aff., ¶ 37.) Indeed, Midway has never even divulged any of the Enhancements it made to UE3 to Epic. (*Id.*, 36.)

With respect to the second category (documents relating to complaints about UE3's performance), Silicon Knights specifically "exclude[s] documents or portions of documents that contain technical information regarding any actual enhancements that Midway has made with respect to [UE3]" and "documents discussing what Midway did to fix the problems it found with the engine, or the way that Midway developed around the problems with the Unreal Engine for its particular game." (Exhibits C & H.) Midway does not have any documents responsive to the second category of the modified request. (Weilbacher Aff., ¶¶ 24-25, 27-28.)

**II.     Regardless of how Silicon Knights phrases their document requests, any documents related to Midway's use of UE3, Midway's negotiations with Epic, and the License Agreement contain confidential information and trade secrets that Midway should not be forced to disclose to a direct competitor.**

This Court has the power to quash a subpoena if it requires "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(3)(B)(i). When a subpoena requests confidential information or trade secrets, the burden is on the party seeking the discovery to show a "**substantial need** for the testimony or material that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(3)(C)(i) (emphasis added). To meet this burden, the party seeking discovery must "establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *Concord Boat Corp. v. Brunswick Corp.*,

8

No. 96 C 6026, 1996 WL 705260, *2 (N.D. Ill. Dec. 4, 1996) (quotations omitted);[2] *see also Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 138 F.R.D. 530, 534 (C.D. Ill. 1991). In applying this balancing test, courts consider a number of factors, including: "the relevance of the requested information to the underlying litigation, the party seeking discovery's need for the information, whether the requests are burdensome, the fact that the party from whom discovery is being requested is a non-party to the underlying case, and the fact that the disclosure would be made to competitors." *Concord Boat*, 1996 WL 705260 at *3. "Even if the information is relevant, discovery is not allowed if the person seeking discovery fails to show their need for the information, or compliance with the request is unduly burdensome, or where the harm of disclosure outweighs the need of the person seeking discovery of the information." *Greater Rockford Energy*, 138 F.R.D. at 534. Silicon Knights cannot show a "substantial need" for Midway's confidential and trade secret documents and Silicon Knights' subpoena should be quashed.

      **A.    Documents relating to Midway's use of UE3 and Midway's business dealings with Epic contain Midway's trade secrets and confidential information.**

When deciding whether proprietary business information requires protection as a trade secret for purposes of the Federal Rules of Civil Procedure, courts often look to Restatement of Torts § 757 for guidance. *Andrew Corp. v. Rossi*, 180 F.R.D. 338, 341 (N.D. Ill. 1998). Section 757 provides:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which give him an opportunity to obtain an advantage over competitors who do not know or use it.

*Id.* (*quoting* Restatement of Torts § 757 (1939)). Factors to consider in determining whether information is of this character include: (1) the extent to which it is known outside the business;

---

[2] Copies of unpublished cases are attached as Exhibit I.

(2) the extent to which it is known by employees and others involved in the business; (3) the measures taken to guard the information's secrecy; (4) the value of the information to the business or its competitors; (5) the amount of time, money, and effort expended in the development of the information; and (6) the ease or difficulty of duplicating or properly acquiring the information. *Id.* The documents Silicon Knights seeks fall squarely within the Restatement's definition and are, therefore, protected trade secrets that Midway should not be forced to produce to a direct competitor.

The only documents Midway has regarding UE3 relate to UE3's compatibility with Midway's specific games. (Weilbacher Aff., ¶¶ 24-25, 27-28.) Midway expended a substantial amount of time and money to develop the information contained in these documents. (*Id.*, ¶¶ 13, 22, & 29.) The information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and Midway's specific video games is extremely valuable to Midway. (*Id.*, ¶ 30.) The information would also be valuable to its competitors like Silicon Knights, which completely failed to achieve compatibility between UE3 and the video games it was developing and was allegedly forced to build its own game engine. Midway has consciously undertaken those specific and significant efforts necessary to ensure that the trade secret information related to its use of UE3 in the creation, development and publication of its games remains confidential and protected under the law as trade secrets. (Weilbacher Aff., ¶¶ 31-34.)

Similarly, documents related to Midway's negotiations with Epic regarding the License Agreement and the License Agreement itself contain Midway's trade secrets as well as confidential business information. *Everco Indus. v. O.E.M. Prods. Co.*, 362 F. Supp. 204, 206 (N.D. Ill. 1973) (holding that "Defendant's request for *carte blanche* production of all contracts

and communications between Plaintiff and certain other companies is not a properly defined request for production given the potentially confidential nature of many of the documents"). For example, the License Agreement refers to technical features that Midway required Epic to create specifically for the unique games that Midway planned to develop using UE3. (Weilbacher Aff., ¶ 20.) Midway specifically included provisions regarding these specific technical requirements based on Midway's independent evaluation of UE3 and Midway's determination that UE3 would require some modifications to create compatibility with the specific types of games Midway intended to develop using UE3. (*Id.*) In addition, Midway negotiated specific terms in the License Agreement that are related to Midway's unique business plans for the use of UE3. (*Id.*, ¶ 11.) In order to protect this information, the License Agreement contains a confidentiality provision. (*Id.*, ¶ 26.) While Midway was required to include a copy of the License Agreement with its Form 10-Q filing, Midway purposely filed a redacted copy to ensure that its confidential information and trade secrets did not become public. (*Id.*) In addition, Midway's policies prohibit its employees from disclosing information concerning Midway's business affairs, such as its confidential business dealings with Epic. (Ex. 2 to Weilbacher Aff.)

Because the only documents Midway has regarding UE3 consist of trade secrets and confidential business information, Silicon Knights must prove "**substantial need**" for the documents. Fed. R. Civ. P. 45(3)(C)(i) (emphasis added).

### B. The documents sought are not relevant or necessary to the underlying litigation.

Silicon Knights cannot carry its burden of proving "substantial need" because Silicon Knights cannot show that Midway's documents are relevant and necessary to its lawsuit against Epic.

Silicon Knights claims that documents "describing the problems that Midway had with

[UE3] and the complaints that Midway made regarding [UE3]" are relevant because, according to Silicon Knights, Epic is "alleging that other game developers and publishers, including Midway, have used [UE3] successfully and that the problems that Silicon Knights experienced therefore must be due to Silicon Knights and not [UE3]." (Exhibit C.)  Silicon Knights cites to no pleading in the underlying action wherein Epic makes such an argument, and a review of Epic's answer and counterclaim in the underlying action shows that Epic has made no such argument.

Even assuming *arguendo* that Epic made such an argument, the documents Midway has are irrelevant because they concern issues related to UE3's compatibility with Midway's specific games and do not concern issues related to UE3's performance that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games. (Weilbacher Aff., ¶¶ 24-25 & 27-28.)  Because Midway and Silicon Knights developed different games, any technical issues Midway may have encountered are irrelevant to any problems Silicon Knights may have experienced with UE3.  *See Greater Rockford Energy*, 138 F.R.D. at 537 (holding that "the Court will not compel ADM to answer these particular requests, so that Defendants can compare 'apples and oranges'").

Silicon Knights also claims that documents concerning Midway's License Agreement and the interpretation of the word "Enhancement" are somehow relevant because, according to Silicon Knights, "Epic is making the claim that the course of dealing with its licensees and the industry-wide understanding of the term is different from the understanding Silicon Knights has" and "Epic has alleged that Silicon Knights' license agreement should be interpreted based on Epic's course of dealing with all of its licensees and based on the industry-wide understanding of the terms in other licenses." (Exhibit C.)  Again, Silicon Knights cites to no pleading wherein

12

Epic makes such claims, and a review of Epic's answer and counterclaim in the underlying action shows that Epic has made no such claims.

Moreover, even assuming *arguendo* that Epic did make such a claim in the underlying action, Midway's interpretation of the term "Enhancements" as used in its license agreement with Epic is completely irrelevant to the interpretation of the term "Enhancements" as used in Silicon Knights' license agreement with Epic. Indeed, Silicon Knights concedes that the definition of "Enhancements" in Midway's contract with Epic "differs from the language of Silicon Knights' license agreement." (Exhibit C.) Once again, Midway should not be compelled to produce this confidential business information so that Silicon Knights can compare apples and oranges. *Greater Rockford Energy*, 138 F.R.D. at 537; s*ee also West v. Miller*, No. 05 C 4977, 2007 U.S. Dist. LEXIS 11360, *2 & *4 (N.D. Ill. Feb. 13, 2007) (denying motion to compel "all documents related to any recording agreements or music production agreements" because "[t]he only contract relevant to defendants' counterclaim is the purported agreement between plaintiff and defendants in 1995" and "agreements executed by plaintiff over the last five years would not be relevant to the instant matter").

Finally, evidence regarding any problems concerning UE3, as well as the industry-wide understanding of the term "Enhancements" and other contract terms, can and should be shown through expert testimony, not the trade secrets of Silicon Knights' competitors. *See Builders Assoc. of Greater Chicago v. City of Chicago*, No. 96 C 1122, 2001 WL 1002480, *7 n. 5 (N.D. Ill. Aug. 30, 2001) (holding that "this Court is reluctant to use the judicial power to compel non-parties to provide their sensitive business records to create data for a party's expert witness"); *Nat'l Claims Management Corp. v. Mercedes-Benz of North Am., Inc.*, No. 97 C 6293, 1998 WL 27136, *1 (N.D. Ill. Jan. 15, 1998) (granting a motion to quash because "Mercedes has failed to

show that it could not develop the same information through expert testimony or otherwise"). Thus, the documents sought by Silicon Knights are not necessary to Silicon Knights' defense and prosecution of the lawsuit involving Epic.

> **C.     The harm to Midway from disclosing its trade secrets outweighs Silicon Knights' purported need for the documents.**

Midway's motion to quash should be granted for the separate and independent reason that the harm that Midway will suffer from disclosing its trade secrets and confidential information to its competitor outweighs Silicon Knights' need for the documents. *Greater Rockford*, 138 F.R.D. at 534 (holding that "[e]ven if the information is relevant, discovery is not allowed . . . where the harm of disclosure outweighs the need of the person seeking discovery of the information").

Midway is not a party to the underlying litigation, but rather is a direct competitor to Silicon Knights. *Concord Boat*, 1996 WL 705260 at *3. Compelling Midway to produce documents containing confidential information to a direct competitor will cause Midway great harm. *Greater Rockford Energy*, 138 F.R.D. at 536 (denying a motion to compel production of confidential information to a competitor and holding that "[c]ourts have presumed that disclosure of sensitive information to competitors is more harmful than disclosure to a noncompetitor"); *Everco Indus.*, 362 F. Supp. at 206 (noting that "[b]y the very nature of the parties' business relationships, there are certain documents which are confidential and should not be disclosed without sufficient cause"). Midway expended a substantial amount of time and money to develop the information related to UE3's compatibility with Midway's games. (Weilbacher Aff., 22 & 29-30.) This information gives Midway a competitive advantage in the video game industry over its competitors. (*Id.*, ¶¶ 14-15.) Forcing Midway to provide this information to a direct and ineffective competitor like Silicon Knights, which apparently never determined how to

achieve compatibility between UE3 and its own games, will seriously jeopardize Midway's ability to compete in the video game market and give Silicon Knights an undeserved advantage in the video game market. *See, e.g., Culinary Foods, Inc. v. Raychem*, 151 F.R.D. 297, 305 (N.D. Ill. 1993) (noting that "[s]hould Raychem's competitors obtain the information concerning the product design modification and changes, Raychem would lose its competitive advantage it has obtained from this information"); *Greater Rockford Energy*, 138 F.R.D. at 536-37 (holding that "Defendants, as competitors, could easily gain financial advantage over ADM and erode ADM's negotiating power by discovering ADM's cost production for ethanol").

## Conclusion

For the foregoing reasons, Midway should not be compelled to disclose its trade secrets and confidential business information to its direct competitor, Silicon Knights. Accordingly, Midway's Motion to Quash should be granted.

Respectfully submitted,

Dated:  March 21, 2008                **MIDWAY GAMES INC.**

By: s/ Gerald O. Sweeney, Jr.
One of Its Attorneys

Gerald O. Sweeney, Jr.
**Barnes & Thornburg LLP**
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
(312) 357-1313

**CERTIFICATE OF SERVICE**

I, Gerald O. Sweeney, Jr., an attorney, certify that a copy of the foregoing *Midway Games Inc.'s Memorandum in Support of Its Motion to Quash Subpoena* was served on the following attorneys of record via the Court's CM/ECF system on this 21st day of March 2008:

**Daniel I. Konieczny**
Tabet DiVito & Rothstein, LLC
209 South LaSalle Street
Seventh Floor
Chicago, IL 60604
(312) 762-9450
Email: dkonieczny@tdrlawfirm.com

**Timothy A. Hudson**
Tabet DiVito & Rothstein, LLC
209 South LaSalle Street
Seventh Floor
Chicago, IL 60604
(312) 762-9450
Email: thudson@tdrlawfirm.com

By: s/ Gerald O. Sweeney, Jr.
One of Its Attorneys

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SILICON KNIGHTS, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 08 C 782 |
| ) | Judge Gettleman |
| vs. ) | Magistrate Judge Schenkier |
| ) | |
| EPIC GAMES, INC., ) | Case No. 5-07-00275-D |
| ) | (Eastern District of North Carolina, |
| Defendant. ) | Western Division) |

## EXHIBIT INDEX

A. Affidavit of Michael Weilbacher

  1. Inventions, Intellectual Material, and Confidentiality Agreement for Midway Employees

  2. Midway Policies Regarding Trade Secrets and Confidential and Proprietary Information

B. Silicon Knights' Complaint

C. Letter from Daniel I. Konieczny to Gerald O. Sweeney, Jr. dated March 3, 2008

D. Letter from Daniel I. Konieczny to Gerald O. Sweeney, Jr. dated March 6, 2008

E. Plaintiff Silicon Knights, Inc.'s Third Request for Production of Documents and Things to Defendant Epic Games, Inc.

F. Plaintiff Silicon Knights, Inc.'s Motion to Compel Further Responses to Second Set of Requests for Production of Documents and Second Set of Interrogatories

G. Defendant Epic Games Inc.'s Memorandum in Opposition to Silicon Knights' Motion to Compel

H. Email dated February 7, 2008 from Anjali Kurani to Gerald Sweeney

I. Unreported Cases Cited in Midway Games Inc.'s Memorandum in Support of Its Motion to Quash

CHDS01 BRAGO 454497v3