**EXHIBIT  A**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SILICON KNIGHTS, INC., )<br><br>Plaintiff, )<br><br>vs. )<br><br>EPIC GAMES, INC., )<br><br>Defendant. ) | Case No. 08 C 782<br>Judge Gettleman<br>Magistrate Judge Schenkier<br><br>Related to Case No. 5-07-00275-D<br>(Eastern District of North Carolina,<br>Western Division) |

### AFFIDAVIT OF MICHAEL WEILBACHER

1.      I have personal knowledge of the facts set forth in this affidavit and can testify to them if called upon to do so.

2.      I am currently a Vice President and the Chief Technology Officer of Midway Amusement Games, LLC ("Midway"). I have been the Chief Technology Officer since October 2006.

3.      I began my employment at Midway in July 2002 as the Engineering Director of Sports. In February 2005, I became the Studio Technical Director, which is the position I held until I became the Chief Technology Officer. In that capacity, I am the technical leader for all studios within the corporate family.

4.      Midway is a subsidiary of Midway Games Inc., a publicly traded company that is a leading developer and publisher of video games for use on major video game platforms, such as Microsoft's Xbox 360, Nintendo's Wii and Nintendo DS and Sony's PlayStation 3 and PlayStation Portable.

5.      Midway has developed best-selling video games including the *Mortal Kombat* series.

6.      Silicon Knights, Inc. is also a developer of video games and is a direct competitor

of Midway.

7.    As Chief Technology Officer, I oversee the development of Midway's video games. My job responsibilities as Chief Technology Officer include evaluating and examining video game engines and other types of middleware created by third-parties for the purpose of ensuring that Midway can achieve compatibility between the middleware and the specific video games Midway's programmers are developing.

8.    Middleware is a software program that includes one or more of the elements (*e.g.*, sound, animation, background artwork, etc.) that a video game developer may need to build a video game.

9.    A video game engine is a type of middleware that provides most or all of the core elements needed to develop a basic video game.

10.    On or about January 14, 2005, Midway Home Entertainment Inc., which is a sister company of Midway, entered into an Unreal Engine 3 License Agreement ("License Agreement") with Epic Games, Inc. ("Epic") related to Midway's use of a video game engine called "Unreal Engine 3" ("UE3").

11.    The License Agreement contains specific terms that are related to Midway's unique business plans for the use of UE3, as well as descriptions of technical features unique to the development of Midway's specific video games.

12.    In order to develop a video game utilizing a video game engine like UE3, Midway first evaluates whether it can make the video game engine compatible with the specific video game Midway intends to develop.

13.    Achieving compatibility between a video game engine and the specific video games Midway develops is a costly process that involves identifying potential compatibility

issues, making adjustments to the video game engine's source code, integrating Midway's own source code into the engine and game, and integrating source code of third-party middleware developers into the engine and game.

14.    The video game industry is highly competitive and Midway's corporate family's profit margins are often dependent upon the speed by which it can release new video games to keep up with the rapidly changing technology for the various video game platforms and whether it can release new video games ahead of its competitors.

15.    The faster the Midway corporate family achieves compatibility between a video game engine and its specific video games, the more likely it will be able to release games ahead of its competitors.

16.    At the time that Midway Home Entertainment Inc. entered into the Licensing Agreement with Epic, Midway knew that Epic developed the software necessary for UE3 to run on a personal computer but that Epic had not developed the software necessary for UE3 to run on the production models of certain video game platforms, such as PlayStation 3 and Xbox 360, which had not been released at that time.

17.    Prior to entering into the License Agreement, Midway anticipated that Midway would need to create the software programs necessary for the games Midway planned to develop using UE3 to run on the production models of PlayStation 3 and Xbox 360.

18.    Prior to entering into the License Agreement with Epic, Midway Home Entertainment Inc. evaluated UE3 using a personal computer. I was personally involved in this evaluation of UE3. Midway Home Entertainment Inc. conducted the evaluation of UE3 for the purpose of determining whether Midway could achieve compatibility between UE3 and the specific types of video games Midway planned to develop. This evaluation of UE3 did not

reveal any issues related to UE3's performance aside from compatibility issues concerning Midway's specific games.  For example, UE3 was meant to be used to develop multi-level games where a player cannot view or enter into sections of the video game world without advancing from one level to the next.  In contrast, Midway intended to develop open roaming games where a player is free to move around the entire video game world.

19.    Prior to entering into the License Agreement, Midway anticipated, based on its independent analysis and its particular and unique requirements, that it would need to make adjustments to UE3 and integrate Midway's own programs, as well as programs of third-party middleware developers, into UE3 in order to achieve compatibility between UE3 and the specific video games Midway intended to develop.

20.    The License Agreement required Epic to achieve certain milestones after the Agreement was executed with respect to Epic's continued development of UE3.  These milestones included creating software to allow UE3 to run on PlayStation 3 and Xbox 360.  The milestones also included several technical features that Midway required Epic to create specifically for the unique games and applications that Midway planned to develop using UE3.  Midway Home Entertainment Inc. included provisions in the License Agreement regarding these specific technical features based on its independent evaluation of UE3 and Midway's determination that UE3 would require some modifications to create compatibility with the specific games that Midway intended to develop using UE3.

21.    Midway evaluated each milestone when it was completed by Epic.  I was personally involved in Midway's evaluation of the milestones.  Midway conducted the evaluation of the milestones using a version of UE3 that Midway had significantly modified with Midway's source code and the source code of third party middleware developers.  Midway did

not have any complaints regarding the performance of the milestones.

22.     Midway expended tens of millions of dollars and its corporate family employed as many as two-hundred twenty-five (225) engineers to develop video games using UE3. Midway has spent several years developing video games using UE3.

23.     Video games Midway and its sister companies developed utilizing UE3 include *Stranglehold* and *Blacksite Area 51*. Midway is currently developing several games using UE3.

24.     During Midway's development of video games using UE3, Midway did not encounter problems or have any complaints related to UE3 that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games and unique applications.

25.     Midway communicated with Epic regarding UE3 via an online message board called the Unreal Developers' Network. All licensees that were authorized by Epic to use UE3 had access to the Unreal Developers' Network, including Silicon Knights. Communications between Epic and Midway concerning UE3 that were not conducted via the Unreal Developers' Network only concerned issues related to UE3's compatibility with Midway's specific games and did not concern issues related to UE3's performance that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games.

26.     The License Agreement contains a nondisclosure clause prohibiting Epic from disclosing any of Midway's confidential or proprietary information to third parties. While Midway Games Inc. was required to include a copy of the License Agreement with its Form 10-Q filing, Midway Games Inc. purposely filed a redacted copy to ensure that confidential information and trade secrets that are contained in the License Agreement did not become public.

27.     Midway's programmers communicated amongst themselves concerning UE3's

compatibility with Midway's specific games through in person communications, e-mail, and an internal electronic message board. All of these communications were directly related to Midway achieving compatibility between Midway's specific games and UE3. These communications did not concern issues related to UE3's performance that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games.

28.    Midway also communicated with third-party middleware providers regarding UE3, but these communications were limited to issues concerning UE3's compatibility with the specific games Midway was developing. These communications did not concern issues related to UE3's performance that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games.

29.    A substantial amount of the time and money Midway expended to develop games utilizing UE3 was directed specifically toward evaluating UE3's potential compatibility with Midway's specific video games and achieving compatibility between UE3 and Midway's specific video games.

30.    The information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and Midway's specific video games is extremely valuable to Midway.

31.    Throughout Midway's use of UE3, Midway has undertaken efforts to ensure this information remains confidential by requiring all of its employees to sign confidentiality agreements and conflict of interest forms. A copy of the confidentiality agreement required for Midway employees is attached as Exhibit 1.

32.    Throughout Midway's use of UE3, Midway had, and continues to have, policies prohibiting its employees from disclosing Midway's trade secrets and confidential and

proprietary information, such as the information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games, Midway's efforts to achieve compatibility between UE3 and Midway's specific video games, and Midway's confidential business dealings with third-parties such as Epic. Copies of these policies are attached as Exhibit 2.

33.     Midway permits only a limited number of employees, who are integral to the development of Midway's video games, to access information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and Midway's games.

34.     Subject only to signed confidentiality agreements and on an "as needed" basis, Midway has allowed a limited number of third parties, such as middleware providers, to have limited access to information related to Midway's evaluation of UE3's potential compatibility with Midway's specific video games and Midway's efforts to achieve compatibility between UE3 and Midway's games. Midway has not granted any third parties access to this information unless they have executed a confidentiality agreement.

35.     The License Agreement refers to the term "Enhancements" and provides a definition for that term.

36.     Midway has not divulged the Enhancements it made to UE3 to Epic, and Midway has never been involved in a dispute with Epic regarding Enhancements that were made to UE3.

37.     Midway has not communicated with Epic regarding the definition or interpretation of the term "Enhancement" since Midway Entertainment Inc. executed the License Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 21, 2008.

Michael Weilbacher

CHDS01 BRAGO 454956v1

**EXHIBIT   1**

[Employee Form 12/27/04]
One copy for Human Resources
One copy for Legal Department
One copy for Employee

Name _____

Date _____

## INVENTIONS, INTELLECTUAL MATERIAL
## AND CONFIDENTIALITY AGREEMENT

I am an employee of the Company checked on Exhibit A and I work in the Department checked on Exhibit B or one of its subsidiaries or affiliated companies (hereinafter collectively referred to as the "Company"). I acknowledge that as a result of such employment I may have the opportunity to become familiar with Inventions and Trade Secret Materials (each defined below) or other confidential information relating to the Company's business, products or equipment. I also acknowledge that as a result of such employment I may have the opportunity to develop or create certain "Intellectual Material," as defined below, which, because of the nature of the Company's business, the Company shall own and control.

Therefore, in consideration of my employment or continued employment by the Company and of the payment of my salary during such employment, I understand and agree to the following:

(A)    I agree to disclose to the Company promptly and fully all ideas, inventions, discoveries, developments or improvements (hereinafter called "Inventions") that may be made or conceived by me (whether made solely by me or jointly with others) either during the term of my employment or during a period of one (1) year after its termination which either (i) in any way are connected with or related to the actual or contemplated business, work, research, or undertakings of the Company, or (ii) result from or are suggested by any task, project, or work that I may do for, in connection with, or on behalf of the Company.

(B)    I agree to assist the Company and its nominees during and subsequent to such employment in every proper way (entirely at its or their expense) to obtain for its or their own benefit patents or copyrights for any or all such Inventions and full title to such patents and Inventions in any and all countries, including the execution of all related documents presented to me by the Company or its nominees, said patents and Inventions, whether patented or not, to be and remain the sole and exclusive property of the Company or its nominees.

(C)    I hereby assign and transfer to the Company, all my rights, title and interest in and to all such Inventions and to any letters patent or applications which may be filed hereon.

(D)    I agree to make and maintain adequate and current written records of all Inventions, in the form of notes, including photographs, sketches and drawings where appropriate, or reports relating thereto, and to disclose these records promptly and fully to the Company, in such manner or manners as may from time to time be designated by the Company. All such Inventions and records shall be the property of the Company, whether patentable or

9507443                                      -1-

not, and whether conceived of during regular business hours or otherwise.

(E)  I agree not to use or disclose at any time (except as my Company duties may require or except as the Company may otherwise consent in writing) either during or subsequent to my employment, any matter or thing whatever, whether or not recorded on any medium, by which the Company derives actual or potential economic value from such matter or thing being not generally known to other persons or entities who might obtain economic value from its disclosure or use, or which gives the Company an opportunity to obtain an advantage over its competitors who do not know or use the same, to which I may have access during the course of my employment, including without limitation, the Company's customer lists, price data and other non-public financial information, identity of and other information concerning suppliers, costs, abilities and specialized training or experience of other employees of the Company and other employee relations matters, manner of operations, ideas, formulas, business processes, methods, machines, hardware, software, inventions, designs, drawings, artworks, blueprints, specifications, tools, plans and processes, including, without limitation, all Inventions (hereinafter called "Trade Secret Information"), nor will I retain after termination of my employment with the Company, any of such Trade Secret Information in whatever medium of form except with the prior written consent of an authorized Company official.

(F)  I agree to notify the Company in writing before I make any disclosure or perform or cause to be performed any work for or on behalf of the Company, when such disclosure or work conflicts with (i) rights I claim in any Inventions which were conceived by me or others prior to my employment or otherwise outside the scope of this Agreement, or (ii) rights of others arising out of obligations incurred by me prior to this Agreement or which are otherwise outside the scope of this Agreement.  In the event of my failure to give notice under the circumstances specified in part (i) of this paragraph (F), the Company may assume that no such conflicting rights or claims exist and that I will make no claim against the Company with respect to the use of any such inventions or ideas in any work or the product of any work which I perform or cause to be performed for or on behalf of the Company.

(G)  I understand and acknowledge that all "Intellectual Material" created or developed by me during the course of my employment with the Company is "work made for hire" as that term is defined by the copyright laws of the United States and as such the Company shall be considered the author of such works and entitled to exploit such works as the Company deems fit.  In the event the "Intellectual Material" created or developed by me during the course of my employment with the company is deemed not to be a "work made for hire" or in the event I retain any rights in and to the "Intellectual Material," I hereby irrevocably assign to the Company all right, title and interest which I may have in the the to the "Intellectual Material." As used herein, "Intellectual Material" shall include, but shall not be limited to, ideas, titles, themes, production ideas, methods of presentation, artistic renderings, sketches, plots, music, lyrics, dialogue, phrases, slogans, catch words, characters, names and similar literary, dramatic and musical material, trade names, trademarks and service marks and all copyrightable expressions in audio and/or visual works, computer software, electronic circuitry and all mask works for integrated circuits.  I further agree to execute and deliver any documents which the Company deems desirable to evidence its ownership rights in and to such Intellectual Material throughout the world.

I acknowledge that the business of the Company includes research, development, manufacture and marketing throughout the world of video games, and that for the purposes of this Agreement, any video game on any platform whatsoever (whether home console system, handheld system, coin-operated system, personal computer, online service, or other product or service capable of supporting game play (regardless of whether game play is the primary function thereof), and whether now know or hereafter developed) shall be deemed to relate to the business of the Company and to the Company's actual or demonstrably anticipated research or development.

This agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on my own time, unless (a) the invention relates (i) to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the Company.

This Agreement and the Company's acceptance thereof shall not in any event be construed as a waiver by the Company of any shop right, implied license, or other rights of the Company resulting from my employment relationship or from the facts and circumstances of the making and development of any inventions but shall be deemed to confirm such rights and to enlarge the same as herein expressly provided.

If any provision of this Agreement or the application thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provision of this Agreement, or the application of such provision to other parties or circumstances.

This Agreement involves no obligation upon the Company to continue to employ me.

This Agreement may not be changed, modified, released, discharged, abandoned, or otherwise terminated, in whole or in part, except by an instrument in writing signed by an officer of the Company and by me.

This Agreement shall inure to the benefit of and be binding upon me, my heirs, executors, administrators, or other legal representatives or assigns and to the Company, its successors or assigns.

I represent that except as stated below, I have no agreements with or obligations to others with respect to the foregoing and no inventions relating to the business of the Company have been conceived by me prior to my employment with the Company, and that I have executed this Agreement with full cognizance of the contents and import hereof. The following are the only agreements or obligations to which I am a party which may be in conflict with obligations undertaken above.

If there are no such agreements or obligations, insert "None":

_____

_____

_____

Use the space below for reserved inventions made or conceived prior to employment and a brief description thereof. If there are no such inventions, insert "None".

_____

_____

_____

EMPLOYEE:


_____
Employee's Signature
(USE <u>INK</u> ONLY)


Revised 11/04

**Exhibit A**

Please check the Company for which you have been hired to work:

**Company**

____    Midway Amusement Games, LLC
____    Midway Games Inc. (f/k/a Midway Manufacturing Company)
____    Midway Games West Inc. ( f/k/a Atari Games Corporation)
____    Midway Home Entertainment Inc. (f/k/a Williams Entertainment Inc.)
____    Surreal Software Inc.
____    Midway Studios – Austin Inc. (f/k/a Inevitable Entertainment Inc.)
____    Midway Studios – Los Angeles Inc. (f/k/a Paradox Development)

**Exhibit B**

Please check the department for which you have been hired to work:

**Department**

  \_\_\_ Accounting
  \_\_\_ Business Development
  \_\_\_ Corporate
  \_\_\_ Creative Media
  \_\_\_ Creative Services
  \_\_\_ Customer Service
  \_\_\_ Facilities
  \_\_\_ Financial Planning
  \_\_\_ Human Resources
  \_\_\_ Information Technology
  \_\_\_ Legal
  \_\_\_ Licensing
  \_\_\_ Marketing
  \_\_\_ Product Development (internal)
  \_\_\_ Product Development (third party)
  \_\_\_ Public Relations
  \_\_\_ Purchasing
  \_\_\_ Quality Assurance
  \_\_\_ Sales
  \_\_\_ Strategic Planning
  \_\_\_ Warehouse

**NOTE:**  If you have any questions about which department or company you are employed by, please contact your supervisor, or the Human Resources Director for your facility.

**EXHIBIT  2**

## PART 3 - TRADE SECRET, CONFIDENTIAL AND PROPRIETARY INFORMATION

Employees shall hold in a fiduciary capacity for the benefit of the Company all information, knowledge and data relating to or concerned with its operations, sales, business and affairs, including information and knowledge with respect to all coin-operated and home video games developed or in any stage of development and the processes, formulas, machinery, plans, devices or materials of the Company. Employees shall not, at any time, use, disclose or divulge any such information, knowledge or data to any person, firm or corporation other than to the Company or its employees, except at such time as any such information and knowledge comes into the public domain through no fault of the employee or as may otherwise be required in connection with the fulfillment of employee's duties in the conduct of the business and affairs of the Company.

The Company operates in a highly competitive industry. New product ideas, marketing plans, manufacturing methods and other aspects of the Company's business that pass through your hands and across your desk or work station are protectable as patents, trade secrets or confidential information. The protection of our intangible assets, such as patents and trade secrets, is of major concern to the Company and is essential for the continued success of the Company.

For these reasons, every employee will be required to sign an agreement, as a condition of employment, promising that confidential information will not be disclosed to others or used by or on behalf of others. Additionally, by signing the agreement, you agree to certain limited restrictions with respect to your use or disclosure of the Company's confidential information to a future employer. Further, every employee will be required to sign an agreement assigning his or her rights to all inventions created on Company time or using Company facilities or information, as such form may be amended from time to time.

To ensure the security of our assets, Company records, files and confidential information should not be discussed outside of work or disclosed to anyone without a need to know. Confidential information at work, when not in use, must be secured in locked files and shredded at the time it is discarded. Confidential documents and information must never leave Company property, must always be stored in appropriate places and must be relinquished upon termination of employment.

*Employees are required to shred all waste paper containing any technical or commercial information before discarding it.*

10

## PART 9 - INFORMATION SERVICES USE POLICY

In an ongoing effort to provide the best resources available for support of company operations, the Company provides its employees with information services which include computer equipment, computer networks, Internet access, e-mail, telecommunications equipment, telecommunications service and voice mail (the "Services").

The Company provides the Services subject to the policies set forth below. The Company reserves the right to alter the Services or the policies governing use of the Services as may be required under the circumstances. The Services are provided at the discretion of the Company and may be altered, restricted or terminated at any time, with or without notice.

1. <u>Business Use</u>.  Employees shall use the Services for Company business. Employees recognize that they represent the Company in any use of the Services to contact a third party.  Accordingly, employees shall use the Services in a businesslike, courteous and civil manner which will not reflect negatively on the Company.  The Services are not to be employed for any non-Company purposes. However, employees may make occasional and incidental personal use of the Services which does not interfere with employees' obligations to the Company; provided, however, that the Company may limit or terminate such use at its sole discretion.  Employees recognize that the Services are a Company resource and shall not use the Services in any way which will disrupt or otherwise impact the Services.

2. <u>Waiver of Privacy</u>.  All Company equipment and services comprising the Services, including all information transmitted or stored by them, are the sole property of the Company.  Employees acknowledge and agree that they have no expectation of privacy with respect to any personal or business use of the services. The Company reserves the right to access, review and monitor employee use of the Services, including stored, transmitted and/or deleted data; and the Company may access, read and disclose to third parties any information transmitted or stored by the Services.

3. <u>Confidentiality; Company Resources</u>.  Employees shall use reasonable efforts to maintain the confidentiality of any information accessed in the course of their employment.  Employees shall not transmit any confidential information over the Services to any third party or to any other employee without the prior approval of the employee's manager.  Employees shall not use the Services to transmit or post any Company materials (e.g., information, animations, art files) on the Internet without the prior written approval of the employee's manager.

24

4. <u>Misuse of the Services</u>. Employees shall not use the Services in any way which is disruptive, offensive to others or inconsistent with the Company's interests. Employees are strictly prohibited from using the Services in a manner that is fraudulent, harassing, illegal, embarrassing, sexually oriented, sexually explicit, obscene, intimidating or defamatory. Employees may not use the Services for commercial or personal advertisements, solicitations, promotions, destructive programs (e.g., viruses and/or self-replicating code), political material or any other use that is not consistent with the Company's interests.

5. <u>Security</u>. Security on the Services is a high priority. Employees are responsible for maintaining the confidentiality of the Services, including but not limited to, maintaining the confidentiality of all passwords. Employees are to use the access controls and other security measures that the Company has provided and take prudent and reasonable steps to protect the Company's information systems. Employees shall not share their passwords with any third party and shall not attempt to access another employee's accounts on any of the Services without that employee's expressed permission. If an employee perceives a security problem, he/she must notify a the Company Information Services Department. Downloading a file via e-mail or from the Internet can bring viruses with it. Employees shall scan all downloaded files with corporate standard virus prevention software.

6. <u>Internet Access and E-Mail</u>. Employees recognize that the Internet is a worldwide network of computers containing millions of pages of information and many diverse points of view. The Company cannot control the availability of information on the Internet nor protect employees from potential access to it. Employees are personally responsible for the material they review and download from the Internet.

7. <u>Third Party Materials</u>. Almost all data and software is subject to copyright, trademark or other forms of intellectual property protection. Employees shall not use the Services to download or upload any pirated software or other third party materials in violation of license restrictions. Moreover, Employees may not incorporate any third party materials downloaded from the Internet into any company product, advertising material, etc. Use of any resources downloaded from the Internet or received via e-mail for any Company purpose must be pre-approved in writing by both the employee's manager and the Legal Department. Please note, this restriction applies even if the materials are designated "free", "shareware", or some other verbage which might lean an employee to believe he/shemay use the materials

8. <u>Enforcement</u>. Violation of the Company's Information Services Policy is grounds for disciplinary action, including termination of employment. The Company will investigate any alleged abuse or misuse of the Services. As part of that

25

investigation, the Company may access any of the information transmitted over or stored by the Services and may disclose such information to other employees, law enforcement authorities or in any judicial or quasi-judicial proceeding. An employee who encounters or knows of conduct that violates the policies and guidelines of the Company must promptly report such conduct to the Company Information Services Department.

9. <u>Additional Policies</u>. Additional policies and guidelines related to use of the Services are and will be available from Human Resources or in the "Public Folders" on Outlook. Moreover, the Company may issue additional or revised policies at its sole discretion. All of such policies and guidelines shall apply to employee use of the Services.

## 3004  Trade Secret, Confidential and Proprietary Information

Employees shall hold in a fiduciary capacity for the benefit of the Company all information, knowledge and data relating to or concerned with its operations, sales, business and affairs, including information and knowledge with respect to all amusement games and gaming devices developed or in any stage of development and the processes, formulas, machinery, plans, devices or materials of the Company and employees shall not, at any time, use, disclose or divulge any such information, knowledge or data to any person, firm or corporation other than to the Company or its employees, except at such time as any such information and knowledge comes into the public domain through no fault of the employee or as may otherwise be required in connection with the fulfillment of employee's duties in the conduct of the business and affairs of the Company.

The Company operates in a highly competitive industry.  New product ideas, marketing plans, manufacturing methods and other aspects of the Company's business that pass through your hands and across your desk or work station are protectable as patents, trade secrets or confidential information.  The protection of our intangible assets, such as patents and trade secrets, is of major concern to the Company and is essential for the continued success of the Company.

For these reasons, every employee will be required to sign an Inventions, Intellectual Material and Confidentiality Agreement, attached hereto as Appendix C, as a condition of employment, promising that confidential information will not be disclosed to others or used by or on behalf of others and assigning his or her rights to all inventions created on Company time or using Company facilities or information, as such form may be amended from time to time. Additionally, by signing the agreement, you agree to certain limited restrictions with respect to your use or disclosure of the Company's confidential information to a future employer.

To ensure the security of our assets, Company records, files and confidential information should not be discussed outside of work or disclosed to anyone without a need to know.  Confidential information at work, when not in use, must be secured in locked files and shredded at the time it is discarded.  Confidential documents and information must never leave Company property, must always be stored in appropriate places and must be relinquished upon termination of employment.

*Employees are required to shred all waste paper containing any technical or commercial information before discarding it.*