**EXHIBIT   B**

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No.: 07-00275

| | | |
|---|---|---|
| SILICON KNIGHTS, INC.,<br>an Ontario (Canada) Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| vs. | ) ) | |
| EPIC GAMES, INC.<br>a North Carolina company, | ) ) ) | |
| Defendant. | ) | |

## INTRODUCTION

This dispute arises out of misrepresentations by Defendant Epic Games, Inc. ("Epic") to

Plaintiff Silicon Knights, Inc. ("Silicon Knights"), which induced Silicon Knights to execute a

License Agreement with Epic for use of a piece of software, Unreal Engine 3 ("the Engine").

Relying on Epic's false and misleading statements, Silicon Knights attempted to use the Engine

to develop its video games for specific gaming "platforms." In addition, Epic violated the

Agreement with Silicon Knights by, among other things, failing to provide a working game

engine, which has caused Silicon Knights to experience considerable losses and ultimately has

forced Silicon Knights to spend its limited time and resources on building its own game engine

rather than in developing its video game. Upon information and belief, rather than provide

support to Silicon Knights and Epic's other many licensees of the Engine, Epic intentionally and

wrongfully has used the fees from those licenses to launch its own game to widespread

1

commercial success while simultaneously sabotaging efforts by Silicon Knights and others to develop their own video games.

## THE PARTIES

1.     Silicon Knights is an Ontario corporation, with its principal place of business at One St. Paul Street, Suite 800, St. Catharines, Ontario  L2R 7L2, Canada.

2.     Epic is a Maryland company, with its principal place business at 620 Crossroads Boulevard, Cary, North Carolina.

## JURISDICTION AND VENUE

3.     The amount in controversy exceeds $75,000.00 exclusive of interest and costs, and this action is between citizens of a State and citizens or subjects of a foreign state.

4.     This Court has jurisdiction over this action pursuant to several United States Code Sections, including at least 28 U.S.C. §§1332(a)(2)-(4), 1338(b), and 15 U.S.C. §1121. Venue is proper in this judicial District under 28 U.S.C. §1391.

## COMMON FACTUAL ALLEGATIONS

5.     On or about May 10, 2005 Silicon Knights and Epic executed a document entitled "License Agreement" (the "Agreement") whereby Epic purported to grant to Silicon Knights a non-exclusive license to use the Engine for development of Silicon Knights' video games for specific gaming "platforms."

6.     As set forth in the Agreement, in return for the use of the Engine, Silicon Knights agreed to: (1) use the Engine exclusively in Silicon Knights' games for the Xbox 360, Playstation 3 ("PS 3"), and personal computers ("PC"); (2) use its best efforts to "develop, market, and sublicense" games using the Engine; (3) pay a licensing fee for each videogame

US2000 10177182.1

developed using the Engine; (4) advertise each such game as "Powered by Unreal Engine" on packaging and within the game itself.

7.      In return, under the express terms of the Agreement, Epic was obliged to, among other things: (1) demonstrate the adequacy of the Engine on specific platforms within a specific timeframe; and (2) support, update, and enhance the Engine in a "commercially reasonable" fashion.

8.      As explained more fully below, prior to execution of the Agreement as well as concurrently with and following its execution, Epic made numerous oral, written, express, and/or implied, misrepresentations regarding the capabilities of the Engine, the ability of Epic to support the Engine as required by the Agreement, the ability of Epic to demonstrate the adequacy of the Engine on specific platforms within a specific timeframe, and Epic's dedication to such support.

9.      Silicon Knights reliance upon Epic's representations was reasonable for a number of reasons, and especially when considered in light of the fast-moving nature of software development and the development of video games in particular.

10.      Because Silicon Knights executed the Agreement as a direct result of Epic's material misrepresentations regarding the capabilities of the Engine, and Epic's ability and willingness to support the Engine, by this action Silicon Knights seeks, among other things, to have the Agreement rescinded, and/or deemed void and unenforceable, and have rescinded any and all obligation and duty by Silicon Knights to exclusively use the Engine. In addition, Silicon Knights seeks, among other things, damages for Epic's numerous breaches of its obligations under the Agreement.

US2000 10177182.1

11.    As one example of such a breach, Epic has failed to comply with Paragraph 5(a) of the Agreement, which sets forth Epic's express warranties as to the performance of the Engine. Subsection (iv) provides:

> Epic warrants that…it can demonstrate that the Licensed Technology (A) operates on the PC platform, (B) will operate on the Xbox 2 [since renamed the Xbox 360] within six (6) months following the release of a final development kit by Microsoft for the Xbox 2 platform; and (C) will operate on the Playstation 3 platform within six (6) months following the release of a final development kit by Sony for the Playstation 3 platform.

12.    The final development kit for the Xbox 360 was released in early September, 2005, such that Epic was obligated to release the functional Engine for that platform no later than March, 2006.  However, that deadline came and went without Epic providing Silicon Knights with a functional version of the Engine.  Indeed, it was not until much later (November, 2006, far too late for time and cost-sensitive projects like SK's videogames) that Epic ever provided anything resembling working Xbox 360 code to its licensees.  Even at that belated date, though, Epic did not provide any guidance to licensees in how to implement the code it finally released.  Further, even if licensees were somehow, on their own, able to utilize the released code, Epic said that such code would not be supported by Epic going forward, as described more fully below.

13.    More recently, Epic has breached its Agreement with Silicon Knights yet again by missing the six-month deadline for release of an Engine that works on the Playstation 3. Final development kits for that console were released in and around mid-August, 2006, making the functional Engine due to Silicon Knights in February, 2007.  Silicon Knights has received no such Engine from Epic.

4

14.    As explained more fully below, Epic has failed to support, update, and enhance the Engine in any commercially reasonable fashion, as required by the Agreement.

15.    Upon information and belief, Epic knew well before it signed the Agreement with Silicon Knights that it had no intention of meeting and would be unable to meet its obligations under the Agreement, including, but not limited to, Epic's obligations to support the license and meet the schedule that Epic warranted it would meet, despite Epic's representations that it was fully able to provide such support and meet the agreed-upon schedule.  Instead, upon information and belief, Epic chose to prioritize its own products, using the revenue from the sale of the Engine licenses to unsuspecting developers like Silicon Knights to fund the development of Epic's own games while it chose not to honor its obligations to provide the Engine in a manner which would allow Silicon Knights and other licensees to develop their own games.  To the extent that Epic's projects allowed or occasioned certain limited updates, patches, or fixes to the Engine, those improvements might or might not be passed down to Silicon Knights (and other licensees), as explained more fully below and as will be subject to proof at trial.

16.    In particular, at the same time that Epic was supposed to be supporting its many licenses to the Engine (Silicon Knights' among them) Epic was also racing to complete and market its own games: "*Unreal Tournament 2007*" and "*Gears of War*."  Upon information and belief, Epic lacked the means to accomplish both of those ends; it employs approximately 75 people, but during the relevant time frame for this action, those employees were and are spread between four significant tasks: (1) the development of next game in the Unreal series, Unreal Tournament 2007; (2) the development of Epic's new flagship game for the Xbox 360, *Gears of War*, which was recently released (near the end of 2006); (3) supporting the many licensees of

5

Unreal Engine 2, and the many games already on the market from those licensees; and, (4) supporting what appears to be an ever-increasing collection of licensees of the Engine (the newer one that Silicon Knights thought it would be getting via the Agreement). By contrast, Silicon Knights employs approximately 140 people involved solely in the development of its next two titles.

17.    Despite the lack of resources that Epic was willing or able to devote to the Engine, Epic, nonetheless, knowingly misrepresented to Silicon Knights that the Engine was then – and would continue to be – the optimal foundation upon which to build Silicon Knights' games going forward.    Silicon Knights relied directly upon those misrepresentations when it executed the Agreement, believing that licensing the Engine would not only enable Silicon Knights to use the software for its upcoming projects, but also would free limited resources for use in game design, game-play, artwork, storyline, and related facets of game development other than software coding.

18.    The support Epic had misrepresented it would provide Silicon Knights (including as reflected in the Agreement) became increasingly inconsistent as both Silicon Knights and Epic progressed toward the target launch date for their respective games.    Epic has attempted to avoid its obligations under the Agreement by representing to Silicon Knights that the support, modifications, or enhancements to the Engine – all of which are essential to the Engine's proper function – were "game specific" and not "engine level" adaptations, and that Epic therefore need not provide them to any of its licensees, including Silicon Knights.    That representation is false, as evidenced in part by the fact that Epic later provided nearly all the *Gears of War* code to all of its licensees, at no extra charge, in a belated effort at damage control.

19.    Epic's refusal to comply with its own representations, as well its obligations and warranties in the Agreement has significantly harmed Silicon Knights. Instead of the powerful and dynamic video game engine promised by Epic, Silicon Knights was saddled with a cumbersome and labor-intensive piece of software that consistently failed to meet the performance requirements of the gaming consoles for which it was intended (and which Epic expressly warranted to Silicon Knights in the Agreement it would meet).

20.    Meanwhile, Silicon Knights has faced pressure from its publishing partners to nonetheless move forward with development of its games, and with respect to one of those partners (Microsoft), to complete its game as early as possible in 2007 (a delay from the original 2006 launch date that was specifically occasioned by the failure of Epic and the Engine, as set forth herein).

21.    Epic's actions and the consequent increasing delay and cost of development of Silicon Knights' own game caused by the unworkable Engine forced Silicon Knights in May of 2006 to embark on the time and resource intensive task of writing its own game engine, the very task it had hoped to avoid be entering the Agreement with Epic. Separate and apart from any other damages suffered by Silicon Knights, that effort alone cost Silicon Knights millions of dollars in man-hours and potential profits.

**Relevant Background of the Video Game Industry in General**

22.    In 2005, the most recent year for which data is available, the worldwide market for videogames, computer games, and interactive entertainment hardware and software was approximately $27.1 billion. That figure is projected to increase by 11.4% ever year, reaching $46.5 billion in 2010. In the U.S. alone, sales of videogame hardware, software, and accessories

7

were $8.4 billion in 2005, and stand to increase by 8.9% annually to reach $13 billion in 2010.

***Financial Structure of the Industry***

23.    Videogames are played on a variety of hardware "platforms" or "consoles." Those platforms include the standard personal computer (or "PC"), as well as special hardware dedicated to videogames, such as the Sony's Playstation series, Microsoft's Xbox platform, and Nintendo's Gamecube.

24.    Developers and others in the industry often refer to "next generation" platforms/consoles, which currently include the Xbox 360, Sony Playstation 3, and Nintendo Wii. In particular, game developers such as Silicon Knights and Epic begin preparation of videogames targeted for those next generation platforms well in advance of the platforms' actual release dates to the public, hoping to introduce videogame products for them early enough in their release cycle before public interest begins to taper off in anticipation of yet another new generation of hardware platforms. On average, next generation platforms have historically been released approximately every four (4) to six (6) years.

25.    There are a variety of participants in the videogame industry, but the bulk of them can be divided between game developers, game publishers, and the specialized hardware manufacturers. Developers – typically smaller companies with as few as one or two employees up to two to three hundred – are the creative side of the industry, responsible for designing a videogame, providing its content, and coding its software for use on one or more of the available (or next generation) hardware platforms.

26.    Publishers, by contrast, tend to be larger companies – many of whom have familiar names like Atari, Electronic Arts, and Activision – that historically have invested

8

heavily in both in-house and external game development (i.e., financing of games developed by independent developers such as Silicon Knights) and then used their extensive distribution networks and corporate affiliations to bring the completed game to market. Today's videogame publishers also include nearly every major motion picture studio in Hollywood, who similarly use their distribution networks and expertise to produce and distribute the games made for various platforms. Many of the publishers (including some of the Hollywood studios) also add to the competition for videogame development by maintaining their own in-house staffs of game developers.

27.    The specialized hardware manufacturers (i.e., those who produce videogame specific platforms other than PCs) have historically been larger companies as well. Those specialized hardware manufacturers currently include the three major players referenced above: Microsoft, Sony, and Nintendo. As is the case with several of the larger videogame publishers, all three of the current hardware manufacturers also maintain their own in-house development staffs, including some previously independent outside developers that were acquired or "captured" by (i.e., entered exclusive development arrangements with) a particular hardware manufacturer.

28.    Developers who lack the resources to "self-publish" their videogames (i.e., those very few developers who do not have to rely on outside financial funding) generally partner with publishers via contracts called "development agreements," or (less frequently) directly with hardware manufacturers in what are known as "first party" development agreements. (The more standard publisher-developer contracts are also sometimes called "second party" development agreements, since the financing entity is not itself a hardware manufacturer.)

9

29.     The typical premise of such contracts (whether they involve first- or second-party financing) is that either the publisher or hardware manufacturer (whichever is involved) pays for the creation of the game by advancing a portion of the developer's royalties from the eventual sale of the game.  In order to exercise interim control over the development process and the cash outlay required for it, these contracts generally impose milestones on developers that must be met before the publisher releases additional funds.  In addition, in order to recoup its initial investment and insure a profit, the financing first- or second-party generally requires that a certain level of "payout" or "payback" occur before any royalties are received by the developer. Therefore, since no intermediary publisher costs are included, as well as for the status associated with them and other reasons, first-party development agreements are generally the most highly sought after and preferred development agreements for videogame developers.

*Middleware and Pre-Built Engines*

30.     Regardless of whether the development agreement is first- or second-party financed, however, the economics of those developer arrangements mandate that for a developer to be profitable it must complete games in a timely and efficient fashion.  Therefore, in order to facilitate the timely completion of milestones and projects, developers often seek ways to streamline production, such as employing "middleware," i.e., software that does specific tasks so that the developer does not have to perform those tasks when making the new game.

31.     Several types of middleware applications are available in the industry, such as software that can create images of plants and trees, and other background artwork for the videogames.  The most significant means of simplifying the complex game development process, however, is through the use of pre-built "game engines."

10

32.    A game engine typically is the core software component of a videogame. Purchase of a pre-built game engine should simplify development and enable the game to be relatively easily "ported" (i.e., reconfigured to run on) on multiple platforms beyond the one for which the game is initially developed.

33.    Among the functionalities or "tools" typically provided by a game engine are: (1) a rendering engine (or "renderer") for 2D or 3D graphics; (2), a physics engine for collision detection; (3) sound; (4) scripting; (5) animation; (6) artificial intelligence; (7) networking; and (8) a scene graph. That basic suite of tools is generally provided through an interactive interface that allows individual developers to quickly and simply input data describing an action or object in script without having to work in the more cumbersome underlying code.

34.    The idea behind purchasing a previously built engine, in other words, is to save the developer time and money, and thereby make the game development process more efficient and cost effective to the developer. Epic's own Vice-President, Mark Rein, expressed that strategy when he explained how the Engine could factor into a game developer's plans: "We spent less than $10 million to make *Gears of War.* Somewhere between nine and ten million. People are always saying that making next-generation games is really expensive and we're saying, you should license our technology. Because we have really great tools for building content and a great pipeline that makes your team more productive…" (From February 5, 2007 Interview with Wired GameLife at http://blog.wired.com/games/2007/02/interview_epics.html.) As indicated above and below, that was anything but the case with respect to the purported videogame "engine" that Epic sold to Silicon Knights.

11

**Relevant Background of the Parties**

*Epic Games, Inc.*

35.    Upon information and belief Epic was originally an entity named Potomac Computer Systems in Rockville, Maryland, was formed under that name in or around 1991, and in its early years, functioned as both a developer and publisher of smaller videogame titles, often including "shareware" games.  (For reference, shareware is a type of videogame in which the game is published only in PC format, and is marketed in a limited capacity, often being made available by download over the Internet, to allow prospective customers a chance to "try before they buy.")

36.    Upon information and belief, in or around 1998, the Epic-designed game *Unreal* was published by GT Interactive.  The "story" of *Unreal* was not that remarkable within the industry: players traversed a variety of arenas attempting to kill other players (or computer-controlled characters) with a variety of weapons.  However, *Unreal* incorporated a game engine dubbed the "Unreal Engine," which gained widespread recognition for the manner in which it allowed the game to be played, and the "realism" of its game-play (apparently based in part on its in-game lighting and physics).

37.    In view of the success of *Unreal*, Epic determined a way to further capitalize on its game by licensing the use of the Unreal Engine to other developers for a set license fee.  Upon information and belief Epic's strategy for financial success going forward centered on the Engine licensing scheme:  Epic would sell licenses and offer support for its purportedly "proprietary" technology, all the while using its limited staff to develop its own games internally, including spin-offs and sequels to *Unreal*.

12

38.     Upon information and belief Epic has followed the aforementioned licensing scheme to date, introducing new versions of the Unreal Engine every few years and, in the interim, occasionally releasing new "builds" – incremental improvements – for each such engine. Generally, each new engine debuts with another version of the *Unreal* games (e.g., *Unreal Tournament*, *Unreal II: the Awakening*, and *Unreal Tournament 2004*), games that are derivative of the original title, but serve to display the purportedly "new and improved" capabilities of the Engine, capabilities which potential licensees such as Silicon Knights are naturally enticed to believe they will obtain if they pay the license fee Epic demands.

39.     Indeed, Epic furthered that scheme by actively promoting the alleged time-savings and efficiency that licensees supposedly would obtain from the Unreal Engine.  For example, Mark Rein, Vice President and co-founder of Epic, has been directly quoted as advising to developers to stop "wasting money developing your own tools…People who are trying to re-invent the wheel are spending way more money than they should…My point is that we [the video game industry] can make it [the gaming experience] more affordable, we can grow the market.  One way we can do this is to use Unreal Engine 3 and take advantage of the productivity gains you can take from that." (From September 20, 2005 interview with computerandvideogames. com.)

40.     The Unreal Engine 3 is the most recent version of the Engine to be mass licensed under Epic's plan.  Upon information and belief, Epic has issued licenses to numerous developers, not counting the variety of other applications for which Epic has licensed the Engine. At the same time Epic was purportedly maintaining those multiple licenses and purportedly fulfilling its obligations thereunder, it was also, and currently is, developing its own games using

13

the Engine, which include *Unreal Tournament 2007*, and *Gears of War* (which was released at the end of 2006). Indeed, Epic's Vice-President, Mark Rein, announced in August of 2005 that Epic already had been working on Unreal Engine 4 for over two years.

*Silicon Knights, Inc.*

41.     Silicon Knights was founded in 1992 by Denis Dyack. After graduating from Canada's Brock University in 1991, Dyack formed Silicon Knights while in graduate school, with a partner who left the company a few years later. It was the first corporate venture for Mr. Dyack, and despite the various industry changes, the numerous financial difficulties faced by nearly all videogame developers, and the fact that literally hundreds of such developers have come and gone since 1991, Dyack has shepherded Silicon Knights through it all. To the extent Silicon Knights has succeeded, it has been largely due to Mr. Dyack's perseverance and his uncompromising dedication to a singular philosophy: gather talented individuals together and allow them to create groundbreaking videogames.

42.     Indeed, in the years since its inception, Silicon Knights has created, designed, and developed numerous interactive entertainment products, primarily videogame titles, artwork, and related software materials, in a variety of different first- and second-party publishing arrangements. Over the years, Silicon Knights has built a reputation for quality videogames with fascinating game-play and compelling storylines, and has a list of internationally successful videogames to its credit, including early titles such as *Steel Empire* (published in 1992 by a British company, Millennium); *Cyber Empires*; *Fantasy Empires*; *Fantasy Empires* - CD Enhanced Version (published in 1992, 1993 and 1994, respectively, by Strategic Simulations, Inc., or "SSI"); and *Dark Legions* (published in 1994, also by SSI).

43.     In 1996, Silicon Knights produced its "breakthrough" title, ***Blood Omen: Legacy of Kain*** (published by Crystal Dynamics).  ***Kain*** was remarkable for the depth of its storyline and the immersive nature of its game-play, so much so that it garnered widespread industry praise, including (among other things) being awarded "Best Overall Game" in 1995 by *Die Hard Game Fan* magazine, at what was at the time the videogame industry's premier trade-show, Electronic Entertainment Expo ("E3").

44.     Following the popularity and widespread industry recognition of ***Blood Omen: Legacy of Kain***, Silicon Knights worked on several other projects, and ultimately was able to enter into a highly-coveted, first-party, exclusive partnership with Nintendo.  During that partnership, Silicon Knights' reputation and respect within the industry further increased, as it worked with famed Japanese video game designers Hideo Kojima and Shigeru Miyamoto on a variety of projects for Nintendo, in addition to producing another hit game of its own, ***Eternal Darkness: Sanity's Requiem*** (2002) and creating ***Metal Gear Solid: The Twin Snakes*** (2003, in conjunction with Konami).

45.     Silicon Knights and Nintendo mutually determined to take different creative tracks in 2004, and ended their exclusive partnership.  Silicon Knights continued its focus on next-generation platforms, however, by entering a new first-party partnership with Microsoft to develop games for Microsoft's new Xbox 360, and a short time later embarking on development of a second game with another major publisher, Sega, on the Playstation 3.

46.     In order to succeed on those parallel-tracked development schedules, and particularly due to the pressures of its new partner relationships, it was imperative that Silicon Knights be efficient in its development process.  With that in mind, Silicon Knight began to evaluate potential

15

"plug-in" options for basic portions of its new games, including pre-built engines. As a result of those evaluations and various recommendations and/or demands it received from its publishing partners, Silicon Knights ultimately entered into negotiations with Epic, as described below.

47.     Notably, at all times relevant herein, including during its negotiation of the Agreement with Epic, Silicon Knights also was weighing and evaluating, both on its own and with its business partners, the possibility of utilizing what was believed at the time to be the more onerous and time-consuming method of creating its own game engine from scratch. It decided not to do so as a result of Epic's misrepresentations as described herein.

**The Relationship Between Silicon Knights and Epic**

48.     While Silicon Knights was evaluating potential pre-built engines (and simultaneously considering the possibility of creating its own game engine), Epic was touting the success of the newest embodiment of its licensing scheme, the Unreal Engine 2. That engine had shown well in Epic's game *Unreal Tournament* 2004, and was garnering a great deal of industry "buzz" based on its performance as displayed in Epic's own game.

49.     Then, at the 2004 Game Developer's Conference in San Francisco, Epic unveiled its newest engine, Unreal Engine 3, an engine that purportedly would be tailored specifically to next generation games. It is that version of the Engine that is at issue now, following Silicon Knights' May 10, 2005 execution of the Unreal Engine 3 License Agreement ("the Agreement").

50.     As set forth in more detail below, Epic made numerous misrepresentations regarding the capacities and functionalities of the Engine to Silicon Knights to induce Silicon Knights into entering the Agreement. Moreover, immediately upon signing Silicon Knights as a licensee, Epic's co-founder Rein again publicly confirmed the supposed benefits of the Engine

16

that Epic had used to lure Silicon Knights in the first place: "Combining the technology of the Unreal Engine 3 with the creativity of Silicon Knights has awesome potential. Silicon Knights is a powerhouse for creating original content and the Unreal Engine 3 is a perfect vehicle to deliver it on." Tim Sweeney, CEO and the other co-founder of Epic, further confirmed the supposed benefits that Silicon Knights would derive from using the Engine exclusively, adding, "It is very exciting to have Silicon Knights use Unreal Engine 3 technology exclusively. Silicon Knights is a savvy developer that has always created their own technology in the past. It is inspiring that they have now partnered with us exclusively this generation as it re-enforces our belief that we are on the right path for developing the proper tools and technology for creating the best games on the next generation systems." (From May 10, 2005 Epic Games Press Release.)

51.     Those purported benefits of the Engine never materialized, since, among other things, Epic wrongfully retained for itself all aspects of the Engine that Epic's own games had used to generate such a buzz in the industry – and not coincidentally, millions of dollars in ill-gotten Unreal Engine 3 licensing revenues from Silicon Knights and other developers who had been misled to believe they would be getting what Epic had promised.

**Epic's Unreal Engine 3 License Agreement with Silicon Knights**

52.     Silicon Knights and Epic began negotiating the Agreement for the Engine in or about January, 2005.

53.     Under the Agreement, Epic was obligated to make "commercially reasonable efforts to provide Updates which enhance to performance of the [Engine]." As explained below, Epic failed to do so.

54.     Pursuant to the Agreement, Epic also promised it would provide Silicon Knights

17

with the working Engine within a specific timeframe.  Specifically, Epic expressly warranted that it would "demonstrate that the Licensed Technology (A) operates on the PC platform, (B) will operate on the Xbox 2 [since branded as the Xbox 360] within six (6) months following the release of a final development kit by Microsoft for the Xbox 2 platform; and (C) will operate on the Playstation 3 platform within six (6) months following the release of a final development kit by Sony for the Playstation."

55.    The final development kit for the Xbox 360 was released by Microsoft in early September, 2005, meaning that Epic was obligated to deliver a fully operable version of the Engine to Silicon Knights by no later than March, 2006.  That delivery date is significant, since compliance by Epic would have given Silicon Knights time to prepare an appropriate demonstration version of its Microsoft Xbox 360 game, *Too Human*, for the very important industry trade show, E3, two month later in May, 2006.  Had Epic complied with its promises and contractual obligations, Silicon Knights would have had the opportunity not only to generate a positive press and industry response to *Too Human*, but also to finish the game earlier and on better financial terms.

56.    Epic apparently was able to achieve a very useable version of the Engine for the Xbox 360 – the version that it kept to itself, for use only on its *Gears of War* game (as discussed below), to the detriment of Silicon Knights and Epic's other licensees, as set forth in more detail below.  Epic's plan to avoid its obligations and hoard all of the necessary functionalities not only harmed Silicon Knights and all of Epic's other licensees in the industry, but also gave Epic a clearly unfair advantage in the industry.  That advantage was nowhere more evident than at E3 2006, where *Gears of War* was awarded "Best Game in Show" and garnered nothing but

US2000 10177182.1

laudatory press.  By contrast, Silicon Knights – one of the only other developers to publicly display a playable demonstration of its game – saw *Too Human* roundly criticized in the videogame press for its technical problems and generally unpolished appearance.  The damage to Silicon Knights caused by Epic's misconduct was manifest, because E3 attendees were able to compare *Too Human* with another game running ostensibly the same game engine, *Gears of War*, with vastly superior results.

57.    By May of 2006, just prior to E3, it was clear that Epic had failed to meet its bright-line obligation of supplying the commercially viable Engine within six months of the release of the development kits for the Xbox 360.  Consequently, Silicon Knights was forced to decide whether to continue waiting for Epic to provide it with a commercially functional version of the Engine.  Under the Agreement, Silicon Knights found itself in the position of being ostensibly "bound" to use Epic's non-functional product, even though doing so would result in the breach of its obligations to its publishing partners.  Rather than let that happen, in May of 2006, with the Engine two months overdue and under the looming risk of funding for *Too Human* drying up if no workable engine could be found, Silicon Knights had no choice but to abandon the Engine and begin creating its own game engine ("the Silicon Knights Engine").  By that time, Epic had shown neither the ability nor the intent to fulfill its obligations under the Agreement.

58.    Upon information and belief other game developers have been faced with a similar dilemma as Silicon Knights.  To the extent that Epic contends any such third party developers purportedly were able to utilize the Engine during the early development cycle (when Epic had warranted Silicon Knights would have a functional engine but failed to deliver one),

US2000 10177182.1

upon information and belief those third party developers broke away from the unworkable code that Epic had delivered and created their own distinct engines, just as Silicon Knights was forced to do.

59.    Progress on the Silicon Knights' Engine continues to date and, at this time, the Silicon Knights Engine is completely independent of Epic's Engine and certainly derives no benefit from the unworkable source code provided by Epic.  In fact, at this juncture the Silicon Knights Engine should, at a minimum, be described under the Agreement as an "Enhancement" of Epic's Engine, which, as defined by the Agreement, is technology developed by Silicon Knights that improves upon the Engine and is therefore the property of Silicon Knights. Moreover, as development of the Silicon Knights Engine continues, the amount of code from Epic's Engine employed by Silicon Knights continues to decrease.  After the release of Silicon Knights' *Too Human*, all Epic code will be removed from the Silicon Knights Engine.

**The Problems With Epic's Unreal Engine 3**

60.    From the outset of the Silicon Knights-Epic negotiations, a crucial selling point of the Engine for Silicon Knights was that it would not be "genre-specific."  Among other misrepresentations, in a visit to Silicon Knight on December 15, 2004, Mark Rein represented to Silicon Knights that the Engine could be used for any game – from "first-person shooters" to third-person action/adventure games to racing games to arcade-style games.

61.    The lack of genre-specificity was a material prerequisite for Silicon Knights licensing the Engine because – as Epic knew – Silicon Knights' games had historically been, and were likely to continue to be, very different from Epic's *Unreal Tournament*-template.  That is, Silicon Knights needed, and discussed with Epic that it must have, an Engine that would do more

20

than simply recreate the effect of a weapon on its surroundings, as seen from the vantage point of the first-person shooter. Instead, Silicon Knights' games place a premium on realistically rendering the surroundings in which the player finds him or herself and creating an immersive experience through the use of lighting, sound, and the virtual-physical interplay of characters and objects.

62.    Unfortunately, as Silicon Knights attempted to use the Engine up until May, 2006, it became clear that the Engine did not satisfy those needs, and moreover, did not appear to perform correctly in connection with anything other than Epic's Unreal series of games. No amount of inquiry by Silicon Knights and/or solicitation for Epic's assistance served to resolve the very simple fact that Epic appears to have simply taken-in millions of dollars in license fees from Silicon Knights and other developers, and provided them in return with vastly less than the entirety of the Engine, let alone all parts of the Engine that are necessary to make a videogame function on the next generations systems as Epic warranted. Rather, Epic appears to have been maintaining those most critical facets of the Engine for use in its own *Gears of War* game to, among other reasons, "show up" the entire industry in connection with the 2006 E3 show and ultimately to enhance the marketing of the game on the Xbox 360.

63.    In addition to the Engine that Epic provided Silicon Knights simply being unsuitable for use according to reasonable industry standards and to meet Silicon Knights' needs (despite Epic's numerous representations to the contrary), Silicon Knights experienced – prior to May, 2006, when Silicon Knights was forced to begin creation of its own game engine – a variety of other, more specific issues with the Engine's performance. For instance, at the end of May, 2005, Silicon Knights requested from Epic details regarding what form the Engine's multi-

21

processor support may take, implementation of which was scheduled for a few months later (in approximately September, 2005). A game engine's multi-processor support, and the way in which it is implemented, is crucial to a videogame's overall performance because it concerns the hardware's ability to execute multiple tasks, or "threads," at one time, via a process known in the industry as "multi-threading."

64.    Epic's response to Silicon Knights' request evidences yet another breach of Epic's basic warranties an obligations: Epic took the position that it regarded all such multi-processor support, implementation, and multi-threading issues as "optimizations," which would only be scheduled and provided to licensees (like Silicon Knights) as the relevant systems became final enough that the optimizations do not impede current new feature development work. Epic further responded that such optimizations were ultimately "asymptotic in nature," and thus the word "done" should not be used in conjunction with them.

65.    In other words, Epic would not provide any information about how the Engine would work with the Xbox 360, itself a multi-processor system, unless Epic could do so without hindering the development of *Gears of War*. And, even once Epic did furnish those details, a licensee could not rely on them as Epic considered such a fundamental characteristic of the Engine mutable and thus subject to constant alteration.

66.    Prior to May, 2006, when Silicon Knights was forced to begin creation of its own game engine, Silicon Knights also experienced a number of other problems, including, but not limited to long load times and memory-spikes during loading, both of which cause a game that employs the Engine to slow down significantly (so much so that in many instances it becomes unplayable in any realistic sense of the word), and neither of which should have been issues

pursuant to Epic's promises and express warranties. Silicon Knights is informed and believes and, based thereon, alleges that Epic had been well informed and aware of those problems since at least October of 2004. In fact, in and around that time (October, 2004), Epic promised all licensed users a solution by the first quarter of 2005, with the purported solution being a single loading path for console game systems, and no memory spikes. As of May of 2006, however, that promise still has not been fulfilled by Epic: the Engine still experienced memory spikes during loading, and console games loaded across multiple paths.

67.    Another issue that plagued the Engine until at least May, 2006 was its performance of "garbage collecting," a term of art used in the industry for the process by which systems within the Engine free up memory from tasks that are no longer necessary. Given the pace of game-play, the "universe" of the game changes several times a second, and if a system does not collect its "garbage" information adequately, the computer must waste memory "remembering" anachronistic settings, rather than using that memory for any number of other tasks that are currently at hand.

68.    Upon information and belief, the target for garbage collection in the Engine is that that it will run for 5 milliseconds every 30 seconds to 2 minutes. Prior to May, 2006, when Silicon Knights was forced to begin creation of its own game engine, Silicon Knights had to run the Engine's garbage collector every 25 seconds for 30 to 50 milliseconds. Those additional garbage collection processes – which would not be present in any commercially reasonable pre-built engine of the type Epic advertised and solicited licensees, and certainly should not be present in any videogame engine that comported with Epic's express warranties in the Agreement – would equate directly to slower game-play.

69.     Those are just some of the major issues Silicon Knights experienced with the Engine while Silicon Knights attempted to use it in developing *Too Human.* Upon information and belief Epic is well aware of the host of other problems that have existed (and currently exist) with the Engine.  Incredibly, while Silicon Knights was still working with the Engine prior to May, 2006, Epic would refuse to act on even the simplest of Silicon Knights' requests to correct those problems, often on the specious assertion that if Epic could not use the fix for development of its own game (*Gears of War*), the request somehow was not a valid one.

### Epic's Improper Withholding of Updates, Improvements, and Enhancements

70.     As indicated above, shortly after Silicon Knights executed the Agreement, there was a fundamental dispute between the parties as to what was a "game specific" enhancement – and therefore not available to licensees – versus what was "engine level," and thus available to licensees.  That dispute was drawn into even sharper focus by the showing of *Gears of War* at E3.

71.     As mentioned above, when *Gears of War* showed so well at E3 and walked off with Best Game honors from the show, *Gears of War* was ostensibly running the same engine as Silicon Knights' *Too Human*, even though the version that Silicon Knights had been provided by Epic was nothing but problematic.  The aspects of the two games that were clearly "engine level" functions (load times, frame rates, multi-processor support, implementation, and multi-threading, to name only a few) performed radically better in *Gears of War* as displayed at E3 than in Silicon Knights' own game.  Similarly, at E3 the vast majority of all other developers whom Epic had announced as "licensed users" of the Engine, showed only unplayable demos of their games, and then only behind closed doors.

24

72.    After E3, and as Epic's *Gears of War* approached its release date, Epic continued to improperly designate clearly necessary functionalities as "game specific" instead of "engine level." For example, as of May, 2006, Silicon Knights was consistently unable to achieve acceptable frame rates from the Engine's graphics renderer. A functional graphics renderer is crucial to ensuring seamless game-play for the end-user, since it is the renderer that is responsible for translating the digital information created during game-play into the visual images shown to the end-user. A renderer is therefore judged on two bases: the accuracy of the image (e.g., the texture of the image, the effect of lighting, etc.) and the speed with which the renderer displays the image (i.e., framerates and load times). The slower the processing (e.g., when lower frame rates occur), and/or the more delay there is between discrete sections of the game (i.e., when long load times occur), the less compelling the game-play.

73.    The Engine's inadequate rendering system damaged Silicon Knights, led directly to bad press for it at E3, created skepticism in the marketplace (both by the press and potential buyers of the game), and have unquestionably made the potential for advanced and post-launch sales more difficult.

74.    Prior to May, 2006, Silicon Knights had also asked Epic for support in optimizing the Engine's renderer. Epic, however, refused to provide such support, and moreover declined to even provide a timeline for further optimization of the Engine at all. Upon information and belief, Epic was then "mostly done" with its work on the renderer as used in its own game, *Gears of War*.

US2000 10177182.1

75.     Nonetheless, Epic improperly withheld the renderer optimizations from Silicon Knights and its other licensees, despite Epic's obligations and the basic necessity of the renderer to commercially feasible performance of the Engine.  Instead, when asked what optimizations Epic had used to get *Gears of War* to work, Epic responded that the optimizations were "game specific" and entailed "very specialized knowledge that is hard to transfer."  Upon information and belief, the renderer that was eventually supplied to licensees by Epic on or about the end of July, 2006, dubbed "Gemini," was incompatible with functions supported by the previous version of the renderer, which licensees had already used in developing their games.  When at least one licensee pointed that out to Epic, Epic's response was that "fringe" features (i.e., those not being used by Epic in *Gears of War*) would not be implemented in Gemini until Epic had completed its work on its own game, including the "little polish items" needed to bring *Gears of War* into a "shippable state."  Moreover, Epic suggested that its Licensees "fix them up on [their] end" and then forward those patches on to Epic.

76.     The problems created by Epic's withholding of such enhancements and optimizations on the dubious grounds of them being "game-specific" became especially pronounced when such withholding impacted the specific benchmarks known as "Technical Certification Requirements" (or "TCRs") that every videogame must meet before it can be played on a particular game console.  For example, Microsoft imposes certain TCR's for games that are to be run on the Xbox 360.  One very basic TCR is simply how long it takes the videogame to start-up.  For Silicon Knights, as of May, 2006, the Engine had been unable to meet even that simple start-up requirement, still taking over twice as long as Microsoft requires in its Xbox 360 TCRs.

US2000 10177182.1

77.     Another of Microsoft's TCRs is that the system User Interface ("UI") can be rendered at least every 66 milliseconds at all times.  As of at least as late as May, 2006, it was clear to Silicon Knights that the Engine and its renderer could not satisfy that TCR.

78.     However, when Epic was asked what was being done to bring the Engine into compliance with these fundamental TCR requirements from the Xbox 360 manufacturer (which again, Epic warranted to Silicon Knights it would meet), Epic responded that, though it was at that very time working toward meeting the TCRs in *Gears of War*, that level of functionality would not "make it to the engine level, as it is custom to the game."

79.     In other words, Epic has refused to even release code, tools, and/or information to Silicon Knights that would be sufficient to provide simply the manufacturer-necessitated performance levels of the Engine on the Xbox 360, let alone code, tools, and/or information sufficient to meet the promises and warranties Epic made to Silicon Knights in connection with the Agreement.  Epic all the while has kept to itself the code, tools, and/or information necessary to make the Engine functional, so that in addition to bilking its licensees of millions of dollars in ill-gotten license fees, Epic was able to gain an unfair advantage within the videogame market with respect to those same licensees, because its own game – the only one with the coding and tools sufficient to function on the Xbox 360 – was able to be "first out of the gate" and run off to rampant market success since Epic had effectively eliminated all competition through its fraudulent scheme.

80.     Epic's misconduct has created an industry-wide uproar because of its hoarding all of the necessary functionalities of the Engine for *Gears of War*, and the other breaches and misrepresentations by Epic referenced herein.  In response, Epic belatedly represented near the

27

end of 2006 that it would release to Engine licensees the "code bases" for several "systems" in the game so that the developers could see how to make the Engine work with the Xbox 360. Epic immediately hedged even further on that promise, by saying that Epic would remove much of the code for some unspecified "middleware" *that Epic itself apparently had to use* to get the Engine to perform on the Xbox 360 as mandated by Microsoft. Epic's refusal to provide its Licensees, Silicon Knights included, with such essential middleware is a further breach of the Agreement, which obligates Epic to provide Silicon Knights third-party software products that have been integrated into the Unreal Engine.

  81. Despite its own refusal to provide the necessary code, tools, and/or information to its licensees, Epic has continued to tout the purported cost savings and efficiency gains that developers stand to benefit from by using the Engine. Among other examples, as recently as October 30, 2006, Mark Rein was reported as extolling the Engine's abilities to allow games to be developed cheaper, faster, and with smaller teams. Likewise, on February 5, 2007, Mark Rein was still lauding the Engine's "great tools for building content and a great pipeline that makes [a developer's] team more productive" and Epic's devotion to its licensees: "[s]o we're really good at helping our licensees figure out how to attack problems and do things that we're not even doing in our own games." (From February 5, 2007 Interview with Wired GameLife at http://blog.wired.com/games/2007/02/interview_epics.html.)

### Epic's Release of *Gears of War* Code

  82. On November 7, 2006, Epic made available to its licensees a "snapshot" of the Xbox 360-specific code as used in ***Gears of War*** along with four games levels with which the licensee that code applied. Epic informed its licensees that the snapshot represented "100% of

the shipping code" for *Gears of War*. Even that snapshot was incomplete, however, as Epic, in further violation of the Agreement with Silicon Knights, again refused to provide essential third-party software – this time a full-motion video player – that apparently had been integrated into the Engine by Epic.

83.    Moreover, in Epic's message to its licensees accompanying that snapshot it represented that the snapshot would be useful to licensees "as a reference for examining full-performance, ship-quality content." However, at the same time, Epic included the caveat that the snapshot also contains "*Gears*-specific game-play code" and that such code was not readily "extensible or retargettable," and Epic would not be providing "in-depth support for" that code. Finally, Epic concluded with the instruction that its licensees should not, in fact, use the "particular version" of the Engine represented in the snapshot, but should continue using only "official approved builds" of the Engine.

84.    A review of Epic's "snapshot" reveals that not only were there significant differences between the *Gears*-engine described in the snapshot and the Engine code released by Epic prior to November 7, 2006, but that Epic had in fact built the *Gears*-engine to perform certain in-game tasks in a manner that was the exact opposite of what it had been telling its licensees, including Silicon Knights, while secretly developing *Gears of War* and not sharing the time working code and other Xbox 360 solutions with its licensees.

85.    For example, a game engine uses what is called a "particle system" to emulate "fuzzy" atmospheric effects, which constantly change in appearance (e.g., the flicker of a flame, snowfall, a stream of water, etc.). In determining how a game will render its particles, a developer can choose to either "pool" particles or employ a "dynamic allocating system." A

US2000 10177182.1

dynamic system allocates memory to particles only as needed, whereas a pooled system reserves a set amount of memory for particles whether the game-play requires it or not at any given time, thereby reducing on aggregate the amount of memory available for other engine functions. Thus, one clear advantage of a dynamic system is that it potentially optimizes memory usage and thereby improves game-play, provided that the memory cost of creating and destroying particles on demand does not outweigh the burden of maintaining a pool of memory for particles, and provided that the game engine can collect its garbage without imposing a further significant memory cost. How a game represents particles is not something that is "game-specific" or even "genre specific," but rather reflects a developer's decision regarding how to ration the resources available for a given game based on the hardware and software available to him or her.

86.    Upon information and belief, throughout Epic's development of the Engine, it has advised its licensees to use the "dynamic allocating system" for particle effects, despite the fact that such a system requires the game engine to be more discriminating in its use of memory and further complicates garbage collection (which process was already problematic with the Engine, as described above). The snapshot of the *Gears*-engine, though, reveals that Epic itself resorted to using pools of particles for its game, a game that supposedly demonstrates the "full performance" of the Engine.

### Epic's Misrepresentations in Connection With the Unreal Engine 3 and the Agreement

87.    As indicated and described above, prior to execution of the Agreement, as well as concurrently with and following its execution, Epic made numerous oral, written, express, and/or implied, misrepresentations regarding the capabilities of the Engine, the ability of Epic to support the Engine, and Epic's intention to provide such support.

US2000 10177182.1

88.    In addition to all of the omissions and misrepresentations already set forth herein, Silicon Knights also is informed and believes and, based thereon, alleges that such oral and written misrepresentations and false and misleading statements of fact by Epic include, but are not limited to, at least the following omissions and misrepresentations:

(a)    In a visit to Silicon Knights' offices (in St. Catharines, Ontario, Canada), on or about August 12, 2004, Tim Sweeney of Epic represented that the Engine would be able to render both indoor and outdoor terrain. Mark Rein touted that feature of the Engine as well in his visit to Silicon Knight on December 15, 2004. That feature of the Engine was crucial to Silicon Knights because *Too Human* makes extensive use of outdoor terrain. However, those representations were false: as Epic continued to work on *Gears of War* rather than further develop the Engine and provide code, tools, and/or support to its licensees like Silicon Knights, Epic apparently decided that the terrain-creating portion of the Engine would need to be completely rewritten in order to create outdoor terrain. Moreover, Epic informed its licensees the re-write would not be available until after *Gears of War* was complete. As noted above, Epic's continued misrepresentations and breach of its obligations under the Agreement forced Silicon Knights to begin the process of creating its own game engine as of May, 2006. At that time, almost two years after those representations were first made, and four months after the deadline for successful implementation of the Engine on the Xbox 360, as provided by paragraph 5(a)(iv)(B) of the Agreement, Epic had not delivered software,

31

code, tools, and/or information sufficient to, and had otherwise failed to, fulfill its promise of providing an Engine that would render both indoor and outdoor terrain.

(b)    Also during the August 12, 2004 meeting at Silicon Knights' offices, Tim Sweeney described the lighting model that the Engine would make available. According to Sweeney, the model was to be mostly dynamic with three or four lights affecting each object, and with only a small amount of pre-calculation needed for static lights.  Lighting is a key component to any game designer's efforts to create a realistic scene, and the ability of a game engine to create a scene whose lighting is constantly shifting by virtue of a number of light sources is integral to that effort.  However, that promise by Epic also turned out to be untrue.  Prior to May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic's recommended model and means of using the Engine for lighting had changed repeatedly and without warning. As of May, 2006,, Epic and its Engine had been unable to deliver the lighting model on which Sweeney had sold Silicon Knights the license.   Upon information and belief, at the time Epic shipped its own game, *Gears of War* – over seven months after the deadline for successful implementation of the Engine on the Xbox 360, as provided by paragraph 5(a)(iv)(B) of the Agreement – the prescribed lighting model for the Engine was to pre-calculate as much of the scene as possible and consolidate the light effects into three

32

light vectors per vertex while lighting the character from a single point light that approximates the overall scene lighting. The net effect of those restrictions, simply put, is to dramatically limit the dynamic nature of the lighting and the creativity with which that lighting can be used throughout the game; limitations that Epic plainly represented at the outset of is relationship with Silicon Knights would not be present in "the Engine" it was going to, and did, license to Silicon Knights.

(c)     During that same August 12, 2004 visit to Silicon Knights' offices, Tim Sweeney also represented on behalf of Epic that the Engine would allow many tens of characters on the screen at the same time. That representation was reinforced by Joe Graf on behalf of Epic on or about January 3, 2005, when he stated that the Engine would allow 40-50 characters on the screen at the same time. As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill those promises. In fact, as of October 30, 2006, Epic had conceded that it was only placing 8-10 "pawns" on the screen at one time in the version of its own *Gears of War* that it was (as of that time) hoping Microsoft would certify.

(d)     On or about January 3, 2005, Joe Graf, on behalf of Epic, also represented, in an e-mail to Silicon Knights, that the Engine would allow for four (4) player co-operative play on the Xbox 360 while at the same time still meeting

33

the bandwidth specifications set by Microsoft. As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

(e)    On or about February 21, 2005, Joe Graf, on behalf of Epic, further represented, in an e-mail to Silicon Knights that the Engine would operate on final hardware at 30 frames per second with more than 30 characters on the screen. As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

(f)    On or about October 24, 2004, Tim Sweeney on behalf of Epic represented to Silicon Knights in an e-mail that the general asynchronous streaming framework of the Engine would come "on-line" (i.e., would be made available to licensees like Silicon Knights) at the end of the first quarter of 2005. As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

(g)    On or about October 27, 2004, Tim Sweeney made the following representations on behalf of Epic in an e-mail to Silicon Knights:

34

**(i)** Loading or pre-defined level-content would be "seek free," and levels will typically load with 2-5 "seeks." As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

**(ii)** Memory spikes would be limited, and unpredictable memory spikes will be eliminated when loading. As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

**(iii)** Console games would load with a single loading path. As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

**Further Breaches of the Agreement By Epic**

89.    Epic utterly failed to make "commercially reasonable" efforts to support, update, and enhance the Engine as required by the Agreement.

90.    Epic further failed to present Silicon Knights with a workable product within 6 months of the release of the final development kit for the Xbox 360, that kit having been released in early September, 2005, although Epic knew from the outset that Silicon Knights is in partnership with Microsoft (and others) to develop Xbox 360 games, just as Epic is a partner with Microsoft.   Indeed, the pre-existing relationship between Epic and Microsoft further encouraged Silicon Knights to take a license for the Engine, since, among other reasons, Microsoft itself had already taken a license for the Engine for its own internal developing house, Microsoft Games Studios.

91.    Epic has likewise failed to provide Silicon Knights with a working Engine for the PS3 within 6 months of the release of the final development kits for that console, and has thus breached the Agreement in that regard.

92.    As a direct result of Epic's actions and misrepresentations, Silicon Knights has been forced to rework its contractual obligations with its business partners and accept less favorable financial and other contractual terms in those relationships in order to obtain the financing necessary to see Too Human through to completion and publication.   None of those delays, financial losses, and contractual harms would have occurred but for Epic's illegal and wrongful conduct.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Fraud/Fraudulent Inducement

93.     Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

94.     Epic has made numerous oral and written misrepresentations and false and misleading statements of fact to Silicon Knights as set forth above, including, but not limited to, those set forth in paragraph 96(a)-(g).   Silicon Knights reserves its rights to, and hereby does incorporate by reference any and all additional or different fraudulent statements, and/or further information related to same, which may be obtained in the course of investigation and discovery in this action.

95.     Upon information and belief, Epic knew those statements and misrepresentations were in fact false at the time they were made, and/or Epic made such statements and misrepresentations with reckless disregard as to their truth or falsity.

96.     The material misrepresentations made by Epic before the parties executed the Agreement were made with the intention of inducing Silicon Knights to enter into an agreement with Epic to license the Engine.   Upon information and belief Epic knew those statements were false or made such statements and misrepresentations with reckless disregard as to their truth or falsity.   Silicon Knights is informed and believes and, based thereon, alleges that, at the time they were made, Epic intended to induce reliance by Silicon Knights on those misrepresentations and false and misleading statements of fact.

97.     Silicon Knights reasonably and justifiably relied on Epic's misrepresentations and

37

false and misleading statements of fact.

98.     As a result of the misrepresentations and false and misleading statements by Epic, Silicon Knights has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

99.     Upon information and belief, the above alleged acts were committed by Epic intentionally, fraudulently, maliciously, and oppressively, and in conscious disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to exemplary and punitive damages, including pursuant to North Carolina General Statute § 1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

100.    Silicon Knights realleges and incorporates by reference the allegations in the forgoing paragraphs, as though set forth here in full.

101.    Epic made numerous negligent misrepresentations in the course of its various business and professional dealings with Silicon Knights.  Silicon Knights reserves its rights to, and hereby does incorporate by reference any and all additional or different negligent misrepresentations, and/or further information related to same, which may be obtained in the course of investigation and discovery in this action.

102.    Upon information and belief, at the time such negligent misrepresentations and false and misleading statements of fact were made, it was reasonably foreseeable to Epic that Silicon Knights would rely on those negligent misrepresentations and false and misleading statements of fact.

38

103.   Silicon Knights has, in fact, justifiably relied on Epic's negligent misrepresentations and false and misleading statements of fact.

104.   As a result of the aforementioned negligent misrepresentations and false and misleading statements of fact by Epic, Silicon Knights has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Intentional Interference with Contractual Relations

105.   Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

106.   Silicon Knights is informed and believes and, based thereon, alleges that Epic knew of Silicon Knights contracts with its business partners to develop games for the Xbox 360 video game console, and that for Silicon Knight to perform under those contracts, its games had to meet specific performance standards and progress according to specific timelines.

107.   By misrepresenting the capabilities of the Engine and Epic's ability and willingness to support the Engine, and by inducing Silicon Knights to agree to exclusively use the Engine in developing games for use on the Xbox 360, PS 3, and PC, Epic intended and intends to harm Silicon Knights by interfering with its ability to perform under its contracts with its business partners.  Likewise, Epic's actions were intended to and did cause one or more of Silicon Knights' business partners to rescind their contracts with Silicon Knights and replace them with contracts whose terms were substantially less favorable to Silicon Knights, but which Silicon Knights had to accept as a result of Epic's malfeasance.

108.   Epic's interference with Silicon Knights' contracts with its business partners is

39

US2000 10177182.1

unlawful, improper, and unjustified.

109.    Silicon Knights has suffered damages and consequential damages in an amount not yet ascertained, but including, though not limited to: (a) increased costs associated with performing the contracts with its business partners as a direct and proximate result of Epic's unlawful acts, (b) lost profits which it otherwise would have realized but for Epic's interference, and (c) other related damages.    Silicon Knights is therefore entitled to recover compensatory damages in an amount to be determined at trial.

110.    Upon information and belief, the above alleged acts were committed by Epic intentionally, fraudulently, maliciously, and oppressively, and in conscious disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to exemplary and punitive damages, including pursuant to North Carolina General Statute § 1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

## FOURTH CAUSE OF ACTION

### Intentional Interference With Prospective Economic Advantage

111.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

112.    Silicon Knights had an existing relationship with various business partners premised upon the prospect of Silicon Knights supplying games for the Xbox 360 video game console.    The future economic benefit to Silicon Knights included, but was not limited to, a prospective relationship with those business partners for the development and funding of additional games for the Xbox 360 and other game platforms.

113.    Epic was aware of the economic relationship between Silicon Knights and its

40

business partners and the probable future benefit to Silicon Knights arising therefrom. As set forth more fully above, Defendants engaged in intentional acts designed to disrupt Silicon Knights' economic relationship with its business partners and to cause damage in Silicon Knights' business. In particular, Epic's actions were intended to and did cause one or more of Silicon Knights' business partners to rescind their contracts with Silicon Knights and replace them with contracts whose terms were substantially less favorable to Silicon Knights, but which Silicon Knights had to accept as a result of Epic's malfeasance.

114.    Epic's acts have in fact disrupted that economic relationship by jeopardizing Silicon Knights ability to design a game that meets the specifications for use with the Xbox 360.

115.    Epic's interference with Silicon Knights' economic relationship with its business partners was done without right or justifiable cause and was accomplished through improper means, including, but not limited to: interference with contract, unfair competition, fraud, and other acts described more fully above.

116.    As a direct and proximate result of Epic's interference with Silicon Knights' prospective economic advantage with its business partners, Silicon Knights has lost profits and incurred other damages in an amount not yet ascertained. Silicon Knights is therefore entitled to recover compensatory damages in an amount to be determined at trial.

US2000 10177182.1

117.    Upon information and belief, the above alleged acts were committed by Epic intentionally, fraudulently, maliciously, and oppressively, and in conscious disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to exemplary and punitive damages, including pursuant to North Carolina General Statute § 1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

### FIFTH CAUSE OF ACTION

#### Breach of Warranty

118.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

119.    In connection with the Agreement, Epic expressly warranted (including in Section 5(a)(iv)(B)) that Epic would "demonstrate that the Licensed Technology will operate on the [Xbox 360] platform within six (6) months following the release of a final development kit by Microsoft for the [Xbox 360] platform."

120.    The final Xbox 360 development kit was released in or about September, 2005. To date, one year later and six months after the deadline to which Epic expressly agreed, the Licensed Technology does not function in a commercially reasonable or feasible fashion.

121.    Epic is and has been on notice of its breach as result of both oral and written communications for Silicon Knights and others, as well as from the self-evident failure by Epic to deliver a working Engine as of the time Epic warranted it would. In addition, Epic's repeated and consistent inability and unwillingness to meet its obligations under the Agreement made any further and/or additional notice by Silicon Knights moot and/or futile. In particular, based on Epic's conduct prior to and since its failure to provide a commercially reasonable and operable

US2000 10177182.1

engine as warranted and at the time warranted, Silicon Knights had no reasonable basis on which to believe Epic could or would remedy that breach. In fact, Silicon Knights is informed and believes and, on that basis, alleges that Epic did not disclose an operable engine to its Engine licensees until its November 7 code posting, and, as noted above, that code is not for the Engine that Silicon Knights licensed and that code will not even be supported by Epic.

122.   As a direct and consequential result of Epic's material breaches of its warranty to Silicon Knights, Silicon Knights has suffered, and continues to suffer, loss of business reputation, good will, monetary damages, and stature in the business community.

## SIXTH CAUSE OF ACTION

### North Carolina Unfair and Deceptive Trade Practices Act
### N.C.G.S. § 75-16

123.   Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

124.   Upon information and belief, Epic knowingly and maliciously performed numerous unfair or deceptive acts and practices, including, but not limited to: (a) misappropriating funds from Silicon Knights based on misrepresentations and fraud; (b) misappropriating to Epic the reputation for video game development superiority that Silicon Knights has spent many years and hundreds of thousands of dollars attempting to achieve; and (c) wrongfully and maliciously misrepresenting to Silicon Knights the capabilities of the Engine and the capacity, intention, and ability of Epic to support its product. Moreover, on information and belief, Epic has conducted and continues to conduct, a campaign to frustrate the ability of Silicon Knights to complete development of and bring to market a competing product.

125.   Epic's wrongful acts set forth herein occurred in the course of commerce or affect

43

commerce.

126.   Epic's wrongful acts set forth herein have and continue to benefit Epic, and continue to irreparably harm Silicon Knights.

127.   Epic's conduct constitutes unlawful, unfair and fraudulent business practices and unfair competition under North Carolina General Statute § 75-16.

128.   As a direct and proximate result of Epic's conduct, Silicon Knights has suffered, and continues to suffer, monetary damages in an amount to be proven at trial, and said damages should be trebled pursuant to North Carolina General Statue § 75-16.

## SEVENTH CAUSE OF ACTION

### Common Law Unfair Competition

129.   Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

130.   Upon information and belief, Epic knowingly and maliciously performed numerous wrongful and unfairly competitive acts, including, but not limited to:   (a) misappropriating funds from Silicon Knights based on misrepresentations and under fraudulent circumstances; (b) misappropriating to Epic the reputation for video game development superiority that Silicon Knights has spent many years and hundreds of thousands of dollars attempting to achieve; (c) wrongfully and maliciously misrepresenting to Silicon Knights the capabilities of the Engine and the capacity, intention and ability of Epic to support its product; and, (e) engaging in all of the other fraudulent and wrongful conduct alleged herein.. Moreover, on information and belief, Epic has conducted and continues to conduct, a campaign to frustrate the ability of Silicon Knights to complete development of and bring to market a competing

44

product.

131.    As a direct and proximate result of Epic's actions, Silicon Knights has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

132.    Upon information and belief, the above alleged acts were committed by Epic intentionally, fraudulently, maliciously and oppressively, and in conscious disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to exemplary and punitive damages, pursuant to North Carolina General Statute § 1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

133.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

134.    Epic has been unjustly enriched as a result of Epic's wrongful conduct as alleged above. The property and other benefits Epic has wrongfully gained at Silicon Knights' expense include, but are not limited to, the money paid by Silicon Knights to Epic for a license to use the Engine to develop games for the Xbox 360 video game console.

135.    It would be unjust for Epic to retain the benefits it has gained through its wrongful conduct. Unless the Court orders restitution, Epic will unjustly benefit and Silicon Knights will suffer a loss at the hands of Epic.

## NINTH CAUSE OF ACTION

### Rescission or Reformation of Alleged Contract

136.    Silicon Knights realleges and incorporates by reference the allegations in the

45

foregoing paragraphs, inclusive, as though set forth here in full.

137.    Any and all alleged contracts or agreements between Silicon Knights and Epic regarding the use of the Engine in the development of games by Silicon Knights were based on material misrepresentations by Epic regarding its intended role with respect to the capabilities of the Engine and Epic's commitment to support Silicon Knights' use of the Engine.

138.    Had Silicon Knights been aware of the true facts regarding Epic's representations, Silicon Knights would not have entered into the Agreement.

139.    Epic has failed to perform, and has prevented Silicon Knights from performing, material duties purportedly arising under the Agreement, to such a degree that the Agreement should be rescinded, and/or deemed void and unenforceable, and any and all obligation and duty by Silicon Knights to exclusively use the Engine should be rescinded.

## TENTH CAUSE OF ACTION

### Breach of Contract

140.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

141.    In the alternative, Epic and Silicon Knights have a valid, enforceable contract regarding Silicon Knights license to exclusively use the Engine in the development of games for the Xbox 360, which contract was supported by good and valuable consideration.

142.    Silicon Knights has performed all conditions, covenants, and promises required to be performed by Silicon Knights in accordance with the terms of the Agreement, except those which Silicon Knights was prevented or legally excused from performing because of Epic's own acts or omissions.

143.    As set forth above, Epic has materially breached its aforementioned contract with Silicon Knights.

144.    Epic is and has been on notice of its breach as result of both oral and written communications for Silicon Knights and others, as well as from the self-evident failure by Epic to deliver a working Engine as of the time Epic warranted it would.  In addition, Epic's repeated and consistent inability and unwillingness to meet its obligations under the Agreement made any further and/or additional notice by Silicon Knights moot and/or futile.  In particular, based on Epic's conduct prior to and since its failure to provide a commercially reasonable and operable engine as warranted and at the time warranted, Silicon Knights had no reason to believe Epic could or would remedy that breach.  In fact, Silicon Knights is informed and believes and on that basis alleges, that Epic did not disclose an operable engine to its Engine licensees until its November 7 code posting, and, as noted above, that code is not for the Engine that Silicon Knights licensed and that code will not be supported by Epic.

145.    As a direct and consequential result of Epic's material breaches of its contract with Silicon Knights, Silicon Knights has suffered, and continues to suffer, loss of business reputation, good will, sales, and stature in the business community.

47

## ELEVENTH CAUSE OF ACTION

### Breach of Contract
### N.C. Gen. Stat. § 25-2-101 *et seq.*

146.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

147.    In the alternative, Epic and Silicon Knights have a valid, enforceable contract regarding Silicon Knights license to exclusively use the Engine in the development of games for the Xbox 360, which contract was supported by good and valuable consideration.

148.    Silicon Knights has performed all conditions, covenants, and promises required to be performed by Silicon Knights in accordance with the terms of the Agreement, except those which Silicon Knights was prevented or legally excused from performing because of Epic's own acts or omissions.

149.    As set forth above, Epic has materially breached its aforementioned contract with Silicon Knights.

150.    Epic is and has been on notice of its breach as result of both oral and written communications for Silicon Knights and others, as well as from the self-evident failure by Epic to deliver a working Engine as of the time Epic warranted it would.  In addition, Epic's repeated and consistent inability and unwillingness to meet its obligations under the Agreement made any further and/or additional notice by Silicon Knights moot and/or futile.  In particular, based on Epic's conduct prior to and since its failure to provide a commercially reasonable and operable engine as warranted and at the time warranted, Silicon Knights had no reason to believe Epic could or would remedy that breach.  In fact, Silicon Knights is informed and believes and on that basis alleges, that Epic did not disclose an operable engine to its Engine licensees until its

48

November 7 code posting, and, as noted above, that code is not for the Engine that Silicon Knights licensed and that code will not be supported by Epic.

151.    As a direct and consequential result of Epic's material breaches of its contract with Silicon Knights, Silicon Knights has suffered, and continues to suffer, loss of business reputation, good will, sales, and stature in the business community.

## TWELFTH CAUSE OF ACTION

### Declaratory Relief

152.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

153.    An actual and present controversy exists concerning the legal rights and duties of Silicon Knights and Epic with respect to the Epic's obligations pursuant to the Agreement. Silicon Knights contends that Epic misrepresented the capabilities of the Engine and Epic's ability to make the necessary improvements in the Engine to make it ready for "next-generation" video games.  Moreover, Epic has not provided adequate and timely support for the Engine and the Epic has arbitrarily and wrongfully designated certain functions and abilities of the engine as "game specific" and this not subject to Epic's duty to disclose to the Engine licensees.  Silicon Knights is informed and believes and, based thereon, alleges that Epic disputes Silicon Knights' contention in this regard.

154.    A declaratory judgment in this case is necessary and proper.  Such a judgment would clarify the parties' rights and eliminate the uncertainty that has been generated with respect to the parties' rights under the Agreement.

155.    Accordingly, Silicon Knights requests that this Court make the following judicial

49

declarations: (1) the Agreement between Epic and Silicon Knights for a license to the Engine is null and void; (2) Silicon Knights owes no obligations to Epic under any purported agreement by Silicon Knights to license the Engine; (3) Silicon Knights is not required to use the Engine in developing any current or future games; (4) Silicon Knights may alter the Engine without restriction; (5) Silicon Knights is under no obligation to disclose or share any alterations Silicon Knights makes or causes to be made to the Engine with anyone, including Epic; (6) Silicon Knights owes no monetary obligations to Epic and/or any of its business partners associated with the agreement to license the Engine; (7) the game engine developed by Silicon Knights is totally independent of the Unreal Engine 3 and therefore is the sole property of Silicon Knights, or, alternatively, the game engine developed by Silicon Knights constitutes an "Enhancement" under the terms of the Agreement, and therefore is the sole property of Silicon Knights under the terms of that Agreement; and (8) Silicon Knights owes no obligations, financial or otherwise, to Epic in connection with and/or related to the Silicon Knights Engine.

## PRAYER

WHEREFORE, plaintiff Silicon Knights prays that:

A.    Epic be found to have committed fraudulent, intentional, and/or negligent misrepresentations to Silicon Knights, and that any alleged contract between Epic and Silicon Knights is and was void, and/or voidable by Silicon Knights.

B.    Any alleged contract between Epic and Silicon Knights be rescinded, or in the alternative reformed, to provide that Silicon Knights need not use the Engine exclusively or at all in developing games.

C.    In the alternative, Epic be found to have materially breached its contract with Silicon

50

Knights, which breach damaged, and continues to damage, Silicon Knights.

D.     Epic be found to have breached its express contractual warranties made to Silicon Knights.

E.     If it is determined that a contract exists between the Epic and Silicon Knights, Epic's breaches of that contract be held to include material breaches (including, but not limited to, Epic's failure to provide adequate and timely support for the Engine to licensees of the Engine), such that Silicon Knights may use another engine or make material changes to the Engine necessary to achieve the functionality necessary for games under-development by Silicon Knights, and that all declarations in Paragraph M, below, be found to apply to Silicon Knights' benefit.

F.     Epic be found in violation of unfair competition provision of North Carolina General Statute § 75-16, which acts damaged Silicon Knights.

G.     Epic be found to have unfairly competed with Silicon Knights at common law, which acts damaged Silicon Knights.

H.     A permanent injunction issue pursuant to North Carolina General Statute § 75-19: (a) restraining and enjoining Epic its unfairly business practices against Silicon Knights; and (b) restoring to Silicon Knights any and all monies and/or other property acquired by Epic through such unfair competition.

I.     Epic be found to have intentionally interfered with Silicon Knights' prospective economic advantage, which acts damaged Silicon Knights.

J.     Epic be found to have negligently interfered with Silicon Knights' prospective economic advantage, which acts damaged Silicon Knights.

51

K.    Epic be found to have intentionally or negligently interfered with Silicon Knights' contractual relationship with one or more of Silicon Knights' business partners.

L.    Epic be found to have been unjustly enriched by virtue of its fraudulent, deceitful, and otherwise wrongful conduct with respect to Silicon Knights, to the detriment of Silicon Knights.

M.    The Court issue the following judicial declarations:  (1) the Agreement between Epic and Silicon Knights for a license to the Engine is null and void; (2) Silicon Knights owes no obligations to Epic under any purported agreement by Silicon Knights to license the Engine; (3) Silicon Knights is not required to use the Engine in developing any current or future games; (4) Silicon Knights may alter the Engine without restriction; (5) Silicon Knights is under no obligation to disclose or share any alterations Silicon Knights makes or causes to be made to the Engine with anyone, including Epic; (6) Silicon Knights owes no monetary or other obligations to Epic and/or any of its business partners associated with the agreement to license the Engine; (7) the game engine developed by Silicon Knights is totally independent of the Unreal Engine 3 and therefore is the sole property of Silicon Knights, or, alternatively, the game engine developed by Silicon Knights constitutes an "Enhancement" under the terms of the Agreement, and therefore is the sole property of Silicon Knights under the terms of that Agreement; and (8) Silicon Knights owes no obligations, financial or otherwise, to Epic in connection with and/or related to the Silicon Knights Engine.

N.    The Court award damages to Silicon Knights in an amount proved at trial for the damages as set forth above.

O.    Epic be required to disgorge all profits obtained on its *Gears of War* game as a result of the misconduct set forth above.

P.    Any amount awarded by this Court be trebled pursuant to North Carolina General Statute § 75-16.

Q.    Silicon Knights be awarded punitive damages, in an amount to be proven at trial.

R.    The Court award Silicon Knights its reasonable attorneys' fees, costs, expenses and prejudgment interest, as permitted by law.

S.    The Court award Silicon Knights such other relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand is hereby made for trial by jury on all issues triable to a jury.

US2000 10177182.1

This 18th day of July 2007.

/s/ Hayden J. Silver, III
_____

Hayden J. Silver III
NC State Bar No. 10037
Betsy Cooke
NC State Bar 25353
KILPATRICK STOCKTON LLP
3737 Glenwood Avenue, Suite 400
Raleigh, NC 27612
Telephone: (919) 420-1711
Facsimile: (919) 510-6136

*Attorneys for Plaintiff*
*SILICON KNIGHTS, INC.*

Christopher T. Holland
CA State Bar No. 164053
Garth A. Rosengren
CA State Bar No. 215732
KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
114 Sansome Street, 4th Floor
San Francisco, CA 94104
Telephone: (415) 249-8330
Facsimile: (415) 249-8333

*Attorneys for Plaintiff*
*SILICON KNIGHTS, INC.*

54