**EXHIBIT   G**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

SILICON KNIGHTS, INC.,
An Ontario (Canada) Corporation,

                        Plaintiff,

     v.                                 5-07-CV-00275-D

EPIC GAMES, INC.,
a North Carolina Company,

                     Defendant.

DEFENDANT EPIC GAMES INC.'S
MEMORANDUM IN OPPOSITION TO SILICON KNIGHTS'
MOTION TO COMPEL

## INTRODUCTION

SK's core claims in this case are for breach of contract and fraudulent inducement arising out of Epic's licensure of its Unreal Engine 3 game engine to SK for use in creating a video game titled *Too Human*.[1] Epic's core counterclaims are for breach of contract, copyright infringement, and theft of trade secrets arising out of SK's misuse of Epic's licensed technology. Rather than seeking discovery tailored to those claims and counterclaims, SK demands that Epic produce (i) each of the more than 100 license agreements that it has entered into with other licensees (RFPs 11-109 (odd numbers) and 136), (ii) all communications and other documents (defined to include electronic data) that refer or relate to those licenses (RFPs 11-109 (even numbers) and 137), (iii) all documents relating to complaints about any of the Unreal Engines and all of Epic's license agreements (Interrogatory 13 and RFPs 111 and 131), (iv) all documents relating to Epic's Integrated Partners Program (Interrogatories 11 and 12 and RFPs 118 and 135), and (v) all documents relating to the design and development of Unreal Engine 3 and Epic's projects using that engine (RFPs 127-129 and 132). *See* SK Brief in Support of Motion to Compel ("SK Brief"), p. 3. The cumulative effect of SK's discovery tactics would require Epic to search for and produce every document in its possession, custody, or control having anything to do with its licensees or its licensing business, regardless of relevance to the case. The requests are all the more objectionable because SK already has much of the information it claims it needs, can easily obtain legitimate discovery by less intrusive means, and has ignored or rejected Epic's efforts at reasonable accommodation. SK's motion seeks to compel discovery that is overbroad, unduly burdensome, not relevant, and not reasonably calculated to lead to the discovery of admissible evidence. Accordingly, the motion should be denied.

## ARGUMENT

The scope of discovery is not without limits. Only for "good cause" is discovery allowed where, as in this case, it is related only to the general subject matter of the action, as opposed to the specific claims and defenses in the case. Fed. R. Civ. P. 26(b)(1). SK has not established any such good cause.

---

[1] SK also alleges the all too frequent litany of tag along torts (Complaint, Counts 3, 4, and 7). None of them affects the disposition of the pending motion.

Further, discovery must be denied where the burden or expense outweighs its likely benefit, taking into account "the needs of the case" and "the importance of the proposed discovery in resolving the issues" before the parties. Fed. R. Civ. P. 26(b)(2)(c); *McDougal-Wilson v. Goodyear Tire and Rubber Co.*, 232 F.R.D. 246, 249 (E.D.N.C. 2005). Thus, simply because information *may* be discoverable "does not mean that discovery must be had." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) (affirming denial of additional discovery as it was "cumulative and duplicative, unduly burdensome, and harassing.").

If, as here, the discovery is unreasonably broad, burdensome, expensive or seeks materials with little or no connection to the case, it should be limited or denied. *Id.*; *see also Schaaf v. Smithkline Beecham Corp.*, 233 F.R.D. 451 (E.D.N.C. 2005) (denying motion to compel - Judge Dever). Further, temporal or classification limitations to the discovery sought are appropriate to protect a party from oppression, undue burden or expense, especially when the requested information is collateral to the case. *See McDougal-Wilson*, 232 F.R.D. at 249; *Johnson v. Mundy Indus.*, No. 7-01-CV-99-BO-3, 2002 U.S. Dist. LEXIS 19346 *10 (E.D.N.C. March 15, 1999). SK contends that Epic's license agreements and related documents are relevant to several issues in the case. Each contention is addressed by issue below.

**I.     As Sought by SK, Epic's License Agreements And Related Documents Are Not Discoverable**

**A.     SK's License Fee:** SK argues that it needs *all* of Epic's more than 100 license agreements with other Unreal Engine licensees in order to confirm or refute Epic's contention in paragraph 16 of the Counterclaim that SK negotiated a substantial discount off Epic's regular license fee. SK Brief at 4. Epic's allegation relating to SK's license fee is, in context, background. What is important is that Epic and SK negotiated the license agreement extensively. The amount of the fee, relative to amounts paid by other licensees, has no independent bearing on the case. At most, it is on the periphery of the action.

If any discovery on the fee issue is warranted, Epic has produced enough. Epic has already produced (i) a list identifying all of Epic's Unreal Engine 3 licensees and (ii) a chart summarizing the fee

related terms in each of the Unreal Engine 3 licenses entered into during the six month period surrounding the effective date of SK's license.  In addition, Epic has offered to produce copies of *all* its Unreal Engine 3 agreements, with only the licensees' identities and fee provisions redacted.  Declaration of Sean Braswell ("Braswell Dec.") ¶ 8 attached hereto as Exhibit A.[2]  A copy of these materials, including a representative copy of a redacted license agreement, are filed under seal contemporaneous with this brief. *See* Exhibit B attached hereto.  While these documents will not enable SK to match particular licensees with their fees, SK has no legitimate need to do that.  The documents do address, in a reasonable way, SK's articulated need to "confirm or refute" Epic's fee allegation.  They also fairly address SK's other purported needs for the agreements, as discussed below.

**B.    Epic's Success:**  SK contends that it is entitled to all of the license agreements and related documents in order to test Epic's allegations that Epic and others have published successful games using the Unreal Engine, particularly including Unreal Engine 3.  Epic's allegations, contained in paragraphs 16 of its Answer and 9 and 11 of its Counterclaim, are both background and responses to SK's allegations that Epic failed to provide SK with a "workable" or "commercially viable" Unreal Engine 3.

SK's request for all license agreements and related documents[3] is not reasonably related to SK's purported justification for the request.  The best evidence of Epic's success are the games that Epic and its licensees have built with the Unreal Engine.  That information, including information relating to Unreal Engine 3 – the engine at issue in this case – is detailed in Epic's Answer and Counterclaim, is widely and equally available to SK on the Internet, and upon information and belief is already well known to SK.

Moreover, since August 2004, SK has had unfettered access to Epic's Unreal Developers' Network ("UDN").  *See* Declaration of Mark Rein ("Rein Dec.") ¶ 11 attached hereto as Exhibit C.  The

---

[2] At the time of the parties meet and confer on January 15, 2009, SK had begun to serve broad and burdensome subpoenas on Epic's licensees, who are competitors of SK, without notice to, or proper service on Epic.  SK has now served subpoenas on 34 of Epic's licensees.  Braswell Dec. ¶ 3.

[3] For example, Epic objected to Interrogatory No. 9 that requires the identification of licensees for any Unreal Engine, including those who had not even licensed Unreal Engine 3, the product at issue in this action.  Additionally, "Relating to" is defined broadly, encompassing any document that has anything to do with the agreements.  For instance, RFP 109 seeks any document or communication referring to relating to any license agreement Epic has ever entered.

UDN is an electronic forum created by Epic to, among other things, distribute its licensed technology and to provide a searchable online community within which Unreal Engine licensees can discuss the technology and ask and obtain answers to their development and support questions. Rein Dec. ¶¶ 12, 13. Because SK remains an Epic licensee, it can access the UDN as easily as Epic or any other licensee.

C.    **Epic's Support:** SK contends that the license agreements and licensee-related information may have a bearing on whether Epic breached its *contractual* obligation to provide "support." Epic's support obligation is contained in Section 4 of SK's license agreement.  It requires that Epic (i) make commercially reasonable efforts to provide updates that enhance the performance of the licensed technology and (ii) provide technical support via e-mails. Epic's support obligations to *other* licensees, including whether Epic performed or failed to perform *those* obligations, are not relevant to the breach of contract action asserted by SK. *Kanye West v. Eric "E-Smoove" Miller*, 2007 U.S. Dist. LEXIS 11360 (N.D. Ill. Feb. 13, 2007) (upholding magistrate judge's denial of motion to compel third party recording agreements and related documents, finding: "[t]he only contract relevant…is the purported agreement between plaintiff and defendants in 1995."). Expanding discovery into Epic's relationships with its other licensees is at best collateral, and is expensive and disruptive of Epic's business relationships with these licensees. Rein Dec. ¶¶ 6-8.

Further, through its longstanding use of the UDN, SK already has access to information that would reveal much of the nature of the technology and the timing and extent of Epic's support to other licensees. As a licensee of Unreal Engine 3, SK has access to Epic's Perforce revision control system and also can observe and/or participate in discussions with or between other licensees and Epic on electronic mailing lists provided by Epic. Rein Dec. ¶¶ 12, 13. Thus SK has not articulated why it is entitled to any additional material regarding Epic's support of other licensees. Its claims and relief are based only on its agreement with Epic and Epic's performance. The terms and conditions under which Epic's other licensees entered agreements with Epic, and Epic's performance under those separate agreements is irrelevant and far removed from the performance of the parties under the Agreement that is at issue in this case.

4

**D.    Epic's Use of License Fees:** SK contends that it is entitled to unredacted license agreements and all communications between Epic and its licensees because it has asserted that Epic used licensing revenue to fund the development of its own game, *Gears of War,* rather than to support its licensees. This funding assertion, even if true (it is not), adds nothing to SK's claim that *it* did not receive appropriate support from Epic. Putting aside that nothing in SK's license agreement addressed, let alone restricted, Epic's right to use its licensing revenue in any way it deemed appropriate, Epic's dealings with third parties have nothing to do with Epic's support of SK or Epic's use of its licensing revenue.

**E.    Meaning of Allegedly Ambiguous Contract Term:** SK contends that it is entitled to Epic's license agreements and related documents, including communications with other licensees, in order to develop parol evidence as to the meaning of "key terms" in its license agreement. But SK did not ask for documents relating to the meaning of any term. Instead it seeks *all* documents relating in any way to Epic's license agreements. *See* SK's RFP 11-107 (even numbers) and 137.

The only term that SK identifies in its Motion is "Enhancement," which is specifically defined in the parties' license agreement itself. *See* License Agreement §1(d) filed under seal contemporaneous with this brief. Even if "Enhancement" were ambiguous (it is not and SK does not even hint at the substance of any ambiguity), parol evidence would most properly relate to Epic's and SK's understandings of the term in *their* contract, and any evidence derived from *their* contract negotiations would be admissible. *Cordaro v. Singleton*, 31 N.C. App. 476, 479 (1976). To the extent custom and usage were relevant, Epic would produce documents, if any, referring to the meaning or interpretation of the term "Enhancement" as used in any of its Unreal Engine 3 license agreements, and is already in the process of producing redacted copies of all of those agreements.

More incredible still is SK's contention that this Court should compel Epic to produce a description of, and all documents relating to, all enhancements created by Epic's licensees.[4] Without

---

[4] For example, Interrogatory 10 and RFP 134 requests that Epic describe with particularity "each and every 'Enhancement' to any/ and/or all of the Unreal Engines" and that it produce all documents relating to each of these "Enhancements."

saying so expressly, SK is attempting to obtain the exceedingly valuable and confidential computer code created by and belonging to its competitors. While the Court's Protective Order would apply to this material, it provides little comfort to licensees whose most valuable assets would be released to a competitor.[5] (Indeed on two occasions in this litigation already, SK has disclosed information required to be maintained as confidential by the terms of its license with Epic). No litigant ought to ask for the discovery of such highly sensitive third party information without demonstrating the most compelling need. Here, SK can neither demonstrate nor articulate any credible need, let alone a compelling one. The burden of such production on Epic and its licensees far outweighs any need of SK in this case. *Upsher-Smith Lab. v. Mylan Lab.*, 944 F. Supp. 1411, 1445 (D. Minn. 1996); *Taco, Inc. v. Fed. Ins. Co.*, 2007 U.S. Dist. LEXIS 88504, 5-6 (D.R.I. Nov. 30, 2007); *Nationwide Mut. Ins. Co. v. LaFarge Corp.*, 1994 U.S. Dist. LEXIS 3851, 21-23 (D. Md. Jan. 10, 1994).

**G.    SK's Alleged Disparate Treatment:** SK contends that it needs broad discovery to determine whether it was treated equally with other licensees. For example, SK states that license agreements it has obtained, via subpoenas, from third parties may vary considerably from its agreement with Epic. Equality is not an issue in this case. Nor are the terms of third party contracts, each of which, like SK's own agreement, was separately negotiated. The simple question is whether Epic breached its *negotiated* contract with SK. By any measure, third party licenses are not "reasonably likely to lead to the discovery of admissible evidence" on this question.

**H.    Complaints About Unreal Engine 3:** SK also overreaches by seeking discovery related to any "complaints" (broadly and ambiguously defined as "any level of dissatisfaction") regarding "all of Epic's Unreal Engines." This case concerns only Unreal Engine 3, the engine licensed to SK. Complaints about other engines, if any, are irrelevant in this action and not reasonably calculated to the

---

[5] Even if kept from SK employees, this license information will be viewed by SK's counsel, who is responsible for negotiating SK licenses, and by SK's experts who will retain (at least in memory) the information they are provided, even as they may in the future assist a competitor of Epic's to structure their business. *Litton Industries, Inc. v. Chesapeake & O. R. Co.*, 129 F.R.D. 528, 531 (D. Wis. 1990) ("There is a constant danger inherent in disclosure of confidential information pursuant to a protective order. Therefore, the party requesting disclosure must make a strong showing of need . . . .").

discovery of admissible evidence. Further, SK's requests regarding third party "complaints" about Unreal Engine 3 are overly broad and unreasonable. SK has not restricted its request to the type of complaints it has alleged in its Complaint and has refused Epic's multiple requests to identify the complaints by type.[6]

Thus, SK seeks all documents relating to any hint of "dissatisfaction" with the Unreal Engine 3, regardless whether that dissatisfaction has anything to do with the subject matter of this action. On its face, the ambiguity inherent in SK's broad definition of "complaints," and its refusal to narrow its request to the kinds of complaints it has asserted in this case, places an undue and unfair burden on Epic. Epic is "neither under an obligation to struggle to interpret [SK's] ambiguous questions, nor to provide answers to questions that are so broad and all inclusive as to be unduly burdensome." *Glosson v. Equifax Credit Info. Servs.*, 1996 U.S. Dist. LEXIS at *6 (E.D.N.C., Aug. 13, 1996) (internal citations omitted). Any issues raised by a licensee would not be referenced as a "complaint" (or any synonym of this word), but instead could only be identified by the substantive nature of the purported problem with the engine. SK's requests, as propounded, make it practically impossible to locate and produce responsive documents.

In the absence of any cooperation from SK, Epic is searching for communications with licensees, not already available to SK through the UDN, regarding complaints about Unreal Engine 3 specifically alleged in the Complaint. *Id.*[7] This response and production should more than satisfy any bona fide discovery need of SK, and is all that could reasonably be required by the discovery rules.

---

[6] In the meet and confer on January 15, 2008 and twice subsequent to this meeting, Epic asked SK to particularize the subject matter of the "complaints" it sought to make the search for such material reasonably possible. SK refused to narrow its requests or further define what it sought. Braswell Dec. ¶ 6.

[7] As Epic's counsel informed SK's counsel, this search concerns the subject matter of complaints SK alleged including, but not limited to: demonstration of working engine, game v. engine level enhancements, genre-specific, graphics renderer - including optimization and acceptable frame rates, indoor/outdoor terrain, dynamic allocating system, asynchronous streaming framework, single loading path for console games, lighting, number of characters or co-players, multi-threading, long load times/memory spikes, garbage collecting, Microsoft TCR requirements, incomplete Gears of War snapshot, unresponsive or inadequate support to licensees, delay(s). Braswell Dec. ¶ 7.

II.     **Epic's Integrated Partners Program ("IPP") And Third Party Middleware Have No
        Bearing On This Case**

        Epic appropriately objected to SK's attempt to obtain additional discovery about its independent

relationships with third-party developers providing middlewear or who are part of the IPP, a program

whereby IPP partners are granted access to the UDN and Epic is granted certain rights in certain

middlewear, software or tools. Rein Dec. ¶ 9.  SK justifies its meddling into Epic's separate IPP business

by claiming that discovery relating to Epic's use of middlewear will determine what Epic knew it could

provide to SK.  Epic is in the process of producing its entire "Perforce" database, which reflects the

history of the development of Unreal Engine 3. Braswell Dec. ¶ 9.   Thus, without resort to third party

information, SK can determine the accuracy and timing of Epic's representations and its performance

under the license with SK from the license agreement, software code, and the content of Unreal Engine 3.

        Similar to SK's discovery of Epic's license relationships, SK's requests related to IPP and

middlewear developers are solely designed to and will disrupt these separate business practices.  Rein

Dec.¶ 10.  Even if any discovery as to the IPP was warranted (which it is not), it must be limited to the

time period just prior to when Epic licensed Unreal Engine 3 to SK, as SK's professed need for this

material is only to show what Epic knew before it made representations to SK.  It is also appropriately

limited to Epic documents showing what functionality it reasonably expected from Unreal Engine 3.

III.    **SK is Not Entitled To Documents Related to The Design And Development of Gears of War
        or Unreal Tournament 3 - Video Games That Are Not At Issue In This Case.**

        In terms of the design documents its seeks, SK again casts its fishing net in an unreasonably

broad and indiscriminate way.  SK asks this court to compel the production of documents not just on

Unreal Engine 3, the game engine it licensed  −  and the focus of the claims and defenses in this litigation

− but also documents related to Epic's proprietary video games (Gears of War and Unreal Tournament 3)

that were independently developed and that have nothing to do with SK.

        Epic is in the process of producing documents concerning the design and development of Unreal

Engine 3, and has agreed to produce documents reflecting the plans and strategies for Unreal Engine 3

pursuant to RFP 129. Braswell Dec. ¶ 9.[8]  And, as mentioned, Epic is in the process of producing the entire Perforce database which reflects the history of the development of Unreal Engine 3. Epic is also producing documents regarding the release of Gears of War code on the UDN, but, practically, SK already has this information through its longstanding access to the UDN. In fact, Epic made additional information related to Gears of War and Unreal Tournament 3 available on the UDN. Under even the broadest interpretation of the discovery rules and facts related to this case, Epic's response is sufficient and SK is entitled to no more. As such, Epic stands on its remaining objections with regard to the production of documents related to its separate video games.

## CONCLUSION

The breadth and irrelevance of SK's discovery, as well as its subpoenas for documents on 34 of Epic's business partners demonstrates SK's true intent to interfere with Epic's business relationships and to engage in a widespread investigation of Epic's business and that of its licensees, competitors of Silicon Knights. SK does not seek documents generated by or concerning Epic, but rather those of third parties, a discovery strategy ill-suited to elicit admissible evidence to prove its case, but consistent with an effort to examine and replicate Epic's business, and to intimidate Epic's licensees and seek their proprietary information. Although the Federal Rules permit broad discovery, they do not condone the sort of disruptive fishing expedition that SK seems intent on pursuing in this case. SK's overreaching and refusal to reasonably narrow its discovery has generated the need for a discovery conference, that Epic will move for under separate cover. In light of Epic's production of documents and information, its agreement to produce additional documents,  and its reasonable objections to SK's over broad, burdensome discovery that ventures far beyond the claims and defenses raised, this Court should deny SK's motion.

---

[8] SK misrepresents the requests it propounded and the documents it seeks.  A careful review of RFPs 127 and 128 reveals that neither simply ask for Unreal Engine 3 design documents.  Rather, they are tied to Epic's separate creation of games (Gears of War and Unreal Tournament 3) unrelated to the suit.  RFP 129 was not discussed in the parties meet and confer conference or in the communications thereafter.

Respectfully submitted, this the 4th day of March, 2008.

                        HUNTON & WILLIAMS LLP


            By:     /s/ Robert C. Van Arnam
                    Douglas W. Kenyon
                    N.C. State Bar No. 13242
                    Robert C. Van Arnam
                    N.C. State Bar No. 28838
                    HUNTON & WILLIAMS LLP
                    Post Office Box 109
                    Raleigh, North Carolina 27602
                    Telephone: (919) 899-3000

                    William P. Andrews
                    N.C. State Bar No. 6484
                    Epic Games, Inc.
                    620 Crossroads Boulevard
                    Cary, N.C. 27518

                    *Counsel for Defendant-Counterclaim Plaintiff*
                    *Epic Games, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of Epic's Memorandum of Law in Opposition to Plaintiff Silicon Knights' Motion to Compel was served upon the following counsel of record in this action by electronic mail and U.S. Mail to Hayden J. Silver, III, KILPATRICK STOCKTON LLP, and Christopher Holland, KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP, this the 4th day of March, 2008.

    Hayden J. Silver, III, Esq. (jaysilver@kilpatrickstockton.com)
    N.C. State Bar No. 10037
    Betsy Cooke, Esq. (bcooke@kilpatrickstockton.com)
    N.C. State Bar No. 25353
    KILPATRICK STOCKTON LLP
    3737 Glenwood Avenue, Suite #400
    Raleigh, N.C. 27612
    Telephone:  (919) 420-1700
    Facsimile:  (919) 420-1800

    Christopher T. Holland, Esq. (cholland@kksrr.com)
    Garth A. Rosengren, Esq. (grosengren@kksrr.com)
    KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
    114 Sansome Street, 4th Floor
    San Francisco, CA 94104
    Telephone:  (415) 249-8330
    Facsimile:  (415) 249-8333

    *Attorneys for Plaintiff Silicon Knights, Inc.*

As requested by Silicon Knights' counsel of record, we have also sent copies to the following electronic mail addresses:  <u>ldubose@kksrr.com</u>; <u>jjorgensen@kksrr.com</u>.

                <u>/s/ Robert C. Van Arnam</u>
                HUNTON & WILLIAMS LLP
                421 Fayetteville Street, Suite 1400
                Raleigh, N.C. 27601
                Counsel for Defendant
                Epic Games, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CIVIL ACTION FILE NO. 5-07-CV-00275-D

| | | |
|---|---|---|
| **SILICON KNIGHTS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| | ) | **DECLARATION OF** |
| | ) | **SEAN BRASWELL** |
| **v.** | ) | |
| | ) | |
| **EPIC GAMES, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

I, SEAN BRASWELL, declare under the penalty of perjury that the following is true and accurate, and state as follows:

1. I am over twenty-one (21) years of age. I am an attorney at the law firm of Hunton & Williams, LLP, counsel for the defendant Epic Games, Inc. ("Epic"), and I am duly licensed to practice law in North Carolina. I make this declaration based on personal knowledge and, if called to testify, could and would testify to the matters set forth herein.

2. On December 19, 2007, Epic timely responded to Silicon Knights' Second Set of Interrogatories and Second Set of Requests for Documents.

3. In a telephone conference on January 15, 2008, counsel for the parties met and conferred regarding issues that had been raised by both parties regarding written discovery. At the time of this conference, and without proper notice to and service on Epic, Silicon Knights had begun to serve broad subpoenas on Epic's licensees. To my knowledge, Silicon Knights has now served subpoenas on 34 of Epic's licensees.

1

DEFENDANT'S
EXHIBIT
A
ALL-STATE LEGAL®

4.      Since the parties' telephone conference on January 15, 2008, I have engaged in several "meet and confer" e-mail communications with Silicon Knights' counsel regarding both parties' outstanding discovery requests.

5.      During the parties' conference on January 15 and in subsequent e-mail correspondence, Epic's counsel attempted to get Silicon Knights to more narrowly tailor its requests to allow for the production of all relevant and identifiable material.

6.      In an e-mail to Silicon Knights' counsel on January 30, 2008, I stated that, as written, Silicon Knights' request for the identification of all persons who have complained or "indicated any level of dissatisfaction" with the Unreal Engines was overbroad and unduly burdensome but that if Silicon Knights would "specify the substantive nature of the complaints relating to UE3 about which it seeks information," Epic would evaluate that request and respond promptly. *See* Exhibit G to Silicon Knights' Motion to Compel ("SK's Motion"), p. 8.  Silicon Knights did not respond to this request nor did it make any effort to particularize any of its requests.  Again, in a February 14, 2008 e-mail to Silicon Knights' counsel, I reiterated Epic's request for "[c]larification regarding the nature of the complaints" requested by Silicon Knights and asked for confirmation that Silicon Knights was responding to this request. *See* Exhibit G to SK's Motion, pp. 2-3.  In a February 15, 2008 response to this e-mail, Silicon Knights' counsel stated that they had not (and presumably would not) agree to further particularize their requests. *See* Exhibit G to SK's Motion, p. 1.

7.      In an e-mail dated February 29, 2008, I informed Silicon Knights' counsel that since Silicon Knights would not agree to further particularize "complaints," Epic would, in a good faith effort to respond to a more reasonable construction of Silicon Knights' Int. No. 13 and RFP No. 111, search for all documents containing complaints relating to the subject matter of the complaints Silicon Knights alleged including, but not limited to:  demonstration of working engine, game v. engine level enhancements, genre-specific, graphics renderer - including optimization and acceptable frame rates, indoor/outdoor terrain, dynamic allocating system, asynchronous streaming framework, single loading path for console games, lighting, number of characters or co-players, multi-threading, long load

times/memory spikes, garbage collecting, Microsoft TCR requirements, incomplete Gears of War snapshot, unresponsive or inadequate support to licensees, delay(s).

8.    During the parties' conference on January 15 and in subsequent e-mail correspondence, Epic's counsel also voiced its objections to Silicon Knights' requests for all of Epic's Unreal Engine license agreements and for all "correspondence, memoranda, emails and/or other documents referring to or relating" to any of those agreements. I stated in a February 8, 2008 e-mail to Silicon Knights' counsel that Epic, in a good faith effort to produce reasonably responsive documents and information, would produce a list of all of its licensees and their contact information and repeated the earlier offer (made in a January 30, 2008 e-mail to Silicon Knights' counsel) that Epic was willing to produce all Unreal Engine 3 license agreements with only the price terms and the name of the licensee redacted. *See* Exhibit G to SK's Motion, pp. 4, 7. On February 25, 2008, Epic provided Silicon Knights with a list of all of its Unreal Engine 3 licensees, and, in order to assist Silicon Knights in determining whether it received a discount, Epic produced a spreadsheet detailing the license fees and related terms for each license Epic entered with other licensees during the same time period (May, 2005) that it entered its agreement with Silicon Knights.

9.    Epic continues to work towards the production of materials in response to Silicon Knights' discovery requests. It is in the process of producing its entire "Perforce" database which reflects the entire history of the development of Unreal Engine 3, as well as other documents concerning the design and development of Unreal Engine 3. Epic has agreed to produce all documents reflecting the plans and strategies for Unreal Engine 3 in response to Silicon Knights' RFP 129.

This the 4 day of March, 2008.

Sean Braswell

3

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5-07-CV-00275-D

SILICON KNIGHTS, INC.,
An Ontario (Canada) Corporation,

                              Plaintiff,

    v.

EPIC GAMES, INC.,
a North Carolina Company,

                              Defendant.

EXHIBITS TO
EPIC GAMES, INC.'S
MOTION TO FILE DOCUMENTS
UNDER SEAL CONTAINING
CONFIDENTIAL INFORMATION

SEALED PURSUANT TO THE
PROTECTIVE ORDER
ENTERED ON 01/18/2008
5-07-CV-400275-D
Eastern District of North Carolina
Western Division

FILED UNDER SEAL
BY ORDER OF THE COURT, ENTERED ON
01/18/2008, THIS ENVELOPE IS TO REMAIN
SEALED, AND THE CLERK OF THE COURT
SHALL NOT REVEAL THE CONTENTS
THEREOF TO ANY PERSON UNTIL FURTHER
ORDER OF THIS COURT

Exhibit 1 -    License Agreement
Exhibit 2 -    Representative Third Party License Agreement
Exhibit 3 -    List of Unreal 3 Licensees
Exhibit 4 -    Spreadsheet of License Fees



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CIVIL ACTION FILE NO. 5-07-CV-00275-D

| | |
|---|---|
| SILICON KNIGHTS, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) **DECLARATION OF** |
| | ) **MARK REIN** |
| v. | ) |
| | ) |
| EPIC GAMES, INC., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |

I, MARK REIN, declare under the penalty of perjury that the following is true and accurate, and state as follows:

1.  I am over twenty-one (21) years of age.  I make this declaration based on personal knowledge and, if called to testify, could and would testify to the matters set forth herein.

2.  I am, and at all relevant times have been, the Vice President of Epic Games, Inc. ("Epic").

3.  I make this declaration in support of Epic's Memorandum in Opposition to Silicon Knights' Motion to Compel filed on March 4, 2008.

4.  To date, Epic has entered into over 125 license agreements for the Unreal Engine.  Of these, approximately 70 relate to Unreal Engine 3, which is the subject of this action.

5.  Each of Epic's Unreal Engine license agreements is negotiated between Epic and the applicable licensee.  Pricing and other competitively sensitive terms are often the subject of particularly focused negotiations.

1

ALL-STATE LEGAL® **DEFENDANT'S EXHIBIT** C

6.      I understand that Silicon Knights is seeking discovery of *all* of Epic's Unreal Engine license agreements and *all* communications and other documents, including computer code owned by licensees, within Epic's possession, custody, or control. Silicon Knights' requests would require Epic to disclose highly sensitive, competitive information regarding its business and the business of its licensees. Because Epic's licensees compete with Silicon Knights, such disclosure would likely (i) have a significant negative impact on licensee confidence in Epic and (ii) threaten the integrity of Epic's licensing business. I can ascertain no legitimate motive for the discovery requests, which appear to be calculated to disrupt Epic's business relationships.

7.      My views on this subject are not made in the abstract. Silicon Knights has already sought identical or similar competitively sensitive information from numerous licensees, and certain of those licensees have complained to Epic about the potential disclosure of their confidential information.

8.      Silicon Knights' request for all correspondence, memoranda, e-mails and/or other documents referring to or relating to any license agreements entered into with all of its Unreal Engine licensees would likely require Epic to search for and produce tens of thousands of documents (virtually all documents relating to licensing business) and to obtain the permission of certain licensees, pursuant to confidentiality provisions in their license agreements, before disclosing any of the contents of the agreement to a third party such as Silicon Knights. Conducting such an expansive search for tens of thousands of documents referring to or relating to Epic's license agreements would also disrupt and place an undue burden on Epic's business operations and would significantly detract from its abilities to support its licensing business.

9.      Under Epic's Integrated Partners Program ("IPP"), Epic grants third party software and hardware developers ("IPP Partners") access to the Unreal Engine code for the limited and express purpose of creating code ("Integration Code") which will allow the software, tools and middleware of such developers to integrate with the Unreal Engine. As part of the program, Epic grants IPP Partners access to the Unreal Developer Network ("UDN") and maintains a webpage for the IPP on Epic's Unreal

Technology website (located at http://www.unrealtechnology.com).  In exchange for inclusion in the program, IPP Partners grant rights in certain of their software, tools, and middleware to Epic.

10.     IPP Partners are also licensed to market the Integration Code to Unreal Engine licensees and receive certain limited rights to use the Unreal Engine 3 in connection with public demonstrations of their products and the Integration Code.  Epic receives a license to use the licensee's trademarks in connection with Epic's advertisement and promotion of the Integrated Partners Program as well as certain other rights.  As with the request for all documents relating to Epic's license agreements above, conducting such an expansive search for all documents relating to Epic's IPP business would also disrupt and place an undue burden on Epic's business operations.

11.     From approximately August 18, 2004 to the present date, Silicon Knights has had access to Epic's UDN pursuant to a Mutual Nondisclosure Agreement executed on August 6, 2004 and a License Agreement executed on May 10, 2005.

12.     The UDN is a multi-faceted online forum, supporting Unreal Engine licensees.  It contains Epic and licensee-generated encyclopedic content regarding game development with the Unreal Engine.  Thus, a licensee has access, through the UDN, to support documentation regarding the Unreal Engine that is frequently updated.  In addition, Epic provides Unreal Engine 3 licensees with access to its Perforce revision control system, which contains the latest versions of the source code, along with a history of changes to the source code so that licensees.

13.     Epic also provides electronic mailing lists for licensees to communicate with each other and with Epic regarding game development with the Unreal Engine, and modification and enhancement of the Unreal Engine.  Licensee communications and discussions on the electronic mailing lists are wide ranging and include such topics as future Unreal Engine development plans, troubleshooting and other technical support questions, and general discussions of video game development.  The UDN contains a searchable archive of messages posted to these electronic mailing lists.

This the 4 day of March, 2008.

_____
Mark Rein