# EXHIBIT I

Case 1:08-cv-00782 Document 18-10 Filed 03/21/2008 Page 1 of 20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SILICON KNIGHTS, INC., ) | |
| ) | Case No. 08 C 782 |
| Plaintiff, ) | Judge Gettleman |
| ) | Magistrate Judge Schenkier |
| vs. ) | |
| ) | Case No. 5-07-00275-D |
| EPIC GAMES, INC., ) | (Eastern District of North Carolina, |
| ) | Western Division) |
| Defendant. ) | |

## UNREPORTED CASES CITED IN MIDWAY GAMES INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO QUASH

1. *West v. Miller*, No. 05 C 4977, 2007 U.S. Dist. LEXIS 11360 (N.D. Ill. Feb. 13, 2007).

2. *Builders Assoc. of Greater Chicago v. City of Chicago*, No. 96 C 1122, 2001 WL 1002480 (N.D. Ill. Aug. 30, 2001).

3. *Nat'l Claims Management Corp. v. Mercedes-Benz of North Am., Inc.*, No. 97 C 6293, 1998 WL 27136 (N.D. Ill. Jan. 15, 1998).

4. *Concord Boat Corp. v. Brunswick Corp.*, No. 96 C 6026, 1996 WL 705260 (N.D. Ill. Dec. 4, 1996).

CHDS01 BRAGO 455554v1

LEXSEE 2007 U.S. DIST. LEXIS 11360

KANYE WEST, Plaintiff/Counter-Defendant, v. ERIC "E-SMOOVE" MILLER and FOCUS MUSIC GROUP, INC., Defendants/Counter-Plaintiffs.

No. 05 C 4977

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2007 U.S. Dist. LEXIS 11360

February 13, 2007, Decided

**PRIOR HISTORY:** *West v. Miller*, 2006 U.S. Dist. LEXIS 56243 (N.D. Ill., Aug. 11, 2006)

**COUNSEL:** [*1] For Kanye West, Plaintiff: Leslie Anne Morse, Law Office of Leslie A. Morse, Homewood, IL; Philip R Hoffman, Pryor, Cashman, Sherman & Flynn, New York, NY.

For Focus Music Group, Inc., Eric E-Smoove Miller, Defendant: Lois T. Collins, Randolph D Phifer, Victor L. Bowman, PHIFER & WHITE, P.C., Detroit, MI.

For Kanye West, Counter Defendant: Leslie Anne Morse, Law Office of Leslie A. Morse, Homewood, IL; Philip R Hoffman, Pryor, Cashman, Sherman & Flynn, New York, NY.

**JUDGES:** Wayne R. Andersen, United States District Judge. Magistrate Judge Maria Valdez.

**OPINION BY:** Wayne R. Andersen

**OPINION**

### MEMORANDUM, OPINION, AND ORDER

This matter is before the Court on defendants Eric "E-Smoove" Miller and Focus Music Group, Inc.'s objection to the order entered by Magistrate Judge Valdez on August 11, 2006, denying defendants' motion to compel production of documents and motion to extend discovery deadline. For the following reasons, we affirm Magistrate Judge Valdez's order and deny defendants' objection.

### BACKGROUND

Plaintiff Kanye West filed this action against defendants Eric "E-Smoove" Miller and Focus Music Group, Inc. alleging commercial misappropriation and commercial unfair [*2] competition through unauthorized exploitation of master recordings of performances by plaintiff made in 1995. According to the complaint, plaintiff is seeking declaratory judgment as to the ownership rights of the 1995 master recordings and also as to the invalidity of the alleged contract between plaintiff and defendants. Plaintiff is also seeking injunctive relief enjoining defendants from any further use of plaintiff's identity, as well as monetary damages. Defendants filed a counterclaim against plaintiff seeking declaratory judgment as to their rights to the 1995 master recordings, as well as monetary damages for breach of contract, fraud, and services rendered.

On June 29, 2006, defendants filed a motion to compel production of documents, seeking "all Documents relating to any recording agreements or music production agreements executed by Plaintiff," and specifically "all documents concerning the allegation in P 11 of the Complaint that Plaintiff is currently signed to an exclusive recording deal with Roc-A-Fella Records." Plaintiff argued that any recording agreements executed by plaintiff were confidential business records and not relevant to the matter at issue in this litigation. [*3] Plaintiff also asserted such agreements were not relevant to plaintiff's market value at the time of the alleged contract with the defendants. Plaintiff offered defendants a redacted version of his present recording agreement with Roc-A-Fella showing exclusivity clauses contained therein. Defendants denied that offer, demanding the

contract in full. On June 30, 2006, defendants also filed a motion to extend discovery, seeking an additional sixty days for depositions regarding the documents sought in the motion to compel.

In her August 11, 2006 Order, Magistrate Judge Valdez denied defendants' motion to compel all documents, finding that the documents sought were irrelevant to the issue in this matter and that the redacted version offered by plaintiff was sufficient. She also reasoned that the contracts that defendants were seeking would neither assist in determining the market value of plaintiff's work as a recording artist nor would it determine the value of his studio time in 1995. Defendants filed an objection to Magistrate Judge Valdez's Order stating they should be able to see all of plaintiff's recording agreements and the entire Roc-A-Fella contract, not just the redacted version. [*4] In response to Magistrate Judge Valdez's ruling and in an effort to compromise, defendants' objection limited their request to only those documents relating to any recording agreement executed by plaintiff over the last five years, which included the Roc-A-Fella contract.

## DISCUSSION

Magistrate Judge Valdez's Order is reviewed by this Court under the "clearly erroneous" or "contrary to law" standard. *FED.R.CIV.P. 72(a); 28 U.S.C. § 636(b)(1)(A).* "The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co., 126 F.3d 926, 943 (7th Cir. 1997).*

We find that Magistrate Judge Valdez correctly held that the documents relating to plaintiff's current contracts are not relevant to this litigation. The only contract relevant to defendants' counterclaim is the purported agreement between plaintiff and defendants in 1995. Consequently, agreements executed by plaintiff over the last five years would not be relevant to the instant complaint.

Defendants argue the Roc-A-Fella [*5] contract must be produced because that is what is motivating plaintiff to bring this lawsuit. However, Magistrate Judge Valdez determined that no documents relating to any recording agreements executed by plaintiff in the last five years, including the Roc-A-Fella contract, are relevant to this litigation and consequently no additional discovery was needed. We conclude that Magistrate Judge Valdez's ruling was not clearly erroneous, nor was it contrary to law.

## CONCLUSION

For these reasons, we deny defendants' objection to Magistrate Judge Valdez's August 11, 2006 Order.

IT IS SO ORDERED.

Wayne R. Andersen

United States District Judge

Dated: February 13, 2007

Westlaw.

Not Reported in F.Supp.2d        Page 1
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

H
Builders Ass'n of Greater Chicago v. City of Chicago
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
BUILDERS ASSOCIATION OF GREATER CHICAGO Plaintiff,
v.
CITY OF CHICAGO Defendant.
No. 96 C 1122.

Aug. 30, 2001.

MEMORANDUM OPINION AND ORDER

BROWN, Magistrate J.
*1 The District Judge having referred this matter for discovery supervision and for ruling on discovery motions and motions to quash subpoenas, and this Court having reviewed the pending motions and objections, and having received briefs and heard argument by the parties to this action and by recipients of certain subpoenas, for the reasons set out below, the objections to subpoenas served by the City of Chicago are SUSTAINED, the motions to quash subpoenas served by the City of Chicago are GRANTED and the City of Chicago's motions to compel are DENIED. See Exhibit A to this Order.

FACTUAL BACKGROUND

The factual background of this matter set out in the Memorandum Opinion and Order dated June 11, 2001 will not be repeated here. The issue presently before this Court is the enforcement of more than 500 subpoenas served by the City of Chicago ("City") on various construction contractors and subcontractors in connection with this case.[FN1] More than 30 objections to the subpoenas or motions to quash were filed by or on behalf of the recipients of the subpoenas. See Exhibit A to this Opinion. The City filed Motions to Compel Responses from the Trade Associations and from the Third Party Contractors. [Dkt119, 120.] Because the motions and objections raised common issues relating to the scope of discovery, the earlier Opinion concluded that this Court would await the expected decision of the United States Court of Appeals for the Seventh Circuit in *Builders Ass'n of Greater Chicago v. County of Cook* before ruling on the enforcement of the City's subpoenas. On July 6, 2001, the Seventh Circuit issued its opinion affirming the decision by District Judge John Grady that Cook County's ordinance requiring that minority- and women-owned businesses ("M/WBEs") be allotted certain percentages of subcontracts on county construction contracts is unconstitutional. *Builders Ass'n of Greater Chicago v. County of Cook,* 256 F.3d 642 (7th Cir.2001), hereinafter referred to as "*BAGC v. County.*" The Seventh Circuit did not directly address the issue of whether the governmental entity may introduce so-called "post-enactment" evidence in support of its burden to support a set-aside requirement. However, as discussed below, the Seventh Circuit's opinion sets out several points that guide this Court's determination on the issue of the City's subpoenas.

FN1. As described in that Opinion, in late October and early November, 2000, the City served subpoenas with virtually identical Riders requesting 49 categories of documents to: (a) all of the contractors and subcontractors who had been members of the plaintiff Builders Association of Greater Chicago ("BAGC") when the case was filed in 1996; (b) all of the contractor and subcontractor members of the Illinois Road Builders Association; (c) all of the contractor and subcontractor members of the Underground Contractors Association; and (d) all of the contractor and subcontractor members of the Electrical Contractors Association. (Mem. Op. and Order at 4.)

LEGAL STANDARDS

In 1996 when this case was filed, Rule 26(b)(1) of the Federal Rules of Civil Procedure described the scope of discovery as follows:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.[FN2]

> FN2. Effective December 1, 2000, Rule 26(b)(1) was amended to narrow the scope of discovery to "any matter, not privileged, that is relevant to the claim or defense of any party." However, this decision assumes that the earlier version of the Rule applies.

*2 Rule 45(c)(3)(A) provides, "On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it:...(iv) subjects a person to an undue burden." Rule 45(c)(2)(B) provides that a party serving a subpoena may move to compel the inspection or copying of materials sought in the subpoena over the objection of the subpoena recipient, but instructs the court that "[s]uch an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." The subpoenas at issue are considered against those standards.

THE CITY'S SUBPOENAS

There is simply no dispute that the City's subpoenas are extremely broad. (Copies of the subpoenas were attached as exhibits to the City's Response to Third-Party Motions to Quash [Dkt # 119].) The format of the subpoenas is virtually identical. The Rider to each subpoena begins with "Definitions and Instructions." The definition of "document" is 15 lines long, and apparently includes every format of information storage and retrieval. The time period covered by the subpoenas is 1978 through the present. The "Chicago area" is defined to include Cook, Lake, McHenry, Kane, DuPage, Kendall and Will counties. "Related to" is defined to mean "without limitation, concern, consist of, refer to, reflect,

evidence, display, show, prove, contain, encompass, support, demonstrate, include, or *be in any way legally, logically or factually connected to the matter referred to or have a tendency to prove or disprove the matter referred to* " (emphasis added). *See* Def. City of Chicago's Resp. to Mot. to Quash, Ex. J at 2.[FN3] The documents to be produced by the company receiving the subpoena are grouped in five categories: 1) background; 2) private sector jobs/projects; 3) public sector jobs/projects; 4) analyses; and 5) current lawsuit. There are thirteen specifications of documents to be produced in the category of "background." They include all joint venture agreements to which the company is a party, and all documents "relating to" the following: the company's incorporation; marketing and advertising; membership or resignation in or from business associations or social organizations; business licenses or governmental certifications; membership or affiliation with any trade organization; sponsorship of any person to become a member of a trade union; the company's hiring or use of any apprentice; and all documents related to any activity in which the company participated with respect to affirmative action. The background category also requires all documents that "relate to" any claim or complaint filed with any court, tribunal, union, administrative agency or governmental body, including *but not limited to* claims relating to race, age, gender or disability discrimination.

> FN3. It has been noted that the use of an "omnibus phrase" like "related to" when applied to general categories of documents is generally objectionable, because it imposes on the respondant "the arduous task of determining what documents or other information may or may not relate to the subject matter of the particular request for discovery." *Schartz v. Unified School Dist. No. 512,* 1996 WL 741384, *1 (D.Kan.1996). (No. Civ.A.95-2491-EEO).

The private sector jobs/projects category and the public sector jobs/projects category contain 13 parallel specifications relating to the private sector jobs and public sector jobs of the company receiving the subpoena: Bid

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lists maintained by the company, comprising the subcontractors the company has on its list for soliciting bids; bid lists "in the company's possession" (presumably bid lists provided by other primary contractors and trade associations); bid solicitations/invitations sent to subcontractors by the company; bid solicitations/invitations sent to subcontractors by the company in projects that have M/WBE utilization requirements; bids submitted by the company to the owner, indicating subcontractors included in the bid package; identification specifically of M/WBE subcontractors in bids submitted by the company to the owner; contracts entered into by the company with the owner; bid tally sheets "used or maintained" by the company, showing all subcontractor bids on a project; bid tally sheets in the company's possession; documents related to the company's selection of M/WBE subcontractors on contracts awarded by the owner to the company; documents related to the company's decision not to utilize particular M/WBEs on specific contracts awarded by the owner to the company; documents related to the company's evaluation of M/WBE subcontractors' qualifications; documents relating to payments by the company to M/WBE subcontractors on a project. For public sector jobs/projects, the subpoenas also require all documents related to any application by the company for a waiver or reduction of any M/WBE requirement in City of Chicago jobs, or any applications for credits with the City for non-government projects without affirmative action goals.

*3 In the category of "analyses," the subpoenas require all documents related to any studies of the company's work place by race, ethnicity, or gender, or of the availability of M/WBEs as contractors or subcontractors in the Chicago area.

With respect to the current lawsuit, the subpoenas require "all documents related to the current lawsuit," also all notes taken at meetings of the company's trade association or at any other meeting, and all documents "related to the subject matter raised in the instant lawsuit" generated by the company's trade association or by any other entity.

The City sent subpoenas of that breadth to more than 500 contractors and subcontractors, and stated in oral argument that it intends to serve more. (Tr. of April 30, 2001 at 34.)

THE OBJECTIONS AND MOTIONS

Not surprisingly, numerous objections and motions to quash were filed by individual companies that had received the subpoenas and by trade associations like the Illinois Road Builders Association on behalf of its members. *See* Exhibit A hereto. The non-party recipients of subpoenas who filed motions to quash or objections are referred to herein as the "Movants and Objectors." Many of the Movants and Objectors cited the extremely broad scope of the documents required and the burden upon the responding company. They also discussed the commercially sensitive nature of the information sought. A number of objections and motions included affidavits detailing the burden imposed by the subpoenas. For example, Krusinski Construction Company filed Objections including an affidavit by Jerry R. Krusinski, the Secretary and Treasurer of Krusinski Construction Company. [Dkt # 132]. Mr. Krusinski stated that his company has only 18 main office personnel, and that in order to comply with the subpoena, each such person would need five hours to search his or her files and the company would need an additional 50 hours to search the general files and field office files, for a total of over 140 person-hours. (Krusinski Aff. ¶¶ 15, 16.) As another example, Accu-Paving Company's Objection stated that the subpoena requires it to produce essentially all of the documents relating to its business from 1978 to present, and "if Accu-Paving literally complies, [the subpoena] would shut down its business."(Objections of Accu-Paving Company to Subpoena for Documents Served by City of Chicago at 2 [Dkt # 149].)

Other Movants and Objectors pointed out the particular problems the subpoenas imposed for their situations. For example, Schindler Elevator Company filed Objections and a Brief in Support [Dkt # 85] stating that, as a fabricator and installer of elevators, Schindler does very little subcontracting and therefore has little opportunity to use M/WBEs. In addition, Schindler stated, as a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

maker of heavy use items like elevators and escalators, it has been involved in many different lawsuits, including personal injury lawsuits, and it sees no justification for requiring it to review and produce all of its documents relating to each of those lawsuits.

*4 The City states that it undertook to negotiate with the subpoena recipients to limit the burden imposed, and sent out a proposal to limit certain aspects of the Rider. The proposal suggested that a "representational letter" might suffice for some of the background information, and that with respect to the public and private sector jobs, the City would select a random sample of jobs for inspection and copying. However, the City's proposal maintained the required production of documents "related to" the company's sponsorship of any person to become a member of a trade union, the company's hiring or use of any apprentice, all documents related to any activity in which the company participated with respect to affirmative action, and all documents that "relate to" any claim or complaint filed against the company, as well as all analyses and documents "related to the subject matter of the lawsuit." *See* Def. City of Chicago's Resp. to Mot. to Quash, Ex. S.

As reflected on the Joint Status Report [Dkt # 150], a number of subpoena recipients, including a number of Movants and Objectors, amicably resolved their differences with the City regarding compliance with the subpoena, although none of the motions to quash or objections has been formally withdrawn. The City argues that it was in the process of resolving issues of burdensomeness with the subpoena recipients until the BAGC directed recipients to object, and that "if left alone" by the BAGC, the City would work out the discovery so that it would not be burdensome. (Tr. of July 23, 2001 at 31.) However, the City's position is contradicted by the statements made by counsel for various Movants and Objectors at the oral argument before this Court. Counsel for the Electrical Contractors Association stated that negotiations with the City to limit the subpoenas had not been successful. (*Id.* at 48-49.) Another attorney stated that his client's objection was not prompted by the BAGC but rather by counsel's own concern on seeing the scope of the subpoena. (*Id.* at 52.) Counsel for four contractors, ranging from a small to a large company, all non-parties to the lawsuit, stated that the attorneys' time to review all of the documents and files sought by the City in order to remove privileged documents could amount to hundreds of hours and would cost his clients substantial attorneys' fees. (*Id.* at 51.)

The Court finds that the burden imposed upon the recipients of the subpoenas is very great, even under the City's proposed modification. Compliance with even a modified form of the subpoena will impose substantial expense on companies large and small to resurrect twenty-year-old files out of storage and review them. The scope of the subpoena, even under the proposed modification, touches upon many aspects of a construction company from the bidding and the payout of jobs to the hiring of staff. The personnel time that would have to be devoted to complying with the subpoena would be a hardship for even a large company and could have a serious effect on a small company. In addition, as pointed out by counsel, by insisting on all documents relating to every claim or complaint, the City is effectively forcing the companies to incur substantial attorneys' fees to review those documents for privileged communications. The question before the Court is whether this burden is "undue" in light of the issues in this lawsuit and the evidentiary burden upon the City.

## THE SUBPOENAS IMPOSE AN UNDUE BURDEN ON THE RECIPIENTS

*5 In this lawsuit, the City has a substantial burden to demonstrate "acceptable proof of a compelling interest in remedying past discrimination and illustrat[ing] that its plan is narrowly tailored to achieve this goal...."*Majeske v. City of Chicago,* 218 F.3d 816, 820 (7th Cir.2000). When asked why the City needed the information sought in the subpoenas, the City's counsel responded that the City intended to use the information to assemble a statistical model of the construction industry:
What we have to show, I believe under a proper statistical model, is what the passive participation of government as what happened in the private sector, what was happening in the private sector, what is happening in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

the private sector because of government's passive participation. The only way you can show that is by giving this [information] to economists and letting them apply economic and statistical theories to it to show the statistical model.

(Tr. of July 23, 2001 at 34.) Counsel for the City referred to the criticism of statistical evidence in prior cases, and argued:We cannot control the statistical model for those issues unless we have this type of discovery, because we don't otherwise have the information. It doesn't go to what we knew before the ordinance was enacted. All we needed to know then and all we need to show under *Croson* is that we have strong evidence of a compelling need. We believe we can show that. To prove that the remedy is right we have to be able to create a statistical test that is statistically viable.

(*Id.* at 40-41.)

Statistical evidence has played a role in proving discrimination, as recently discussed by the Seventh Circuit in *Chavez v. Illinois State Police*, 251 F.3d 612, 637-47 (7th Cir.2001). The court in *Chavez* pointed out that there are many difficulties in proving discriminatory effect by statistics, and there are very few cases in which statistics prove discriminatory intent.
Of course, parties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.

251 F.3d at 638. Most importantly, the particular statistics must address the relevant issue of the lawsuit. *Id.* at 638-39.

As the cases demonstrate and the City's counsel acknowledged, the task of demonstrating racial or gender discrimination in construction subcontracting through statistical analysis is fraught with difficulty. The Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) discussed some of the difficulties, which include identifying the number of M/WBEs qualified to undertake particular contracts and the fact that low minority membership in construction trade associations might reflect individual choices and not discrimination. *Id.* at 501-03.The Seventh Circuit's opinion in *BAGC v. County* described other problems. For example, the opinion referred to "the dubious proposition" that a comparison of the fraction of minority subcontractors on public projects and private projects would establish discrimination against minorities by prime contractors on private contracts. 256 F.3d at 647-48. In this case, as a practical matter, many companies may have destroyed in the ordinary course of business the documents the City now seeks, raising the issue of whether a statistically valid model could, in fact, be prepared.

*6 Significantly, the City here has not described a theory under which the enormous amount of raw data to be generated by the subpoenas would be analyzed and tailored to address a relevant issue in the lawsuit. Apparently, the City is seeking evidence of discrimination against minorities and women in the construction industry generally, not only in subcontracting but also in hiring and union membership. The City's subpoenas are not limited to contractors who sought to work on City projects. The subpoenas were sent to 500 contractors and subcontractors, whether or not they ever bid on any projects with the City. The Seventh Circuit's decision in *BAGC v. County* raises serious doubts about the admissibility of such evidence to support the City's set-side program. Even if the City were able to prove that there has been and continues to be discrimination by private contractors on private contracts, somehow overcoming the Seventh Circuit's comment that the use of M/WBE's on public contracts necessarily reduces the M/WBEs available for private contracts (256 F.3d at 645, 648), the focus of the Seventh Circuit's opinion is on discrimination by the government entity, not discrimination in the industry in general. The Seventh Circuit in *BAGC v. County* states that the law granting preferential treatment must be a remedy for intentional discrimination committed by the public entity, noting that there was no evidence presented that the County ever discriminated against any of the minority groups favored in the County's ordinance. 256 F.3d at 644-45. The Court's discussion of the "passive participation" theory again refers back to the County's knowledge:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

If prime contractors *on County projects* were discriminating against minorities and this was *known* to the County, whose funding of the contracts thus *knowingly* perpetuated the discrimination, the County might be deemed sufficiently complicit (a kind of joint tortfeasor, coconspirator, or aider and abettor) to be entitled to take remedial action.

Id. at 645, emphasis added.

Without deciding whether "post-enactment" evidence can ever be admissible to support a set-aside, it is fair to say that the Seventh Circuit's opinion in *BAGC v. County* raises a substantial question whether the information that would be obtained from the subpoenas can be distilled into a statistically valid model that would address a relevant issue in the case.

Even assuming, *arguendo*, that a statistical model demonstrating discrimination in the construction industry could be assembled and would be admissible as evidence, there is also a serious question whether a party may use the subpoena power of the court to compel non-parties to provide the raw data from which that party will extrapolate a statistical model. The City has not cited, nor has this Court's research disclosed, any cases in which a party preparing a study, survey or model has been permitted to use the judicial power of the subpoena to compel non-parties to provide the data the party's expert needs to create the study, survey or model.[FN4] In *Chavez*, for example, the plaintiffs, who sought to prove that traffic stops were impermissibly based on race or ethnicity, obtained by discovery the defendants' databases of citations, warnings and field reports. 251 F.3d at 626. However, when the plaintiffs subpoenaed the Illinois Secretary of State (not a party to the lawsuit) for records of drivers' licenses, the Magistrate Judge held, and the District Judge agreed, that the plaintiffs would be required to pay the statutory fee for the records, which at 2 cents per record amounted to $160,200. *Id.* at 627, 632. The subpoena was quashed. *Id.* at 632.

> FN4. For example, in *Engineering Contractors Ass'n of South Florida, Inc. v. Metropolitan Dade County*, 122 F.3d 895 (1997), several studies were prepared by the defendant county. *Id.* at 912. The data was drawn from the county's own records (*Id.* at 912, 919), a telephone survey of contractors who had filed "certificates of competency" with the county (*Id.* at 920), a database that had itself been derived from the census (*Id.* at 921), and the Census Bureau's Survey of Minority and Women Owned Businesses. (*Id.* at 923.)

*7 It must be remembered that many of the subpoena recipients are bystanders both to this lawsuit and to the City contracts at issue. They have never sought to obtain a contract or subcontract on a City project. To use the power of the subpoena to obtain information from them for the City's proposed model would be comparable to a party in a trademark suit being able to subpoena non-party consumers for information about their personal buying decisions to see whether they were confused concerning the disputed products. There is no precedent that supports that use of the subpoena power.[FN5]

> FN5. In one of the cases that preceded the amendment of Rule 45 regarding a subpoena for an unretained expert's opinion (Rule 45(c)(3)(B)(ii)), a district court quashed a subpoena seeking the research that had previously been done by a safety engineer regarding the safety of the AMC Jeep. The court stated, "Opportunity enough exists [in the judicial process] for an adversarial exploration of truth in litigation without the necessity of conscripting non-witness researchers into discovery and trial appearances." *Snyder v. American Motors Corp.*, 115 F.R.D. 211, 216 (D.Az.1987). Likewise, this Court is reluctant to use the judicial power to compel non-parties to provide their sensitive business records to create data for a party's expert witness.

Turning to the documents sought "relating to" claims and complaints against the company, those documents are not relevant to the subject matter of the lawsuit. Clearly, lawsuits and claims relating to personal injury actions, breach of contract, and all of the myriad dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

putes that arise in the process of a construction project are totally irrelevant, as are claims relating to age discrimination, COBRA, ERISA, ADA, and the Equal Pay Act. The City makes no attempt to justify the burden and expense of compliance with its demand for these documents.

The City claims that it needs documents relating to discrimination claims to "allow the parties to explore the various levels at which discrimination may exist in the construction industry."(Def. City of Chicago's Resp. to Mot. to Quash at 23.) The City similarly defends its demand for documents relating to hiring, use of apprentices and sponsorship of a person for membership in a trade union on the basis that it is exploring barriers to entry in the construction industry. (*Id.* at 23-24.)However, the subject matter of the ordinance in question, and hence of this lawsuit, is subcontracting to minority- and women-owned businesses, not discrimination in hiring on the basis of race or gender, a distinction noted by the Seventh Circuit in *BAGC v. County*, 256 F.3d at 646.

The City also seeks from these non-party respondents "all documents related to" any studies, surveys or statistical analyses of either: (a) the company's workplace; or (b) the availability of MBEs or WBEs as contractors or subcontractors. As noted previously, the company's workplace is not the subject matter of this lawsuit. Furthermore, it is difficult to see how a non-party's studies of either topic could be admissible or lead to admissible evidence. Finally, Rule 45(c)(3)(B)(ii) specifically provides that if a subpoena "requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study not made at the request of any party" a court may quash the subpoena or, upon a showing of substantial need that cannot otherwise be met by the party seeking the material, condition the production. The City has not made a such a showing.

Finally, the City seeks all documents "related to" the current lawsuit, notes taken at meetings "related to the subject matter raised in the instant lawsuit" and, a catchall category: "Any and all documents generated by any person or entity ... related to the subject matter raised in the instant lawsuit."(Def. City of Chicago's Resp. to Third Party Mot. to Quash, Ex. J at 6.) These descriptions, which simply recite the language of Rule 26, are grossly overbroad and would be objectionable if sent to a party to a lawsuit, let alone non-parties. The City's proposed modification did not limit the scope of these descriptions. (Def. City of Chicago's Resp. to Third Party Mot. to Quash, Ex. S.) Rule 45(a) permits a subpoena to command the production of *"designated* books, documents or tangible things" (emphasis added). It cannot lawfully require a non-party to examine each and every document in its possession, custody or control from 1978 to the present to determine if the document is "related to the subject matter of the lawsuit."In *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 21 (D.D.C.1998), the court quashed the portion of a subpoena that required the recipient to provide all documents related to the case or the "Filegate" controversy. The court held that the description was overly broad and impermissibly vague. "The witness should not be required to determine the precise contours of plaintiffs' requests and that is exactly what these requests would necessitate."*Id.* at 35.Furthermore, in this case the City has not explained how a third party's documents on the "subject matter of the lawsuit" could be admissible or lead to admissible evidence.[FN6]

> FN6. There is no point in the Court's limiting the subpoenas, for example, as to recipients or type of documents to be produced, because the City contends it needs all of the information sought, at least in its proposed modification, for its statistical model.

THE SUBPOENAS ARE QUASHED.

*8 A subpoena is not a polite suggestion or an invitation to negotiate. It is a command, literal compliance with which is enforceable by the contempt power of the federal courts. Fed. R.Civ. P.45 (e). The subpoenas sent by the City to more than 500 companies would require an extraordinary expenditure of time and money in attorneys' fees and in the value of employee time spent, reviewing documents in the "possession, custody or control" of the recipients.F.R.Civ.P.45(a). Many of the documents sought by the City are not relevant to the subject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

matter of the lawsuit. The City's extremely broad definition of "related to" improperly shifts the burden to the subpoena recipient to determine factually and legally whether a document relates to the subject matter of the lawsuit. Finally, the City's use of the subpoena power to obtain from non-party witnesses raw data for its statistical model is a burden that has not been justified, even if it were assumed, *arguendo*, that such a statistical model could be admissible as evidence, a questionable proposition in light of the opinion by the Seventh Circuit in *BAGC v. County*.

Contrary to the arguments of the City's counsel, this decision does not cut the City off from all discovery in this case. However, when a party seeks a court order to compel compliance with discovery, the discovery must be consistent with the letter and the spirit of the Federal Rules of Civil Procedure. The City's subpoenas are not.

## CONCLUSION

The motions to quash the City's subpoenas are GRANTED and the objections to the City's subpoenas are SUSTAINED, as set out in Exhibit A hereto. The City's Motions to Compel are DENIED. A schedule for discovery and a discovery cut off date will be set at the status hearing in this matter on August 30, 2001.

IT IS SO ORDERED.

Exhibit A

| Party Name | Brief Name | Docket Number | Ruling |
| --- | --- | --- | --- |
| Accu-Paving Company | Joinder of Accu-Paving Co. in Ecker Enterprises Amended Motion to Quash Subpoena | 104 | Granted |
| | Objections of Accu-Paving to subpoena for docs served by City of Chicago | 149 | Sustained |
| Altschuler, Melvoin & Glasser | Objections to Subpoenas (12/12/00) | 92 | Sustained |
| Associated Equipment Distributors | Objections to Inspection or Copying docs to the Subpoena of The City of Chicago | 82 | Sustained |
| Association Forum of Chicago | Objections to Inspection or Copying docs to the Subpoena of The City of Chicago | 81 | Sustained |
| Barge Terminal Trucking, Inc. | Objections to Subpoena for Docs Served by City of Chicago | 80 | Sustained |
| Fred Berglund & Sons, Inc. | Objection to Subpoena issued by City of Chicago | 72 | Sustained |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

| | | | |
|---|---|---|---|
| Bulley & Andrews | Joinder of Bulley & Andrews In Ecker Enterprises Inc.'s Amended Motion to Quash Subpoena | 109 | Granted |
| | Objection of Subpoena to Inspection and Copying | 68 | Sustained |
| City of Chicago | Motion to Compel Responses from Third Party Trade Associations | 119 | Denied |
| | Motion to Compel Responses from Third Party Contractors | 120 | Denie d |
| Concrete Reinforcing Steel Institute | Objections to Inspection or Copying Docs to the Subpoena of The City of Chicago | 83 | Sustained |
| Ecker Enterprises, Inc. | Motion to Quash Subpoena | 76 | Granted |
| | Amended Motion to Quash Subpoena | 77 | Granted |
| Electrical Contractors Association of City of Chicago [and certain member contractors] | Motion to Quash Subpoenas Issued to the Electrical Contractors Association of The City of Chicago and Certain member Contractors of Said Association | 75 | Granted |
| Erland's Electrical Contractors, Inc. | Motion to Quash Subpoena and to Join Electrical Contractors Associations of City of Chicago Motion to Quash Subpoenas | 124 | Granted |
| Gilbane Building Company, Inc. | Objection to subpoena pursuant to Rule 45(c)(2)(B) | 143 | Sustained |
| Graycor Construction Company | Objection to subpoena pursuant to Rule 45(c)(2)(B) | 142 | Sustained |
| Graycor Industrial Constructors | Objection to subpoena pursuant to Rule | 141 | Sustained |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | | | |
|---|---|---|---|
| Illinois Schindler Elevator Company | 45(c)(2)(B) Objections to subpoena for production of documents | 85 | Sustained |
| Jones & Brown Company, Inc. | Objections to Subpoena | 69 | Sustained |
| Jupiter Mechanical Industries, Co. | Motion to Quash Subpoena | 86 | Granted |
| Kelso-Burnett Co. | Motion to Quash Subpoena | 93 | Granted |
| Kiferbaum Construction Co. ("KCC") | Motion to Quash Doc Subpoena Issued to Non-Party Kieferbaum Construction Company | 88 | Granted |
| | Motion for Leave to Supplement Motion to Quash with Attached Affidavit | 89 | Granted |
| Krusinski Construction Company | Objection to subpoena pursuant to Rule 45(c)(2)(B) | 140 | Sustained |
| Illinois Road Builders Association ("IRBA") | Rule 45(b) Objections of Certain Illinois Road Builders Association Members to City of Chicago Doc Subpoenas | 96, 108 | Sustained |
| | Motion to Quash and/or for Protective Order | 115, 116 | Granted as to motion to quash; denied as moot as to protective order |
| Maron Electric Company | Objection to Subpoena | 97 | Sustained |
| Michuda Construction Inc. | Objections to City of Chicago's Subpoena | 101 | Sustained |
| Northeastern Illinois Chapter of the National Electrical Contractors Association | Objections to City of Chicago's Subpoena | 99, 100 | Sustained |
| Power Construction Company | Objections to Defendant's Rule 45 Subpoena | 70 | Sustained |
| Thorne Associates, Inc. | Objections to Subpoena Duces Tecum Served on Thorne Associates, Inc. | 71 | Sustained |
| Tribco Construction | Objection to Subpoena | 159 | Sustained |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                             Page 11
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

| Company | of City of Chicago | | |
| --- | --- | --- | --- |
| Underground Contractors Association | Motion to Quash Subpoenas and for Protective Order of the Underground Contractors Association | 121 | Granted as to motion to quash; denied as moot as to protective order |
| | Corrected Motion to Quash Subpoenas and for Protective Order of the Underground Contractors Association | 122 | Granted as to motion to quash; denied as moot as to protective order |
| | Objections to the Document Subpoenas Issued by the City of Chicago | 113 | Sustained |
| Valor Power Light & Communications, Inc. | Objection to Subpoena Pursuant to Rule 45(c)(2)(b) | 144 | Sustained |

N.D.Ill.,2001.
Builders Ass'n of Greater Chicago v. City of Chicago
Not Reported in F.Supp.2d, 2001 WL 1002480 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1998 WL 27136 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

C
National Claims Management Corp. v. Mercedes-Benz of North America, Inc.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
In re Subpoena Issued to Certificate Clearing Corporation in NATIONAL CLAIMS MANAGEMENT CORPORATION,
v.
MERCEDES-BENZ OF NORTH AMERICA, INC.
No. 97 C 6293.

Jan. 15, 1998.

### MEMORANDUM OPINION AND ORDER

KEYS, Magistrate J.
*1 This matter comes before the Court on non-party Certificate Clearing Corporation's Motion to Quash Defendant's Subpoena, pursuant to Rule 45 of the Federal Rules of Civil Procedure. For the following reasons, this Court grants the motion to quash.

The underlying lawsuit, pending in the United States District Court for the Central District of California, was brought by Plaintiff National Claims Management Corporation ("NCMC") against Defendant Mercedes-Benz of North America, Incorporated ("Mercedes"). NCMC alleges that Mercedes unlawfully interfered with its attempts to create, or "make", a secondary market in transferrable coupons that Mercedes issued to settle a separate products liability class action. NCMC alleges, *inter alia,* that Mercedes, by refusing to provide it with the names of class members, hindered its efforts to compete in the secondary market for Mercedes' settlement coupons (in violation of the Sherman Act). The parties agree that-to prevail-NCMC must prove that Mercedes had the power to *eliminate* NCMC from any downstream market/competition in settlement coupons, because Mercedes controlled (and kept it from accessing) an "essential facility". A facility is "essential" where it would be impossible to be in business without it. *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 544 (9th Cir.1991), *cert. denied,* 503 U.S. 977 (1992); *see also Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973).

Certificate Clearing Corporation, ("CCC"), is not a party to the underlying lawsuit. Nonetheless, Mercedes seeks to discover CCC's business practices because, despite the fact that it, like NCMC, was not provided with a list of class members, CCC managed to make a market in the coupons at issue. Mercedes would like to use the information to prove that the list was not an essential facility.

Market-making in settlement coupons is a specialized and competitive field, requiring the development of particular business techniques and practices. Allowing Mercedes' subpoena to stand would cause CCC's confidential business practices and techniques, as well as other sensitive information, to be revealed to NCMC, a principal competitor. Moreover, such information is not necessary to Mercedes' defense.

It is undisputed that CCC made a market in the coupons.[FN1] (Declaration of Russell G. Petti, counsel for Mercedes, at para. 6.) Mercedes already has use of that fact in its defense. What the subpoena seeks is information on *how* CCC made that market, how profitable that market was for CCC, and detailed information about *how* CCC conducts its business. If necessary or relevant, experts can provide testimony about *how* one would go about making a market without use of a class member list.

> FN1. However, even if, *arguendo,* there were some dispute about this, the fact that another business made a market in the coupons could be proven with expert testimony, or by other means.

Additionally, as discussed earlier, enforcing the

Case 1:08-cv-00782     Document 18-10     Filed 03/21/2008     Page 17 of 20

Page 2

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 27136 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

subpoena would require disclosure of trade secrets and/or other confidential commercial information that could ultimately result in CCC's destruction. Apparently it is not obvious how CCC operates-if it were, Mercedes would not be seeking a subpoena. Forcing CCC to divulge confidential business information to its competitor could cause it to suffer undue harm through adverse economic consequences.

*2 Finally, Mercedes has failed to show that it could not develop the same information through expert testimony, or otherwise. Thus, Mercedes has not shown a substantial need for the information it seeks in its subpoena. For the foregoing reasons, the subpoena sought by Mercedes is unnecessary, unreasonable, and oppressive.

IT IS THEREFORE ORDERED that CCC's motion to quash Mercedes' subpoena be, and the same hereby is, GRANTED.

IT IS ALSO ORDERED that CCC's request for fees and expenses incurred with respect to the motion to quash be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that NCMC's motion for leave to file objection to CCC's motion to quash, which was untimely (and is now moot) [FN2] be, and the same hereby is, DENIED.

> FN2. The motion is moot since NCMC's purpose in filing it was "to protect its interest in the event Court determined to impose a protective order."(NCMC's Reply to CCC's Response at 2.)

N.D.Ill.,1998.
National Claims Management Corp. v. Mercedes-Benz of North America, Inc.
Not Reported in F.Supp., 1998 WL 27136 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1996 WL 705260 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

C
Concord Boat Corp. v. Brunswick Corp.
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
CONCORD BOAT CORPORATION, et al, Plaintiffs,
v.
BRUNSWICK CORPORATION, A Delaware Corporation, Defendant.
No. 96 C 6026.

Dec. 4, 1996.

*MEMORANDUM OPINION*

KOCORAS, District Judge:
*1 This matter is before the court on a motion to compel third party National Marine Manufacturers Association to comply with a subpoena duces tecum. For the reasons set forth below, this motion is denied.

BACKGROUND

This motion has been filed by Concord Boat Corporation and other plaintiffs in an action in the United States District Court for the Eastern District of Arkansas (collectively "Concord" or "plaintiffs") seeking to compel the National Marine Manufacturers Association ("NMMA"), a third-party not directly involved in the Arkansas suit, to fully comply with a subpoena duces tecum. The Arkansas suit, file number LR-C-95-781, is an action under the Sherman Antitrust Act, 15U.S.C. §1*et seq.*, and the Clayton Antitrust Act, 15 U.S.C. §12*et seq.* The plaintiffs, members of the recreational marine industry, allege that defendant Brunswick Corporation ("Brunswick") is engaging in various types of anticompetitive behavior. *See* NMMA's Memorandum in Opposition to Plaintiff's Motion to Compel ("NMMA's Memorandum") at 1-2.

The NMMA is a trade association for the recreational marine industry that represents manufacturers and other marine products companies. One of the services that the NMMA provides to its members is the collection and analysis of statistical data concerning various aspects of boating equipment in the United States, the results of which are published by the NMMA in its Monthly Statistical Report of the Recreational Marine Industry ("Monthly Report"). Thus, while the NMMA collects data from individual companies, it reports the information in the aggregate, reflecting the industry as a whole. The information reported by each company includes the number of its products which were shipped during the prior month and the wholesale value of these shipments. Since this information is potentially valuable to competitors, the manufacturers that submit data to the NMMA have required assurances that the information they provide will be kept confidential. *See* NMMA's Memorandum at 5-6.

DISCUSSION

The NMMA objects to requests 7, 8, and 10 of Concord's subpoena on the grounds that they are "vague and ambiguous" and because they seek "highly confidential commercial information." The relevant requests seek the following information:
7. All documents, information or data in any form submitted by Association members to the Association relating to the period from January 1, 1990 through April 1, 1996 which report, categorize, set forth, summarize, evaluate, estimate or project, on a monthly, quarterly, seasonal, annual or periodic basis: (a) revenues, expenses and profits and losses from the sale of stern drive marine engines; (b) revenues, expenses and profits and losses from the sale of outboard marine engines; (c) revenues, expenses and profits or losses from the sale of stern drive boats; (d) production or manufacturing capacity, production or manufacturing volume, actual sales information regarding stern drive marine engines,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 705260 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 2

outboard engines, stern drive boats and/or outboard boats; and (e) revenues, expenses and profits and losses from the sale of outboard boats.

*2 8. Documents relating to any and all monthly and/or quarterly financial statements, including without limitation, balance sheets, income statements, and related work papers, compilations, review or opinions furnished by Association members to the Association.

10. Documents relating to any and all reports by all manufacturers that provide data that is used in compiling the statistical data such as the attached July 1995 NMMA Monthly Statistical Report of the Recreational Marine Industry, or any similar report relating to the period from January 1, 1990 through April 1, 1996.

See Affidavit of Brooks F. Poley exh. E. Because we find that these requests are overbroad and that Concord has failed to sufficiently demonstrate the necessity of such information in this case, we deny its motion to compel.

When a party seeks protection from a subpoena, a district court "must apply a balancing test to determine whether the need of the party seeking disclosure outweighs the adverse effect such disclosure would have on the policies underlying the [claimed] privilege."*Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 559 (7th Cir. 1984), quoting *Equal Employment Opportunity Commission v. University of Notre Dame du Lac*, 715 F.2d 331, 338 (7th Cir. 1983). When confidential information is being sought, "the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information."*The Stanley Works v. Newell Co.*, 1992 WL 229652 at *2 (N.D.Ill. 1992), quoting *Greater Rockford Energy and Technology Corp. v. Shell Oil Co.*, 138 F.R.D. 530, 534 (C.D.Ill. 1991)(other citations omitted). For these purposes, information is considered relevant if it encompasses any matter that bears on or might reasonably lead to matters that could bear upon any issue in the case at hand. *Id.*, quoting *Greater Rockford*, 138 F.R.D. at 534 (other citations omitted).

In applying the balancing test, this court must consider a number of factors. These include the relevance of the requested information to the underlying litigation, the party seeking discovery's need for the information, whether the requests are burdensome, the fact that the party from whom discovery is being requested is a non-party to the underlying case, and the fact that the disclosure would be made to competitors. See *Stanley Works*, 1992 WL 229652 at *3, citing *Greater Rockford*, 138 F.R.D. at 534. With these factors in mind, we will turn to a discussion of their implications to the motion before us.

As a preliminary matter, it is readily apparent, and uncontested by the parties, that the information sought by Concord is confidential information. The documents which Concord seeks contain pricing information of individual manufacturers of marine equipment, information which is not generally known and which the manufacturers do not make publicly available. Since the information sought is confidential, therefore, we will move to a discussion of the various factors which guide our inquiry.

*3 Concord argues that the requested documents are relevant and necessary in this case because they will help establish the "relevant markets" involved, a necessary element in an antitrust action. See *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 891 (1993). However, Concord has not sufficiently demonstrated that these broad requests are truly necessary to determine such markets. It is not clear that Concord cannot glean the necessary information from the documents which it received from its other requests, which include information on Brunswick's sales and sales in various parts of the recreational marine industry as a whole. Outside of assertions that the requested documents are "critical" to discovering the relevant markets and to check the accuracy of the NMMA's statistical reports, there is no evidence that these documents are necessary in light of these other documents which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 705260 (N.D.Ill.)  
(Cite as: Not Reported in F.Supp.)

Page 3

were already produced. Mere assertions of necessity are insufficient to establish that these documents are relevant in the instant case, and this factor tends to weigh against our granting Concord's motion.

In addition, the contested document requests are broad, and compliance by the NMMA would likely be burdensome. Concord is seeking almost six years' worth of documents from an unenumerated set of NMMA members, covering data on revenues, expenses, profits, and losses from various types of marine equipment. The three requests are therefore likely to encompass a great deal of information, the collation and production of which would take a great deal of time and effort. In addition, it is clear that the NMMA is a non-party to this suit, with no real interest in the outcome of the litigation. Therefore, the burden which would likely be placed on the NMMA by these requests weighs against our granting this motion.

Lastly, disclosure of the requested information by the NMMA would be to competitors in the same industry, another factor which weighs against this subpoena. Concord and the other plaintiffs are all manufacturers in the recreational marine equipment industry, and are seeking sales information from other manufacturers in the same industry. The requested information, therefore, is from competitors, and divulging it to the plaintiffs raises antitrust issues of a different sort. Therefore, we find that all of the factors weigh against our compelling the production of the requested documents, and we must deny Concord's motion.

Concord argues that the NMMA has waived many of its objections to the current subpoena because they were not filed within the limit imposed by Fed.R.Civ.P. 45. We disagree with Concord and find that the NMMA's objections are appropriate in this instance. Concord also argues that the protective order which was entered into in this case is sufficient to allay the NMMA's fears that confidential information may be used in an inappropriate manner and that we should therefore reject the NMMA's objections to discovery. However, it is established that even when a protective order has been entered, a party requesting disclosure of confidential material "must make a strong showing of need, especially when confidential information from a nonparty is sought." *Greater Rockford,* 138 F.R.D. at 538, quoting *Litton Industries, Inc. v. Chesapeake & Ohio Railway Co.,* 129 F.R.D. 528, 531 (E.D.Wis. 1990). Since Concord has failed to make a strong showing of need, as discussed above, we find that this argument is without merit.

*4 Therefore, because Concord has failed to show that it truly needs the information sought in requests 7, 8, and 10 of its subpoena, and because we believe that the requests are overly broad on their face, we deny Concord's motion to compel.

CONCLUSION

For the reasons set forth above, the plaintiffs' motion to compel is denied.

N.D.Ill.,1996.  
Concord Boat Corp. v. Brunswick Corp.  
Not Reported in F.Supp., 1996 WL 705260 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.