**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SILICON KNIGHTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 782 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| EPIC GAMES, INC., | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendant. | ) | |

**SILICON KNIGHTS, INC.'S RESPONSE IN OPPOSITION TO**
**MIDWAY GAMES INC.'S MOTION TO QUASH SUBPOENA**

Plaintiff Silicon Knights, Inc. ("Silicon Knights"), by its attorneys, hereby respectfully submits this response in opposition to the Motion to Quash Subpoena filed by Midway Games Inc. ("Midway"). In opposition to the Motion to Quash, Silicon Knights states as follows:

**INTRODUCTION**

Nothing in Midway's Motion to Quash changes the basic fact that the following categories of documents in Midway's possession are highly relevant to the underlying litigation between Silicon Knights and Epic Games, Inc. ("Epic"): (1) communications relating to the interpretation of the term "Enhancements" in Midway's license agreement with Epic; (2) documents relating to complaints about the performance of the Unreal Engine 3 ("the Engine"); and (3) the final, executed license agreement (with any amendments) between Epic and Midway or its subsidiary. Midway's objections to Silicon Knights' subpoena misconstrue Silicon Knights' document requests and manufacture Midway's purported concerns over the disclosure of confidential information and/or trade secrets. To be clear, Silicon Knights is not seeking production of Midway's technical trade secrets (such as source or object code) and has provided the protective order entered in the North Carolina case which ensures that Silicon Knights' employees will not have access to documents produced by Midway.

Midway also ignores Silicon Knights' repeated attempts to cooperate with Midway, including narrowing the subpoena to certain key topics and documents. Indeed, Midway filed its Motion before those efforts took place, yet nevertheless refuses to modify or withdraw any part of its Motion. Moreover, Midway still does not squarely set forth its objections with respect to the modified requests. Rather, Midway misrepresents the requests to make them appear narrower than they actually are and asserts that it has no responsive documents based on those self-serving (and non-existent) conditions. Further, Midway argues that it should not be compelled to produce any documents on the grounds that the documents contain confidential information and/or trade secrets, without addressing: (a) Silicon Knights' efforts to exclude such technical information from the requests, or (b) the protective order, which would clearly protect any residual confidential and trade secret information. The Court should reject Midway's stonewalling tactics, and deny the Motion to Quash.

Likewise, Midway is silent with regard to its extremely close business relationship with Epic. In fact, Midway is the publisher of *Unreal Tournament 3*, a video game that was developed by Epic at the same time as Silicon Knights' development efforts were being delayed by the problems with Epic's Engine. Very simply, Midway's involvement in Epic's competition with Silicon Knights during this time period underscores the relevance of Midway's information.

Most tellingly, however, Midway never addresses the numerous public statements that its employees and officers have made that directly refute its position in its Motion (i.e., that Midway was fully aware of the problems with the Engine and that Midway's efforts to address those problems allegedly were typical of the efforts that others in the industry had to undertake). There is no question that Midway had serious problems with the Engine, which led directly to Midway's reluctance to enter into agreements with other developers using the Engine.

Consequently, the Court should deny Midway's Motion to Quash on the grounds that the documents requested are relevant and necessary to the underlying litigation, and that both the narrowly tailored revisions to the subpoena and the protective order in place in the underlying litigation will serve as adequate safeguards for any material produced by Midway.

**FACTUAL BACKGROUND**

**The Underlying Litigation Between Silicon Knights and Epic.**

This proceeding concerns a subpoena issued by Silicon Knights to Midway, in connection with litigation between Silicon Knights and Epic in the United States District Court for the Eastern District of North Carolina (styled *Silicon Knights v. Epic*, Case No. 07-00275). In May 2005, Silicon Knights entered into a license agreement to use Epic's Engine, based on representations by Epic of the Engine's performance and capabilities. Similarly, Midway Home Entertainment (a division of Midway), also entered into a license agreement with Epic to use the Engine in 2005. Although the license agreement was signed by a separate division, Midway Games nevertheless listed the license agreement with Epic as one of the parent company's assets. (*See* Declaration of Daniel Konieczny ("Konieczny Decl."), Exh. A, License Agreement (Exh. 10.3 from Midway Games' 10-Q).)

Silicon Knights experienced significant problems with the Engine. Despite Epic's representations and assurances, Silicon Knights discovered that the Engine was not functional with the video games that Silicon Knights had informed Epic that it intended to develop. Ultimately, Silicon Knights was forced to abandon the Engine and develop its own software to avoid losing its game, thereby incurring substantial additional costs and production delays.

The Complaint in the underlying lawsuit asserts numerous causes of action against Epic relating to the license agreement, including fraudulent inducement, negligent misrepresentation, unfair competition, and breach of contract. (*See* Konieczny Decl., Exh. B, Complaint at ¶¶ 93 – 117.) In response, Epic contends, *inter alia*, that Silicon Knights should have known that the Engine would not function with the video games that Silicon Knights intended to develop and that Epic's "other licensees" have been content with the Engine and have used it successfully. (*See Id*., Exh. C, Epic's Response at ¶¶ 11, 16, 19 and 37.) Epic also filed a counterclaim alleging that (1) Silicon Knights' experience with the Engine was unique because Epic's "other licensees" have achieved great success using the same Engine, and (2) Silicon Knights' development of its own game engine constitutes misappropriation of Epic's trade secrets and

infringement of its copyrights. (*See Id.*, Exh. D, Epic's Counterclaim at ¶¶ 9 - 11.) Silicon Knights denies Epic's allegations and contends that widespread industry discontent exists with the Engine. *(See Id.*, Exh. E, Silicon Knights' Response, at ¶¶ 20-22.) In addition, Silicon Knights contends that the game engine it successfully developed is distinct from the Engine and, at a minimum, is an "Enhancement" under the terms of its license agreement with Epic, and thus the sole property of Silicon Knights. (*See Id.*, Exh. E, Silicon Knights' Response, at ¶ 22.)

Because Epic refuses to produce certain documents regarding the parties' allegations, claims, and defenses, Silicon Knights seeks to obtain relevant documents from Epic's purportedly successful "other licensees" (a group to which Midway contends it belongs) to determine whether Epic's claims and allegations have merit. Indeed, Silicon Knights is entitled to production from such "other licensees" in any event, given that those licensees may have different document retention policies and likely have relevant, internal materials that Epic would not have in its possession. Moreover, Epic's course of dealing with its licensees and interpretation of recurring contractual terms like "Enhancement" make the experiences of those licensees relevant to the litigation.

**Silicon Knights' Subpoena to Midway and Its Efforts to Meet and Confer.**

On January 16, 2008, Silicon Knights issued a subpoena on Midway requesting the production of documents by February 6, 2008. (*See Id.*, Exh. F, Subpoena.) The subpoena was properly served. (*See Id.*, Exh. G, Proof of Service.) In the cover letter provided with the subpoena, Silicon Knights' counsel offered to accept production of the requested documents by numerous means, attached a proposed protective order designed to protect confidential information, and invited Midway to contact Silicon Knights' counsel to discuss any concerns about the subpoena that it may have. (*See Id.*, Exh. F, Subpoena). Midway's counsel did contact counsel for Silicon Knights to request a time extension but did not otherwise respond to the letter or proposed protective order. Instead, Midway filed this Motion to Quash on February 5, 2008.

Upon receiving the Motion to Quash, Silicon Knights again contacted Midway's counsel and offered to narrow the scope of the subpoena. At the request of Midway's counsel, Silicon

Knights set forth its proposed modifications in writing on February 7, 2008. (*See* Declaration of Anjali Kurani ("Kurani Decl.") at ¶ 2, Exh. A (Feb. 7, 2008 e-mail to Sweeney).) Despite having requested the proposed modifications in writing, Midway's counsel never responded to Ms. Kurani's email. (*See Id.*, ¶ 3.) As part of Silicon Knights' further efforts to resolve this matter, counsel for Silicon Knights sent a second letter to Midway's counsel setting forth the same proposed modifications and a third letter, at this Court's request, confirming that Silicon Knights had modified its subpoena to Midway. (*See* Konieczny Decl., Exh. H and I, respectively, Mar. 3, 2008 and Mar. 6, 2008 letters to Sweeney.) Counsel for Midway again refused to provide any substantive response to those communications.

**Silicon Knights' Modified Subpoena Requests.**

As set forth in Silicon Knights' letters to Midway, Silicon Knights has limited its requests to three specific categories of documents:

1. Communications regarding the interpretation of the term "Enhancements" in the Epic license agreement;
2. Documents relating to complaints about the performance of the Unreal Engine 3; and
3. The final, executed license agreement between Epic and Midway (or the Midway Home Entertainment division), including all amendments, revisions, terminations and/or contracts.

(*See* Konieczny Decl., Exh. G, Mar. 3, 2008 Letter to Sweeney.) In addition, Silicon Knights has offered to exclude from the production "documents or portions of documents containing actual source code or other such technical information regarding Midway's own proprietary efforts to overcome the problems with the Engine." (*See Id.*) Silicon Knights also has agreed, pursuant to the protective order entered in the underlying case (and attached hereto to as Exh. J to the Konieczny Declaration), to designate any Midway documents as "Highly Confidential-Attorneys' Eyes Only" thereby alleviating all concern that any proprietary information will be seen by a competitor.

## ARGUMENT

I.   SILICON KNIGHTS HAS A "SUBSTANTIAL NEED" FOR MIDWAY'S DOCUMENTS THAT ARE HIGHLY RELEVANT TO THE UNDERLYING CASE.

A motion to quash requires the Court to "apply a balancing test to determine whether the need of the party seeking disclosure outweighs the adverse effect such disclosure would have on the policies underlying the claimed privilege. . . That is, the court must compare the hardship to the party or person against whom discovery is sought. . . with the hardship to the party seeking discovery if discovery is denied." *Deitchman v. Squibb & Sons, Inc.,* 740 F.2d 556, 559 (7th Cir. 1984) (citations omitted). Midway's motion focuses on the following factors in balancing the interests involved: "the relevance of the requested material, the party's need for the information, whether the requests are burdensome, the fact that the subpoenaed entity is a non-party to the underlying litigation and the fact that the disclosures would be made to competitors." (Motion at ¶ 9.) The first two of these factors, relevance and need, strongly favor the production of the three categories of documents requested by the subpoena as modified.

Relevance is broadly construed for the purposes of discovery, and encompasses more material than would be admissible under the rules of evidence. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense," and "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."); *see also Elm Energy and Recycling Ltd. v. Basic*, 1996 WL 596456, at *10 (N.D. Ill, Oct. 9, 1996) (attached hereto as Exhibit A). Moreover, "'[a] district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder.'" *Elm Energy*, 1996 WL 596456, at *11 (quoting *Truswal Systems Corp. v. Hydro-Air Engineering, Inc.*, 813 F.2d 1207, 1210 (Fed.Cir.1987)). Therefore, if relevance is uncertain, "the Court should be permissive" and only quash the subpoena if "the documents sought bear no discernable relevance to the case at hand." *Id.*

6

Here, the three categories of requested documents are highly relevant to the claims and defenses in the underlying lawsuit between Silicon Knights and Epic. First, Silicon Knights requests documents regarding complaints about the performance of the Engine. The performance and capabilities of the Engine, including its performance for Epic's "other licensees," is at the core of Silicon Knights' fraudulent inducement and negligent misrepresentation claims. One of Epic's defenses has been to cite its history as an engine developer and licensor as well as the allegedly successful experiences of "other licensees" who used the same Engine to support Epic's claim that any problems must lie with Silicon Knights and not with the Engine itself. (*See* Konieczny Decl., Exh. D, ¶¶ 9 – 11.) To refute that defense, Silicon Knights seeks information from Epic's "other licensees," (including Midway) regarding their complaints (internal or otherwise) about the performance of the Engine. By its subpoena, Silicon Knights seeks information that has not reached Epic or the public domain regarding these complaints and others.

Second, Silicon Knights requests the final, executed license agreement between Epic and Midway, as well as any final, executed amendments, revisions, terminations, or contracts relating to the license agreement. These documents are relevant to determine (1) what similarities exist between Epic's contractual relationships with its "other licensees," and (2) Epic's course of dealing and/or industry-wide definition of the ambiguous terms of the agreement. For the same reasons above, it is necessary that Midway produce these documents pursuant to subpoena.

Admittedly, Epic may have in its possession a subset of the documents, which Silicon Knights seeks directly from Epic. However, many of the documents are likely in the sole possession of Midway, such as those relating to Midway's complaints regarding the Engine.

Third, Silicon Knights requests communications regarding the interpretation of the term "Enhancements" as used in Epic's license agreements with licensees, such as Silicon Knights and Midway. The term "Enhancements" is at issue in both Silicon Knights' and Epic's breach of contract claims, as well as Silicon Knights' defense to Epic's counterclaims. Silicon Knights has asserted that its game engine, if considered to fall within the scope of the license agreement,

7

constitutes an "Enhancement." Silicon Knights' also contends that the term "Enhancement" is ambiguous, which renders Epic's course of dealing with other licensees and the industry standard relevant in interpreting this term. Although Silicon Knights has sought documents from Epic concerning Epic's communications and dealings with its licensees, Silicon Knights also seeks documents relating to Midway's understanding of that term, as evidence of the "course of dealing" and "industry-wide" understanding.

Very simply, as both a licensee of the Engine and a publisher/developer of Epic's games, Midway has been closely involved with Epic for many years and has had significant access to Epic's knowledge and expertise with respect to the Engine. For instance, as the publisher of *Unreal Tournament 3* (a game that Epic developed during the same period that Silicon Knights experienced problems with the Engine), Midway's relationship with Epic likely involved an open exchange of concerns or problems involving the Engine that are relevant to the underlying litigation. For that reason Silicon Knights seeks documents from Midway and in the spirit of compromise agreed to narrow its requests. *See Deitchman at* 560 (subpoenas are typically "a means of opening discussion between discoverer and discoveree"); *see also aaiPharma, Inc. v. Kremers Urban Dev. Co.*, 361 F. Supp. 2d 770, 778 (N.D. Ill. 2005) (declining to quash subpoena claimed to be overbroad where modification was possible to narrow scope). Unless Silicon Knights is able to obtain those documents from Midway, its ability to pursue its claims and defend against Epic's counterclaims will be severely compromised.

II. **THE POTENTIAL HARDSHIP TO MIDWAY IS MINIMAL BECAUSE THE DOCUMENTS WILL BE PRODUCED ON AN "ATTORNEY'S-EYES-ONLY" BASIS AND COMPETITIVE INFORMATION IS NOT SOUGHT.**

Other than Midway's status as a third party, all of the remaining factors in balancing the interests of the parties (such as whether the requests are burdensome and the fact that the disclosures would be made to competitors) favor Silicon Knights not Midway. Indeed, Midway does not argue that Silicon Knights' modified requests are unduly burdensome. Instead, Midway argues that compliance with the subpoena would result in the disclosure of confidential

information to Silicon Knights, one of Midway's competitors. (*See, e.g.,* Memorandum at 14.) When protection of allegedly confidential information is sought, the party seeking protection has the burden to establish both that (1) the information is confidential, and, (2) there is "good cause for restricting dissemination on the ground that it would be harmed by its disclosure." 8 Wright, *et al.*, Federal Practice and Procedure § 2043 (1994); *see also Elm Energy*, 1996 WL 596456, at *16 (a subpoenaed party seeking a protective order "has the burden of demonstrating that good cause exists for the granting of that order"); *cf. Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 300 (N.D. Ill. 1993) ("[i]n order to establish that information should be subject to a protective order, the party seeking protection bears the burden of establishing: (1) that the information is in fact a trade secret or confidential commercial information and (2) that there is good cause to protect the information").[1]

Here, Midway's arguments fail for at least two reasons. First, Silicon Knights has agreed to designate all documents produced by Midway as "Highly Confidential - Attorneys' Eyes Only," thereby obviating Midway's concern that its documents could be seen by employees of Silicon Knights (much less used against Midway in the marketplace). (*See* Konieczny Decl., Exh. J, ¶¶ 9, 17). Although Silicon Knights has described the terms of the protective order to Midway on at least three separate occasions, Midway has never responded with any objection, argument, or explanation regarding why the proposed level of protection is inadequate. Tellingly, Midway did not set forth any objection to the protective order in its Memorandum and, instead, simply chose to ignore the protective order and its implications, apparently intending to wait until the reply brief to respond. That, of course, is not permitted. *See e.g. Bd. of Trustees of*

---

[1] Indeed, Silicon Knights disputes Midway's overly broad designation of its alleged "trade secrets". Moreover, merely stating that all responsive documents in Midway's possession contain trade secrets is insufficient to prove such trade secrets exist. *See e.g. Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir.1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets.") *citing AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir.1987) (where plaintiff improperly relied on the refrain "confidential business and technical information" as proof of the existence of a trade secret.) Nevertheless, in the spirit of compromise, Silicon Knights is willing to treat Midway's documents as "Highly Confidential" within the meaning of the protective order.

*Plumbers Local Union No. 93 U.A. v. Waterworks, Inc.*, 524 F. Supp. 2d 1081, 1085 n.1 (N.D. Ill. 2007) (arguments raised for the first time in a reply brief are waived).

Second, Silicon Knights has limited the scope of the subpoena to avoid altogether the production of documents that could provide technical trade secret information to Midway's competition. For example, Silicon Knights is not seeking any technical or proprietary information regarding how Midway created or executed its "Enhancements" and has explicitly excluded such technical and/or developmental information from its requests. Silicon Knights seeks communications only regarding Midway's and/or Epic's understanding of the term "Enhancement" as it appears in the license agreement. Similarly, with respect to complaints about the Engine, Silicon Knights does not seek any technical documents discussing how Midway fixed any problems it found with the Engine or developed around any such problems. Instead, Silicon Knights only seeks documents describing what problems Midway had with the Engine itself which may include documents reflecting complaints from programmers about the capabilities of the Engine, or documents describing frustrations among game developers with the Engine. None of these documents would jeopardize Midway's competitive position and all of these documents would be subject to a protective order. Midway thus has failed to show good cause for further protection of its documents, and the motion to quash should be denied.

### III.    MIDWAY'S RECITATION OF FACTS REVEALS THAT IT HAS DOCUMENTS HIGHLY RELEVANT TO SILICON KNIGHTS' CASE AGAINST EPIC.

Although Midway states that it "does not have any documents responsive" to the first two categories of Silicon Knights' modified requests, Midway nonetheless explains its lengthy process of evaluation, negotiation, and modification of the Engine to suit its own particular needs. (*See* Memorandum at 7.). In doing so, Midway misconstrues and improperly attempts to narrow the scope of Silicon Knights' request, for which responsive documents certainly exist.

A.  **Midway's Communications about Enhancements are Relevant to Silicon Knights' Request and Are Not Limited to Communications between Epic and Midway.**

Silicon Knights requests all communications regarding "Enhancements," to the Engine, including Midway's internal communications and communications between Midway and its developers. Midway's conclusory arguments misconstrue the category of documents requested by Silicon Knights. For example, Midway asserts that because it never communicated its "Enhancements" to Epic, no responsive documents exist. (*See* Memorandum at 4.) However, Silicon Knights' subpoena request is not limited to communications between Midway and Epic of the Enhancements themselves. As Midway acknowledges, its personnel devoted considerable attention to determining the capabilities of the Engine, its compatibility with Midway's games, and the changes and/or modifications necessary to make the Engine satisfy Midway's needs. (*See* Memorandum at Exh. A, Weilbacher Aff., ¶¶ 16-19.)[2] Whether Midway ever "divulged" its Enhancements to Epic is irrelevant; what *is* relevant are Midway's "Enhancements" to the Engine. (*See Id.* at ¶ 19.) Thus, Midway's internal communications regarding those "Enhancements" including the scope of the "Enhancement," are among the category of communications responsive to Silicon Knights' subpoena. In addition, Midway's communications with third-parties and/or Epic concerning the same topics also are relevant.

B.  **The Subpoena Is Not Limited to Complaints that Are "Separate and Distinct from Midway's Efforts to Achieve Compatibility Between [the Engine] and Midway's Specific Games."**

Midway also argues that it does not have documents responsive to Silicon Knights' request for complaints about the performance of the Engine. (*See* Memorandum at 8.) However, Midway's statements to the press and actions in the marketplace belie its argument. (*See, e.g.,* Konieczny Decl., Exhs. K and L.) For example, Midway's financial troubles are well known in industry, and some insiders believe that its financial troubles are a substantial result of problems

---

[2] Midway makes much of the fact that Midway knew it would have to undertake those modifications and changes to the Engine upfront. However, solely the timing of the changes is not at issue, it is the nature of the modification after it has been created that Silicon Knights is requesting information about.

11

with the Engine.  (*See* Konieczny Decl., Exh. K, (Kotaku article).)  Indeed, as far back as November 2, 2005, Midway was reluctant to fund any Engine-based games because of the problems that Midway reportedly experienced with the Engine.  (*See* Declaration of Michael Scandizzo, ¶ 2.)  As one of the first publishers to use the Engine, Midway apparently learned of problems with the Engine from its developers at an early stage.  So much so, in fact, that Midway deemed the Engine a "risk" to its company.  (*See Id.*)

Moreover, the affidavit attached to Midway's Memorandum undermines its assertion that it "does not have any documents responsive to the second category of the modified request." Specifically, Mr. Weilbacher's affidavit states that "Communications between Epic and Midway concerning UE3 that were not conducted via the Unreal Developers' Network only concerned issues related to UE3's compatibility with Midway's specific games and did not concern issues related to UE3's performance *that were separate and distinct from Midway's efforts to achieve compatibility between UE3 and Midway's specific games.*" (Memorandum at Exh. A, Weilbacher Aff., ¶ 25, emphasis added.)  Mr. Weilbacher's statement does not address the request that was explained to Midway's counsel multiple times, and it implies that Midway does have communications "concerning issues related to UE3's performance."

Finally, Midway's argues that responsive documents may contain trade secrets, which Midway is not obligated to produce.  (*See* Memorandum at 10-11.)  To the contrary, "there is no privilege against discovery of trade secrets," and "any prejudice to the owner of trade secrets caused by disclosure" could be "obviated by a protective order."  *Natta v. Zletz,* 405 F.2d 99, 101 (7th Cir. 1968) (allowing production of confidential information but forbidding disclosure to Plaintiff itself.)  The federal rules provide for liberal discovery and "any inconvenience to third parties in the federal courts is generally outweighed by the public interest in seeking truth in every case, with the elimination of unfair surprise and full and adequate preparation by both sides."  *Carter Prods., Inc. v. Eversharp, Inc.*, 360 F.2d 868, 872 (7th Cir.1966).

Here, Silicon Knights has provided Midway with a protective order that guarantees that all of Midway's documents will be marked "Highly Confidential" and viewed by outside counsel

only, not Silicon Knights' personnel.[3]  Notwithstanding Midway's bald assertion that "the only documents Midway has regarding [the Engine] consist of trade secrets and confidential business information" (Memorandum at 11), the "Highly Confidential" category in the protective order guarantees that Midway will receive no competitive disadvantage by producing its documents. (*See* Konieczny Decl., Exh. J, Protective Order; *see also Davis v. General Motors Corp.*, 64 F.R.D. 420, 422 (N.D.Ill.1974) (allowing production pursuant to a protective order, "because the disclosure of the requested material may affect other parties . . . this Court considers it proper at this time to require that such information be disclosed only to plaintiff's trial attorney and non-party, Court approved, independent experts or consultants.").)  Because Midway's documents will be seen only by outside counsel and never revealed to Silicon Knights' personnel, the possibility of any prejudice or disclosure of trade secrets is mooted.[4]  (*See* Konieczny Decl., Exh. J, Protective Order, ¶ 9.)

Although Midway cites *Everco Industries, Inc. v. O. E. M. Products Co.*, 362 F. Supp. 204, 206 (N.D. Ill. 1973), to support its refusal to comply with Silicon Knights' modified subpoena requests, Midway fails to note that, unlike Silicon Knights, the requesting party in *Everco* made no attempt to narrow its request and did not demonstrate to the Court "the materiality and relevancy of such open-ended discovery." *Id*.  Here, Silicon Knights has done both: it narrowed the request to target solely the specific documents sought and demonstrated the materiality of the requested documents. *See generally Covey Oil Co. v. Continental Oil Co.*, 340 F.2d 993, 999 (10th Cir. 1965) (distinguished on other grounds), *cert. denied* 380 U.S. 964 (1965) (granting enforcement of a subpoena to a third party stating "[t]he claim of irreparable competitive injury must be balanced against the need for the information in the preparation of the

---

[3] Again, Silicon Knights refutes Midway's definition of "trade secrets" but is willing to designate any documents (whether or not the documents actually contain trade secrets) as Highly Confidential.

[4] Midway also argues that third party documents should not be produced if they will simply provide additional data for a party's expert to analyze. (Memorandum at 13.)  Here, as stated above, Silicon Knights is requesting Midway's documents to define an ambiguous contractual term, which is an appropriate use for third party discovery.

defense. Judicial inquiry should not be unduly hampered. Inconvenience to third parties may be outweighed by the public interest in seeking the truth in every litigated case.")

At bottom, Midway's objections are based on an overly broad interpretation of the requests, which exclude any technical or other documents that may reveal confidential or proprietary technical information, such as source or object code.  Although Silicon Knights does not request such documents or information, Midway manufactures purported trade secrets as a rationale to excuse them from producing any documents.  If Midway's argument is to be believed, then any and all communication that Midway had with anyone regarding the problems or performance of the Engine consisted solely of confidential, technical, proprietary information such as source code or object code.  That is almost certainly not the case.  More likely, Midway is attempting to hide behind its trade secret protection to justify its refusal to produce documents that may contradict the representations and allegations of its long time partner, Epic.  However, the potential for repercussions on Midways' relationship with Epic is not a valid reason to withhold documents requests by a subpoena.  *See* Fed. R. Civ. P. 45(c)(3)(B).

## **CONCLUSION**

For all of the foregoing reasons, this Court should deny Midway's motion to quash and grant all further relief appropriate under the circumstances.

Dated:  April 4, 2008 　　　　　　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　　　　　　　　　　SILICON KNIGHTS, INC.

　　　　　　　　　　　　　　　　　　　　　　　　　　By:     /s/ Daniel I. Konieczny
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　One of its attorneys

| | |
|---|---|
| Christopher T. Holland | Caesar A. Tabet |
| Garth A. Rosengren | Timothy A. Hudson |
| Anjali Kumar Kurani | Daniel I. Konieczny |
| Krieg Keller Sloan, Reilly & Roman LLP | Tabet DiVito & Rothstein LLC |
| 114 Sansome Street, 4th Floor | 209 South LaSalle Street, 7th Floor |
| San Francisco, CA  94104 | Chicago, IL 60604 |
| P: (415) 249-8330 | P: (312) 762-9450 |
| F: (415) 249-8333 | F: (312) 762-9451 |

14