# EXHIBIT C

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO.: 07-00275

| | | |
|---|---|---|
| SILICON KNIGHTS, INC., | ) | |
| an Ontario (Canada) Corporation, | ) | |
| | ) | **AMENDED** |
| Plaintiff/Counterclaim-Defendant, | ) | **ANSWER OF EPIC GAMES, INC.** |
| | ) | **TO COMPLAINT OF** |
| vs. | ) | **SILICON KNIGHTS, INC.** |
| | ) | |
| EPIC GAMES, INC. | ) | |
| a North Carolina company, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |

Epic Games, Inc. ("Epic"), by counsel, hereby answers the Complaint of Silicon

Knights, Inc. ("Silicon Knights"). Silicon Knights' allegations are repeated in single-line

spacing, below. Epic's answers follow each allegation and are double-spaced.

## INTRODUCTION

This dispute arises out of misrepresentations by Defendant Epic Games, Inc.
("Epic") to Plaintiff Silicon Knights, Inc. ("Silicon Knights"), which induced Silicon
Knights to execute a License Agreement with Epic for use of a piece of software, Unreal
Engine 3 ("the Engine"). Relying on Epic's false and misleading statements, Silicon
Knights attempted to use the Engine to develop its video games for specific gaming
"platforms." In addition, Epic violated the Agreement with Silicon Knights by, among
other things, failing to provide a working game engine, which has caused Silicon Knights
to experience considerable losses and ultimately has forced Silicon Knights to spend its
limited time and resources on building its own game engine rather than in developing its
video game. Upon information and belief, rather than provide support to Silicon Knights
and Epic's other many licensees of the Engine, Epic intentionally and wrongfully has
used the fees from those licenses to launch its own game to widespread commercial
success while simultaneously sabotaging efforts by Silicon Knights and others to develop
their own video games.

## Response to Introduction

Epic denies the allegations in the **"Introduction"** to the Complaint.

THE PARTIES

1.    Silicon Knights is an Ontario corporation, with its principal place of business at One St. Paul Street, Suite 800, St. Catharines, Ontario L2R 7L2, Canada.

**Response**

Epic admits that Silicon Knights is a corporation organized and existing under the laws of Ontario, Canada.  Epic is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1 of the Complaint.

2.    Epic is a Maryland company, with its principal place [sic] business at 620 Crossroads Boulevard, Cary, North Carolina.

**Response**

Epic admits the allegations in paragraph 2 of the Complaint.

JURISDICTION AND VENUE

3.    The amount in controversy exceeds $75,000.00 exclusive of interest and costs, and this action is between citizens of a State and citizens or subjects of a foreign state.

**Response**

Epic admits the allegations in paragraph 3 of the Complaint.

4.    This Court has jurisdiction over this action pursuant to several United States Code Sections, including at least 28 U.S.C. § 1332(a)(2)-(4), 1338(b), and 15 U.S.C. § 1121.  Venue is proper in this judicial District under 28 U.S.C. § 1391.

**Response**

Epic admits that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) and that venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Epic denies the remaining allegations in paragraph 4 of the Complaint.

## COMMON FACTUAL ALLEGATIONS

5.      On or about May 10, 2005 [sic] Silicon Knights and Epic executed a document entitled "License Agreement" (the "Agreement") whereby Epic purported to grant to Silicon Knights a non-exclusive license to use the Engine for development of Silicon Knights' video games for specific gaming "platforms."

**<u>Response</u>**

Epic admits that, on or about May 10, 2005, it entered into a License Agreement

with Silicon Knights.  Epic further admits that, as part of the License Agreement, it

granted to Silicon Knights a non-exclusive license to use its Licensed Technology, as

defined in the License Agreement, pursuant to the terms and conditions of the License

Agreement.  The License Agreement speaks for itself.  To the extent the allegations in

paragraph 5 of the Complaint differ from the License Agreement, those allegations are

denied.

6.      As set forth in the Agreement, in return for the use of the Engine, Silicon Knights agreed to:  (1) use the Engine exclusively in Silicon Knights' games for the Xbox 360, PlayStation 3 ("PS 3"), and personal computers ("PC"); (2) use its best efforts to "develop, market, and sublicense" games using the Engine; (3) pay a licensing fee for each videogame developed using the Engine; (4) advertise each such game as "Powered by Unreal Engine" on packaging and within the game itself.

**<u>Response</u>**

Epic admits that, as part of the License Agreement, including Epic's concession to

charge Silicon Knights a substantially reduced license fee, Silicon Knights agreed, among

other things, to use Epic's Unreal Engine (as defined in the License Agreement)

exclusively in games developed for the Xbox 2 (also known as the Xbox 360),

PlayStation 3, and PC platforms, to use its best efforts to develop, market, and sublicense

games using Epic's Unreal Engine, and to display Epic's "Powered by Unreal Engine"

logo on the splash screen of the game and on packaging for the game.  The License

Agreement speaks for itself.  To the extent the allegations in paragraph 6 differ from the

License Agreement, those allegations are denied.

7.    In return, under the express terms of the Agreement, Epic was obliged to, among other things:  (1) demonstrate the adequacy of the Engine on specific platforms within a specific timeframe; and (2) support, update, and enhance the Engine in a "commercially reasonable" fashion.

**Response**

Epic denies the allegations in paragraph 7 of the Complaint.  In addition, the

License Agreement speaks for itself.

8.    As explained more fully below, prior to execution of the Agreement as well as concurrently with and following its execution, Epic made numerous oral, written, express, and/or implied, misrepresentations regarding the capabilities of the Engine, the ability of Epic to support the Engine as required by the Agreement, the ability of Epic to demonstrate the adequacy of the Engine on specific platforms within a specific timeframe, and Epic's dedication to such support.

**Response**

Epic denies the allegations in paragraph 8 of the Complaint.

9.    Silicon Knights reliance upon Epic's representations was reasonable for a number of reasons, and especially when considered in light of the fast-moving nature of software development and the development of video games in particular.

**Response**

Epic denies making misrepresentations to Silicon Knights.  Epic further denies, as

evidenced in part by Silicon Knights' express admission in the License Agreement, that

Silicon Knights relied on any such misrepresentation, or any other representation by Epic.

Epic further denies the remaining allegations in paragraph 9 of the Complaint.

4

10.    Because Silicon Knights executed the Agreement as a direct result of Epic's material misrepresentations regarding the capabilities of the Engine, and Epic's ability and willingness to support the Engine, by this action Silicon Knights seeks, among other things, to have the Agreement rescinded, and/or deemed void and unenforceable, and have rescinded any and all obligation and duty by Silicon Knights to exclusively use the Engine.  In addition, Silicon Knights seeks, among other things, damages for Epic's numerous breaches of its obligations under the Agreement.

**Response**

Epic admits that Silicon Knights executed the License Agreement.  Epic denies

that Epic made misrepresentations, material or otherwise, to Silicon Knights, or breached

any obligation owed to Silicon Knights.  The remaining allegations in paragraph 10 of the

Complaint describe the relief sought by Silicon Knights.  Epic denies that Silicon Knights

has suffered any injury or damage by any act or omission of Epic, and further denies that

Silicon Knights is entitled to any relief from Epic.

11.    As one example of such a breach, Epic has failed to comply with Paragraph 5(a) of the Agreement, which sets forth Epic's express warranties as to the performance of the Engine.  Subsection (iv) provides:

> Epic warrants that…it can demonstrate that the Licensed Technology (A) operates on the PC platform, (B) will operate on the Xbox 2 [since renamed the Xbox 360] within six (6) months following the release of a final development kit by Microsoft for the Xbox 2 platform; and (C) will operate on the PlayStation 3 platform within six (6) months following the release of a final development kit by Sony for the PlayStation 3 platform.

**Response**

Epic admits that paragraph 11 of the Complaint accurately quotes section 5(a) (iv)

of License Agreement.  Epic denies that it has breached the warranties in section 5(a) of

the License Agreement, including the warranties in section 5(a) (iv).  Epic further denies

that it has breached any other provision of the License Agreement.  Epic incorporates, as

part of its response, section 5(b) of the License Agreement, which states in part as

follows: "Except as expressly set forth herein, Epic's warranties in Section 5(a) do not

include any warranty (i) that the functions performed by the Unreal Engine or Third Party

Software will meet Licensee's requirements, nor (ii) that the operation of the Unreal

Engine or Third Party Software will be bug free or error free in all circumstances, nor

(iii) that any defects in the Unreal Engine or Third Party Software can or will be

corrected."

      12.    The final development kit for the Xbox 360 was released in early
September, 2005, such that Epic was obligated to release the functional Engine for that
platform no later than March, 2006.  However, that deadline came and went without Epic
providing Silicon Knights with a functional version of the Engine.  Indeed, it was not
until much later (November, 2006, far too late for time and cost-sensitive projects like
SK's videogames) that Epic ever provided anything resembling working Xbox 360 code
to its licensees.  Even at that belated date, though, Epic did not provide any guidance to
licensees in how to implement the code it finally released.  Further, even if licensees were
somehow, on their own, able to utilize the released code, Epic said that such code would
not be supported by Epic going forward, as described more fully below.

**Response**

      Epic denies the allegations in paragraph 12 of the Complaint.

      13.    More recently, Epic has breached its Agreement with Silicon Knights yet
again by missing the six-month deadline for release of an Engine that works on the
Playstation 3.  Final development kits for that console were released in and around mid-
August, 2006, making the functional Engine due to Silicon Knights in February, 2007.
Silicon Knights has received no such Engine from Epic.

**Response**

      Epic denies the allegations in paragraph 13 of the Complaint.

      14.    As explained more fully below, Epic has failed to support, update, and
enhance the Engine in any commercially reasonable fashion, as required by the
Agreement.

**Response**

      Epic denies the allegations in paragraph 14 of the Complaint.

15.     Upon information and belief, Epic knew well before it signed the
Agreement with Silicon Knights that it had no intention of meeting and would be unable
to meet its obligations under the Agreement, including, but not limited to, Epic's
obligations to support the license and meet the schedule that Epic warranted it would
meet, despite Epic's representations that it was fully able to provide such support and
meet the agreed-upon schedule.  Instead, upon information and belief, Epic chose to
prioritize its own products, using the revenue from the sale of the Engine licenses to
unsuspecting developers like Silicon Knights to fund the development of Epic's own
games while it chose not to honor its obligations to provide the Engine in a manner which
would allow Silicon Knights and other licensees to develop their own games.  To the
extent that Epic's projects allowed or occasioned certain limited updates, patches, or fixes
to the Engine, those improvements might or might not be passed down to Silicon Knights
(and other licensees), as explained more fully below and as will be subject to proof at
trial.

**Response**

Epic denies the allegations in paragraph 15 of the Complaint.


16.     In particular, at the same time that Epic was supposed to be supporting its
many licenses to the Engine (Silicon Knights' among them) Epic was also racing to
complete and market its own games:  **"Unreal Tournament 2007"** and **"Gears of War."**
Upon information and belief, Epic lacked the means to accomplish both of those ends; it
employs approximately 75 people, but during the relevant time frame for this action,
those employees were and are spread between four significant tasks:  (1) the development
of [sic] next game in the Unreal series, Unreal Tournament 2007; (2) the development of
Epic's new flagship game for the Xbox 360, **Gears of War**; which was recently released
(near the end of 2006); (3) supporting the many licensees of Unreal Engine 2, and the
many games already on the market from those licensees; and, (4) supporting what
appears to be an ever-increasing collection of licensees of the Engine (the newer one that
Silicon Knights thought it would be getting via the Agreement).  By contrast, Silicon
Knights employs approximately 140 people involved solely in the development of its
next two titles.

**Response**

Epic admits that, as part of its business, it routinely performs various tasks

simultaneously.  Epic further admits that, prior to and after May 10, 2005, the effective

date of the License Agreement, it performed all or some of the following tasks

simultaneously:  (i) developing its *Unreal Tournament 2007*, (ii) developing *Gears of*

*War*, (iii) supporting the licensees of Unreal Engine 2, and (iv) supporting the licensees

of Unreal Engine 3. Epic performed those and other tasks related to its business

extremely well as evidenced, in part, by the success of its games, including *Unreal*

*Tournament 2007* and *Gears of War*, by the success of third-party games developed with

Epic's Unreal Engine 2, and by the critical acclaim garnered by third-party games

developed with Epic's Unreal Engine 3. Epic is without knowledge or information

sufficient to form a belief as to the truth of the allegation that Silicon Knights employs

approximately 140 people involved solely in the development of its next two games, and

therefore denies that allegation. Epic denies that there is a "newer" Unreal Engine 3 and

further denies the remaining allegations in paragraph 16 of the Complaint.

17.     Despite the lack of resources that Epic was willing or able to devote to the
Engine, Epic, nonetheless, knowingly misrepresented to Silicon Knights that the Engine
was then — and <u>would continue to be</u> — the optimal foundation upon which to build
Silicon Knights' games going forward. Silicon Knights relied directly upon those
misrepresentations when it executed the Agreement, believing that licensing the Engine
would not only enable Silicon Knights to use the software for its upcoming projects, but
also would free limited resources for use in game design, game-play, artwork, storyline,
and related facets of game development other than software coding.

**Response**

Epic denies that it knowingly or otherwise made misrepresentations to Silicon

Knights, and further denies the remaining allegations in paragraph 17 of the Complaint.

Before Silicon Knights entered into the License Agreement, it had the full benefit, for

almost nine months, without charge, of Epic's Licensed Technology. Indeed, pursuant to

the Mutual Nondisclosure Agreement ("Evaluation License") entered into between the

parties, Silicon Knights had the same rights, and received the same access to Epic's

Licensed Technology, Unreal Developers Network, and Epic support as all paying

licensees, except that Silicon Knights paid no fee and had no right to commercialize

games created with the Licensed Technology without first entering into a commercial

license agreement - - which it later did by executing, after extensive negotiations through

its counsel, the License Agreement. Section 12(n) of the License Agreement, which

appears immediately before Denis Dyack's (Silicon Knights' president) signature, states

as follows: "This [License] Agreement, including the Exhibits hereto that are

incorporated herein by reference, represents the entire understanding of the parties with

respect to the subject matter hereof and supersedes all prior representations and

agreements, whether oral or written, with respect to the same subject matter."

18.     The support Epic had misrepresented it would provide Silicon Knights
(including as reflected in the Agreement) became increasingly inconsistent as both
Silicon Knights and Epic progressed toward the target launch date for their respective
games. Epic has attempted to avoid its obligations under the Agreement by representing
to Silicon Knights that the support, modifications, or enhancements to the Engine — all
of which are essential to the Engine's proper function — were "game specific" and not
"engine level" adaptations, and that Epic therefore need not provide them to any of its
licensees, including Silicon Knights. That representation is false, as evidenced in part by
the fact that Epic later provided nearly all the *Gears of War* code to all of its licensees, at
no extra charge, in a belated effort at damage control.

**<u>Response</u>**

Epic denies the allegations in paragraph 18 of the Complaint. The Licensed

Technology covered by the License Agreement is not, and never has been, "game

specific." Epic, like its licensees, uses the Licensed Technology to create its own games

and has no obligation to share game specific technology with Silicon Knights. The

Licensed Technology is a set of development tools, inherently evolving, which facilitates

the creative process and the creation of original games. Epic made some of its *Gears of

War* code available to its licensees, without charge, as an example of how it had used the

Licensed Technology in its creative efforts, not because the code was part of the Licensed

Technology. To the extent Silicon Knights has been unable to use the Licensed

Technology to its full potential, it is for reasons unrelated to Epic.

9

19.     Epic's refusal to comply with its own representations, as well its obligations and warranties in the Agreement has significantly harmed Silicon Knights. Instead of the powerful and dynamic video game engine promised by Epic, Silicon Knights was saddled with a cumbersome and labor-intensive piece of software that consistently failed to meet the performance requirements of the gaming consoles for which it was intended (and which Epic expressly warranted to Silicon Knights in the Agreement it would meet).

**Response**

Epic admits that creating video games, especially successful games, is labor-intensive, regardless whether its Licensed Technology is used in the development process.  Properly used, Epic's Licensed Technology provides certain benefits to game developers by making it easier for them to create certain game functions.  Epic's Licensed Technology, however, is no substitute for programming skill, hard work, and creativity.  Epic denies the remaining allegations in paragraph 19 of the Complaint and incorporates its answers to paragraphs 7 and 11 of the Complaint.

20.     Meanwhile, Silicon Knights has faced pressure from its publishing partners to nonetheless move forward with development of its games, and with respect to one of those partners (Microsoft), to complete its game as early as possible in 2007 (a delay from the original 2006 launch date that was specifically occasioned by the failure of Epic and the Engine, as set forth herein).

**Response**

Epic is without knowledge or information sufficient to form a belief as to the allegations in paragraph 20 of the Complaint, and therefore denies those allegations.

21.     Epic's actions and the consequent increasing delay and cost of development of Silicon Knights' own game caused by the unworkable Engine forced Silicon Knights in May of 2006 to embark on the time and resource intensive task of writing its own game engine, the very task it had hoped to avoid by entering the Agreement with Epic.  Separate and apart from any other damages suffered by Silicon Knights, that effort alone cost Silicon Knights millions of dollars in man-hours and potential profits.

**Response**

Epic denies that its Engine was "unworkable" and further denies the remaining

allegations in paragraph 21 of the Complaint.

<u>Relevant Background of the Video Game Industry in General</u>

22.     In 2005, the most recent year for which data is available, the worldwide
market for videogames, computer games, and interactive entertainment hardware and
software was approximately $27.1 billion.  That figure is projected to increase by 11.4%
every year, reaching $46.5 billion in 2010.  In the U.S. alone, sales of videogame
hardware, software, and accessories were $8.4 billion in 2005, and stand to increase by
8.9% annually to reach $13 billion in 2010.

**Response**

Epic is without knowledge or information sufficient to form a belief as to the

allegations in paragraph 22 of the Complaint, and therefore denies those allegations.

*Financial Structure of the Industry*

23.     Videogames are played on a variety of hardware "platforms" or
"consoles."  Those platforms include the standard personal computer (or "PC"), as well
as special hardware dedicated to videogames, such as the Sony's Playstation series,
Microsoft's Xbox platform, and Nintendo's Gamecube.

**Response**

Epic admits the allegations in paragraph 23 of the Complaint.

24.     Developers and others in the industry often refer to "next generation"
platforms/consoles, which currently include the Xbox 360, Sony Playstation 3, and
Nintendo Wii.  In particular, game developers such as Silicon Knights and Epic begin
preparation of videogames targeted for those next generation platforms well in advance
of the platforms' actual release dates to the public, hoping to introduce videogame
products for them early enough in their release cycle before public interest begins to taper
off in anticipation of yet another new generation of hardware platforms.  On average,
next generation platforms have historically been released approximately every four (4) to
six (6) years.

**Response**

Epic admits that certain persons in the video game industry use "next generation"
to refer to platforms and consoles that are in the process of development and that will,
when introduced, contain features or performance characteristics not available on existing
hardware.  Epic admits that it and other game developers from time to time begin
developing games for the "next generation" platforms and consoles before that hardware
is introduced.  Epic denies the remaining allegations in paragraph 24 of the Complaint.

25.    There are a variety of participants in the videogame industry, but the bulk
of them can be divided between game developers, game publishers, and the specialized
hardware manufacturers.  Developers — typically smaller companies with as few as one
or two employees up to two to three hundred — are the creative side of the industry,
responsible for designing a videogame, providing its content, and coding its software for
use on one or more of the available (or next generation) hardware platforms.

**Response**

Epic admits that there are various participants in the video game industry,
including game developers, game publishers, and hardware manufacturers.  Epic further
admits that, typically, game developers, some of which are small companies, design and
create games and codes to operate on game platforms.  Epic is without knowledge or
information sufficient to form a belief as to the remaining allegations in paragraph 25 of
the complaint, and therefore denies those allegations.

26.    Publishers, by contrast, tend to be larger companies — many of whom
have familiar names like Atari, Electronic Arts, and Activision — that historically have
invested heavily in both in-house and external game development (i.e., financing of
games developed by independent developers such as Silicon Knights) and then used their
extensive distribution networks and corporate affiliations to bring the completed game to
market.  Today's videogame publishers also include nearly every major motion picture
studio in Hollywood, who similarly use their distribution networks and expertise to
produce and distribute the games made for various platforms.  Many of the publishers
(including some of the Hollywood studios) also add to the competition for videogame
development by maintaining their own in-house staffs of game developers.

**Response**

Epic admits that some motion picture studios publish video games and that some video game publishers develop their own games. Epic further admits that Atari, Electronic Arts, and Activision are video game publishers. Epic is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 26 of the Complaint, and therefore denies those allegations.

27. The specialized hardware manufacturers (i.e., those who produce videogame specific platforms other than PCs) have historically been larger companies as well. Those specialized hardware manufacturers currently include the three major players referenced above: Microsoft, Sony, and Nintendo. As is the case with several of the larger videogame publishers, all three of the current hardware manufacturers also maintain their own in-house development staffs, including some previously independent outside developers that were acquired or "captured" by (i.e., entered exclusive development arrangements with) a particular hardware manufacturer.

**Response**

Epic admits that hardware manufacturers include Microsoft, Sony, and Nintendo. Epic is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 27 of the Complaint, and therefore denies those allegations.

28. Developers who lack the resources to "self-publish" their videogames (i.e., those very few developers who do not have to rely on outside financial funding) generally partner with publishers via contracts called "development agreements," or (less frequently) directly with hardware manufacturers in what are known as "first party" development agreements. (The more standard publisher-developer contracts are also sometimes called "second party" development agreements, since the financing entity is not itself a hardware manufacturer.)

**Response**

Epic admits that some developers contract with publishers, and that some contracts are called "development agreements." Epic also admits that some agreements

13

are referred to as "first party" agreements, but is without knowledge or information

sufficient to form a belief as to the truth of the allegation as to "second party"

agreements, and therefore denies that allegation.  Agreements between developers and

publishers can, of course, be denominated or referred to by whatever terms the parties

deem appropriate under the circumstances.  Epic is without knowledge to form a belief as

to the truth of the remaining allegations, and therefore denies those allegations.

29.     The typical premise of such contracts (whether they involve first- or second-party financing) is that either the publisher or hardware manufacturer (whichever is involved) pays for the creation of the game by advancing a portion of the developer's royalties from the eventual sale of the game.  In order to exercise interim control over the development process and the cash outlay required for it, these contracts generally impose milestones on developers that must be met before the publisher releases additional finds. In addition, in order to recoup its initial investment and insure a profit, the financing first- or second-party generally requires that a certain level of "payout" or "payback" occur before any royalties are received by the developer.  Therefore, since no intermediary publisher costs are included, as well as for the status associated with them and other reasons, first-party development agreements are generally the most highly sought after and preferred development agreements for videogame developers.

**Response**

Epic admits that some publishers sometimes advance all or some of a developer's

development costs.  Epic is without knowledge or information sufficient to form a belief

as to the truth of the remaining allegations, and therefore denies those allegations.

*Middleware and Pre-Built Engines*

30.     Regardless of whether the development agreement is first- or second-party financed, however, the economics of those developer arrangements mandate that for a developer to be profitable it must complete games in a timely and efficient fashion. Therefore, in order to facilitate the timely completion of milestones and projects, developers often seek ways to streamline production, such as employing "middleware," i.e., software that does specific tasks so that the developer does not have to perform those tasks when making the new game.

**Response**

Epic admits that, all other things being equal, the economics of development

agreements tends to reward efficient developers.  Epic further admits that developers

often seek to simplify game development through the use of middleware or by other

means.  Epic denies that "for a developer to be profitable it must complete games in a

timely and efficient fashion."  Epic denies the remaining allegations in paragraph 30 of

the Complaint.

31.    Several types of middleware applications are available in the industry, such as software that can create images of plants and trees, and other background artwork for the videogames.  The most significant means of simplifying the complex game development process, however, is through the use of pre-built "game engines."

**Response**

Epic admits that middleware is available in the computer game industry and that,

if used properly, game engines may simplify the development process.  Epic denies the

remaining allegations in paragraph 31 of the Complaint.

32.    A game engine typically is the core software component of a videogame. Purchase of a pre-built game engine should simplify development and enable the game to be relatively easily "ported" (i.e., reconfigured to run on) on multiple platforms beyond the one for which the game is initially developed.

**Response**

Epic admits that game engines, properly used, may simplify the development of

some games.  Epic denies the remaining allegations in paragraph 32 of the Complaint.

33.    Among the functionalities or "tools" typically provided by a game engine are:  (1) a rendering engine (or "renderer") for 2D or 3D graphics; (2), a physics engine for collision detection; (3) sound; (4) scripting; (5) animation; (6) artificial intelligence; (7) networking; and (8) a scene graph.  That basic suite of tools is generally provided through an interactive interface that allows individual developers to quickly and simply

input data describing an action or object in script without having to work in the more cumbersome underlying code.

**Response**

Epic admits that game engines contain "tools" for game development. Epic

denies the remaining allegations in paragraph 33 of the Complaint.

34.     The idea behind purchasing a previously built engine, in other words, is to save the developer time and money, and thereby make the game development process more efficient and cost effective to the developer. Epic's own Vice-President, Mark Rein, expressed that strategy when he explained how the Engine could factor into a game developer's plans: "We spent less than $10 million to make *Gears of War*. Somewhere between nine and ten million. People are always saying that making next-generation games is really expensive and we're saying, you should license our technology. Because we have really great tools for building content and a great pipeline that makes your team more productive…" From February 5, 2007 Interview with Wired GameLife at http:/blog.wired.com/games/2007/02/interview_epics.html.) As indicated above and below, that was anything but the case with respect to the purported videogame "engine" that Epic sold to Silicon Knights.

**Response**

Epic admits that, properly used, game engines may simplify the development of

some games. Epic further admits that the quoted language, beginning with the phrase

"We spent less than $10 million to make Gears of War" appears in a Wired Blog

Network Post dated February 5, 2007. Epic denies that the purported quote is complete,

either as a sentence or in context. Epic denies the remaining allegations in paragraph 34

of the Complaint, including the allegations in the last sentence of paragraph 34.

Relevant Background of the Parties

*Epic Games, Inc.*

35.     Upon information and belief [sic] Epic was originally an entity named Potomac Computer Systems in Rockville, Maryland, was formed under that name in or around 1991, and in its early years, functioned as both a developer and publisher of smaller videogame titles, often including "shareware" games. (For reference, shareware is a type of videogame in which the game is published only in PC format, and is marketed

in a limited capacity, often being made available by download over the Internet to allow prospective customers a chance to "try before they buy.")

**Response**

Epic admits that Tim Sweeney founded Epic, originally named Potomac Computer Systems, in 1991. Epic further admits that it has developed and published a variety of video games, including "shareware" games. In addition, Epic admits that the definition of "shareware" is accurate in some, but not all respects. Epic denies the remaining allegations in paragraph 35 of the Complaint.

36.    Upon information and belief, in or around 1998, the Epic-designed game *Unreal* was published by GT Interactive. The "story" of *Unreal* was not that remarkable within the industry: players traversed a variety of arenas attempting to kill other players (or computer-controlled characters) with a variety of weapons. However, *Unreal* incorporated a game engine dubbed the "Unreal Engine," which gained widespread recognition for the manner in which it allowed the game to be played, and the "realism" of its game-play (apparently based in part on its in-game lighting and physics).

**Response**

Epic admits that in or around 1998, it designed and created an award winning and now well-known video game titled *Unreal*, which was published by GT Interactive. Epic further admits that its *Unreal* game was built with its "Unreal Engine," which gained widespread recognition for, among other things, the manner in which it allowed the game to be played and the "realism" incorporated into the game. The content and functions of *Unreal* speak for themselves. Epic denies the remaining allegations in paragraph 36 of the Complaint.

37.    In view of the success of *Unreal*, Epic determined a way to further capitalize on its game by licensing the use of the Unreal Engine to other developers for a set license fee. Upon information and belief, Epic's strategy for financial success going forward centered on the Engine licensing scheme: Epic would sell licenses and offer support for its purportedly "proprietary" technology, all the while using its limited staff to develop its own games internally, including spin-offs and sequels to *Unreal*.

**Response**

Epic admits that it has licensed its Unreal Engine to other video game developers, and that it has charged license fees for certain licenses. Epic further admits that, as part of its licenses, it grants to licensees the right to use certain of its proprietary technology. In addition, Epic admits that its development staff, following publication of its *Unreal* game, continued to develop video games. Epic denies the remaining allegations in paragraph 37 of the Complaint.

38.    Upon information and belief, Epic has followed the aforementioned licensing scheme to date, introducing new versions of the Unreal Engine every few years and, in the interim, occasionally releasing new "builds" — incremental improvements — for each such engine. Generally, each new engine debuts with another version of the *Unreal* games (e.g., *Unreal Tournament, Unreal II: the Awakening*, and *Unreal Tournament 2004*), games that are derivative of the original title, but serve to display the purportedly "new and improved" capabilities of the Engine, capabilities which potential licensees such as Silicon Knights are naturally enticed to believe they will obtain if they pay the license fee Epic demands.

**Response**

Epic admits that, following its Unreal Engine, it introduced Unreal Engine 2 and Unreal Engine 3, which it developed in conjunction with the development of additional games. Epic further admits that Unreal Engine 2 and Unreal Engine 3 each had capabilities that did not exist in its previous engines and that those advances are attractive to many developers and actual and potential licensees. Epic denies that it "demands" license fees generally or that it demanded license fees from Silicon Knights. The License Agreement between Silicon Knights and Epic was negotiated by experienced counsel over several months, and Silicon Knights achieved its objective of obtaining a substantially reduced license fee. Epic also denies the remaining allegations in paragraph 38 of the Complaint.

39.    Indeed, Epic furthered that scheme by actively promoting the alleged time-savings and efficiency that licensees supposedly would obtain from the Unreal Engine.  For example, Mark Rein, Vice President and co-founder of Epic, has been directly quoted as advising developers to stop "wasting money developing your own tools...People who are trying to re-invent the wheel are spending way more money than they should...My point is that we [the video game industry] can make it [the gaming experience] more affordable, we can grow the market.  One way we can do this is to use Unreal Engine 3 and take advantage of the productivity gains you can take from that." (From September 20, 2005 interview with computerandvideogames.com.)

**Response**

Epic admits that, when properly used, game engines may save time and enhance

efficiency.  Epic further admits that it promoted the use of Unreal Engine 3 and that the

quote attributed to Mark Rein from a 2005 interview is, by and large, accurate.  Epic

denies that it has engaged in any "scheme."   Indeed, Epic allowed Silicon Knights

almost nine months to evaluate Unreal Engine 3 free of charge before entering into the

License Agreement.  Epic denies the remaining allegations in paragraph 39 of the

Complaint.

40.    The Unreal Engine 3 is the most recent version of the Engine to be mass licensed under Epic's plan.  Upon information and belief, Epic has issued licenses to numerous developers, not counting the variety of other applications for which Epic has licensed the Engine.  At the same time Epic was purportedly maintaining those multiple licenses and purportedly fulfilling its obligations thereunder, it was also, and currently is, developing its own games using the Engine, which include ***Unreal Tournament 2007***, and ***Gears of War*** (which was released at the end of 2006).  Indeed, Epic's Vice-President, Mark Rein, announced in August of 2005 that Epic already had been working on Unreal Engine 4 for over two years.

**Response**

Epic admits that the Unreal Engine 3 is its most recent engine, that it licenses its

engine to many game developers, that with the help of its engine many developers have

created cutting-edge games, and that it also engages in a variety of other business

activities, including continuing to develop its own games.  Epic further admits that, in or

around August 2005, Mark Rein stated that Epic had been working on Unreal Engine 4

for over two years.  Epic denies the remaining allegations in paragraph 40 of the

Complaint.

### Silicon Knights, Inc.

41.     Silicon Knights was founded in 1992 by Denis Dyack.  After graduating
from Canada's Brock University in 1991, Dyack formed Silicon Knights while in
graduate school, with a partner who left the company a few years later.  It was the first
corporate venture for Mr.  Dyack, and despite the various industry changes, the numerous
financial difficulties faced by nearly all videogame developers, and the fact that literally
hundreds of such developers have come and gone since 1991, Dyack has shepherded
Silicon Knights through it all.  To the extent Silicon Knights has succeeded, it has been
largely due to Mr. Dyack's perseverance and his uncompromising dedication to a
singular philosophy:  gather talented individuals together and allow them to create
groundbreaking videogames.

**Response**

Epic is without knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 41 of the Complaint, and therefore denies those

allegations.

42.     Indeed, in the years since its inception, Silicon Knights has created,
designed, and developed numerous interactive entertainment products, primarily
videogame titles, artwork, and related software materials, in a variety of different first-
and second-party publishing arrangements.  Over the years, Silicon Knights has built a
reputation for quality videogames with fascinating game-play and compelling storylines,
and has a list of internationally successful video games to its credit, including early titles
such as ***Steel Empire*** (published in 1992 by a British company, Millennium); ***Cyber
Empires; Fantasy Empires; Fantasy Empires*** - CD Enhanced Version (published in
1992, 1993 and 1994, respectively, by Strategic Simulations, Inc., or "SSI"); and ***Dark
Legions*** (published in 1994, also by SSI).

**Response**

Epic is without knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 42 of the Complaint, and therefore denies those

allegations.

43.    In 1996, Silicon Knights produced its "breakthrough" title, **Blood Omen: Legacy of Kain** (published by Crystal Dynamics).  **Kain** was remarkable for the depth of its storyline and the immersive nature of its game-play, so much so that it garnered widespread industry praise, including (among other things) being awarded "Best Overall Game" in 1995 by *Die Hard Game Fan* magazine, at what was at the time the videogame industry's premier trade-show, Electronic Entertainment Expo ("E3").

**Response**

Epic is without knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 43 of the Complaint, and therefore denies those

allegations.

44.    Following the popularity and widespread industry recognition of **Blood Omen:  Legacy of Kain**, Silicon Knights worked on several other projects, and ultimately was able to enter into a highly-coveted, first-party, exclusive partnership with Nintendo. During that partnership, Silicon Knights' reputation and respect within the industry further increased, as it worked with famed Japanese video game designers Hideo Kojima and Shigeru Miyamoto on a variety of projects for Nintendo, in addition to producing another hit game of its own, **Eternal Darkness:  Sanity's Requiem** (2002) and creating **Metal Gear Solid:  The Twin Snakes** (2003, in conjunction with Konami).

**Response**

Epic is without knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 44 of the Complaint, and therefore denies those

allegations.

45.    Silicon Knights and Nintendo mutually determined to take different creative tracks in 2004, and ended their exclusive partnership.  Silicon Knights continued its focus on next-generation platforms, however, by entering a new first-party partnership with Microsoft to develop games for Microsoft's new Xbox 360, and a short time later embarking on development of a second game with another major publisher, Sega, on the Playstation 3.

**Response**

Epic is without knowledge of information sufficient to form a belief as to the truth

of the allegations in paragraph 45 of the Complaint, and therefore denies those

allegations.

46.    In order to succeed on those parallel-tracked development schedules, and
particularly due to the pressures of its new partner relationships, it was imperative that
Silicon Knights be efficient in its development process.  With that in mind, Silicon
Knight began to evaluate potential "plug-in" options for basic portions of its new games,
including pre-built engines.  As a result of those evaluations and various
recommendations and/or demands it received from its publishing partners, Silicon
Knights ultimately entered into negotiations with Epic, as described below.

**Response**

Epic admits that Silicon Knights evaluated the Unreal Engine 3, free of charge,

for approximately five months before beginning negotiations for a license to use the

Unreal Engine 3 commercially and for almost nine months before executing the License

Agreement.   Epic is without knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in paragraph 46 of the Complaint, and therefore

denies those allegations.

47.    Notably, at all times relevant herein, including during its negotiation of the
Agreement with Epic, Silicon Knights also was weighing and evaluating, both on its own
and with its business partners, the possibility of utilizing what was believed at the time to
be the more onerous and time-consuming method of creating its own game engine from
scratch.  It decided not to do so as a result of Epic's misrepresentations as described
herein.

**Response**

Epic admits that creating game engines from scratch may be more onerous and

time-consuming than using Epic's Unreal Engine 3 or other commercially available game

engines.  Epic denies that it misrepresented anything to Silicon Knights.  Epic is without

knowledge or information to form a belief as to the truth of the remaining allegations in

paragraph 47 of the Complaint, and therefore denies those allegations.

### The Relationship Between Silicon Knights and Epic

48.     While Silicon Knights was evaluating potential pre-built engines (and
simultaneously considering the possibility of creating its own game engine), Epic
was touting the success of the newest embodiment of its licensing scheme, the Unreal Engine
2.  That engine had shown well in Epic's game **Unreal Tournament** 2004, and was
garnering a great deal of industry "buzz" based on its performance as displayed in Epic's
own game.

**Response**

Epic admits that the Unreal Engine 2 was a cutting-edge engine, worked well in

*Unreal Tournament 2004* and numerous other games, and received critical acclaim and

buzz throughout the industry.  Epic further admits that it promoted the success of Unreal

Engine 2 and *Unreal Tournament,* and that as part of its business it licensed Unreal

Engine 2 to game developers.  Epic denies the remaining allegations in paragraph 48 of

the Complaint.

49.     Then, at the 2004 Game Developer's Conference in San Francisco, Epic
unveiled its newest engine, Unreal Engine 3, an engine that purportedly would be tailored
specifically to next generation games.  It is that version of the Engine that is at issue now,
following Silicon Knights' May 10, 2005 execution of the Unreal Engine 3 License
Agreement ("the Agreement").

**Response**

Epic admits that, at the 2004 Game Developer's Conference in San Francisco, it

unveiled a demo of its newest engine, the Unreal Engine 3, which was being developed

for use in conjunction with certain next-generation platforms.  Epic denies the remaining

allegations in paragraph 49 of the Complaint.

50.     As set forth in more detail below, Epic made numerous misrepresentations regarding the capacities and functionalities of the Engine to Silicon Knights to induce Silicon Knights into entering the Agreement.  Moreover, immediately upon signing Silicon Knights as a licensee, Epic's co-founder Rein again publicly confirmed the supposed benefits of the Engine that Epic had used to lure Silicon Knights in the first place:  "Combining the technology of the Unreal Engine 3 with the creativity of Silicon Knights has awesome potential.  Silicon Knights is a powerhouse for creating original content and the Unreal Engine 3 is a perfect vehicle to deliver it on."  Tim Sweeney, CEO and the other co-founder of Epic, further confirmed the supposed benefits that Silicon Knights would derive from using the Engine exclusively, adding, "It is very exciting to have Silicon Knights use Unreal Engine 3 technology exclusively.  Silicon Knights is a savvy developer that has always created their own technology in the past.  It is inspiring that they have now partnered with us exclusively this generation as it re-enforces our belief that we are on the right path for developing the proper tools and technology for creating the best games on the next generation systems."  (From May 10, 2005 Epic Games Press Release.)

**<u>Response</u>**

Epic admits that it approved and issued the press release on or about May 10, 2005.  Epic, however, denies the implication that it wrote the press release.  In fact, Silicon Knights wrote the press release and sent it to Epic for publication.  Thus, while Epic approved the press release, the statements in it are Silicon Knights' statements. These include the statement - - after nine months of working with the Epic's technology - - that "the Unreal Engine is the perfect vehicle. . ." and that Epic is "on the right path for developing the proper tools and technology for creating the best games on the next generation systems."  Epic denies that it made misrepresentations to Silicon Knights or that it "induced" or "lured" Silicon Knights into signing the License Agreement.

51.     Those purported benefits of the Engine never materialized, since, among other things, Epic wrongfully retained for itself all aspects of the Engine that Epic's own games had used to generate such a buzz in the industry — and not coincidentally, millions of dollars in ill-gotten Unreal Engine 3 licensing revenues from Silicon Knights and other developers who had been misled to believe they would be getting what Epic had promised.

**Response**

Epic denies the allegations in paragraph 51 of the Complaint.

Epic's Unreal Engine 3 License Agreement with Silicon Knights

52.     Silicon Knights and Epic began negotiating the Agreement for the Engine in or about January, 2005.

**Response**

Epic admits the allegations in paragraph 52 of the Complaint.

53.     Under the Agreement, Epic was obligated to make "commercially reasonable efforts to provide Updates which enhance to performance of the [Engine]." As explained below, Epic failed to do so.

**Response**

Epic admits that Section 4 of the License Agreement reads in part:  "Epic shall

use commercially reasonable efforts to provide Updates, which enhance the performance

of the Licensed Technology . . . ."  Epic denies that it failed to provide Updates.

54.     Pursuant to the Agreement, Epic also promised it would provide Silicon Knights with the working Engine within a specific timeframe.  Specifically, Epic expressly warranted that it would "demonstrate that the Licensed Technology (A) operates on the PC platform, (B) will operate on the Xbox 2 [since branded as the Xbox 360] within six (6) months following the release of a final development kit by Microsoft for the Xbox 2 platform; and (C) will operate on the Playstation 3 platform within six (6) months following the release of a final development kit by Sony for the Playstation."

**Response**

Epic denies the allegations in paragraph 54 of the Complaint.  Epic admits that, in

section 5(a) of the License Agreement, it warranted that  "(iv) it can demonstrate that the

Licensed Technology (A) operates on the PC platform, (B) will operate on the Xbox 2

platform within six (6) months following the release of a final development kit by

Microsoft for the Xbox 2 platform; and (C) will operate on the PlayStation 3 platform

25

within six (6) months following the release of a final development kit by Sony for the

PlayStation 3 platform." Epic satisfied these obligations in a timely manner.


55.     The final development kit for the Xbox 360 was released by Microsoft in early September, 2005, meaning that Epic was obligated to deliver a fully operable version of the Engine to Silicon Knights by no later than March, 2006. That delivery date is significant, since compliance by Epic would have given Silicon Knights time to prepare an appropriate demonstration version of its Microsoft Xbox 360 game, *Too Human*, for the very important industry trade show, E3, two months later in May, 2006. Had Epic complied with its promises and contractual obligations, Silicon Knights would have had the opportunity not only to generate a positive press and industry response to *Too Human*, but also to finish the game earlier and on better financial terms.

**Response**

Epic denies the allegations in paragraph 55 of the Complaint.


56.     Epic apparently was able to achieve a very usable [sic] version of the Engine for the Xbox 360 — the version that it kept to itself, for use only on its *Gears of War* game (as discussed below), to the detriment of Silicon Knights and Epic's other licensees, as set forth in more detail below. Epic's plan to avoid its obligations and hoard all of the necessary functionalities not only harmed Silicon Knights and all of Epic's other licensees in the industry, but also gave Epic a clearly unfair advantage in the industry. That advantage was nowhere more evident than at E3 2006, where *Gears of War* was awarded "Best Game in Show" and garnered nothing but laudatory press. By contrast, Silicon Knights — one of the only other developers to publicly display a playable demonstration of its game — saw Too Human roundly criticized in the videogame press for its technical problems and generally unpolished appearance. The damage to Silicon Knights caused by Epic's misconduct was manifest, because E3 attendees were able to compare *Too Human* with another game running ostensibly the same game engine, *Gears of War*, with vastly superior results.

**Response**

Epic admits that *Gears of War* was awarded "Best Game in Show" at the E3 2006

and that *Too Human* was criticized. Epic denies that it had different versions of Unreal

Engine 3, one of which it kept to itself. On the contrary, Silicon Knights had access,

through Epic's Internet-based source central systems, to the latest version of Unreal

Engine 3, as Epic developed it.  Epic denies the remaining allegations in paragraph 56 of

the Complaint.

57.    By May of 2006, just prior to E3, it was clear that Epic had failed to meet
its bright-line obligation of supplying the commercially viable Engine within six months
of the release of the development kits for the Xbox 360.  Consequently, Silicon Knights
was forced to decide whether to continue waiting for Epic to provide it with a
commercially functional version of the Engine.  Under the Agreement, Silicon Knights
found itself in the position of being ostensibly "bound" to use Epic's non-functional
product, even though doing so would result in the breach of its obligations to its
publishing partners.  Rather than let that happen, in May of 2006, with the Engine two
months overdue and under the looming risk of funding for *Too Human* drying up if no
workable engine could be found, Silicon Knights had no choice but to abandon the
Engine and begin creating its own game engine ("the Silicon Knights Engine").  By that
time, Epic had shown neither the ability nor the intent to fulfill its obligations under the
Agreement.

**<u>Response</u>**

Epic denies the allegations in paragraph 57 of the Complaint.

58.    Upon information and belief [sic] other game developers have been faced
with a similar dilemma as Silicon Knights.  To the extent that Epic contends any such
third party developers purportedly were able to utilize the Engine during the early
development cycle (when Epic had warranted Silicon Knights would have a functional
engine but failed to deliver one), upon information and belief those third party developers
broke away from the unworkable code that Epic had delivered and created their own
distinct engines, just as Silicon Knights was forced to do.

**<u>Response</u>**

Epic admits that many developers who license Unreal Engine 3 make

modifications, authorized under the license agreements, to adapt it to their particularized

needs.  Such modifications do not result in a different engine, but simply a modified

version of Unreal Engine 3.  Epic denies the remaining allegations in paragraph 58 of the

Complaint.

59.    Progress on the Silicon Knights' Engine continues to date and, at this time,
the Silicon Knights Engine is completely independent of Epic's Engine and certainly

derives no benefit from the unworkable source code provided by Epic.  In fact, at this juncture [sic] the Silicon Knights Engine should, at a minimum, be described under the Agreement as an "Enhancement" of Epic's Engine, which, as defined by the Agreement, is technology developed by Silicon Knights that improves upon the Engine and is therefore the property of Silicon Knights.  Moreover, as development of the Silicon Knights Engine continues, the amount of code from Epic's Engine employed by Silicon Knights continues to decrease.  After the release of Silicon Knights' ***Too Human***, all Epic code will be removed from the Silicon Knights Engine.

## Response

Epic admits that Silicon Knights is using Epic's code, in an unauthorized and infringing manner, to create the Silicon Knights Engine and for other purposes.  Epic denies the allegations in the first sentence of paragraph 59 of the Complaint, especially including the allegations that begin with the phrase, "the Silicon Knights Engine is completely independent of Epic's Engine. . ."  The second sentence of paragraph 59 states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.  Epic is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences, and therefore denies those and any remaining allegations in paragraph 59 of the Complaint, except that, as noted above, Epic admits that Silicon Knights is using Epic's code in violation of Epic's rights.

The Problems With Epic's Unreal Engine 3

60.    From the outset of the Silicon Knights-Epic negotiations, a crucial selling point of the Engine for Silicon Knights was that it would not be "genre-specific."  Among other misrepresentations, in a visit to Silicon Knights on December 15, 2004, Mark Rein represented to Silicon Knights that the Engine could be used for any game — from "first-person shooters" to third-person action/adventure games to racing games to arcade-style games.

**Response**

Epic admits that the Unreal Engine 3 is not genre-specific, and is being used in the development of action games, sports games, massive multiplayer games, and role-playing games, among other genres of games. Epic further admits that Mark Rein told Silicon Knights that he believed Unreal Engine 3 could, with varying degrees of difficulty, be used in the development of a variety of games, which in fact it can. Epic denies the remaining allegations in paragraph 60 of the Complaint.

61.    The lack of genre-specificity was a material prerequisite for Silicon Knights licensing the Engine because — as Epic knew — Silicon Knights' games had historically been, and were likely to continue to be, very different from Epic's ***Unreal Tournament***-template. That is, Silicon Knights needed, and discussed with Epic that it must have, an Engine that would do more than simply recreate the effect of a weapon on its surroundings, as seen from the vantage point of the first-person shooter. Instead, Silicon Knights' games place a premium on realistically rendering the surroundings in which the player finds him or herself and creating an immersive experience through the use of lighting, sound, and the virtual-physical interplay of characters and objects.

**Response**

All material terms and conditions of Epic's license to Silicon Knights relating to the Unreal Engine 3 are contained in the License Agreement. In addition, prior to entering into the License Agreement, Silicon Knights evaluated the Unreal Engine 3 for nine months, free of charge and without obligation. Moreover, Silicon Knights knew at all times (before and after entering into the License Agreement) that some of the development tools in the Unreal Engine 3 were and would continue to be in the process of development and improvement. Epic denies the remaining allegations in paragraph 61 of the Complaint.

62.    Unfortunately, as Silicon Knights attempted to use the Engine up until May, 2006, it became clear that the Engine did not satisfy those needs, and moreover, did not appear to perform correctly in connection with anything other than Epic's Unreal

series of games. No amount of inquiry by Silicon Knights and/or solicitation for Epic's assistance served to resolve the very simple fact that Epic appears to have simply taken-in millions of dollars in license fees from Silicon Knights and other developers, and provided them in return with vastly less than the entirety of the Engine, let alone all parts of the Engine that are necessary to make a videogame function on the next generations systems as Epic warranted. Rather, Epic appears to have been maintaining those most critical facets of the Engine for use in its own *Gears of War* game to, among other reasons, "show up" the entire industry in connection with the 2006 E3 show and ultimately to enhance the marketing of the game on the Xbox 360.

**<u>Response</u>**

Epic denies the allegations in paragraph 62 of the Complaint, including the

implication that Silicon Knights implored Epic for help but was ignored. Silicon Knights

asked several questions regarding the operation of Unreal Engine 3, all of which were

answered by Epic.

63.    In addition to the Engine that Epic provided Silicon Knights simply being unsuitable for use according to reasonable industry standards and to meet Silicon Knights' needs (despite Epic's numerous representations to the contrary), Silicon Knights experienced — prior to May, 2006, when Silicon Knights was forced to begin creation of its own game engine — a variety of other, more specific issues with the Engine's performance. For instance, at the end of May, 2005, Silicon Knights requested from Epic details regarding what form the Engine's multiprocessor support may take, implementation of which was scheduled for a few months later (in approximately September, 2005). A game engine's multi-processor support, and the way in which it is implemented, is crucial to a videogame's overall performance because it concerns the hardware's ability to execute multiple tasks, or "threads," at one time, via a process known in the industry as "multi-threading."

**<u>Response</u>**

Epic admits that a game engine's multi-processor support and its implementation

can affect the performance of a game. Epic further admits that, in May 2005, it received

and responded to a request from Silicon Knights regarding Epic's future plans for multi-

thread support. Epic denies the remaining allegations in paragraph 63 of the Complaint.

64.    Epic's response to Silicon Knights' request evidences yet another breach of Epic's basic warranties an [sic] obligations: Epic took the position that it regarded all

such multiprocessor support, implementation, and multi-threading issues as
"optimizations," which would only be scheduled and provided to licensees (like Silicon
Knights) as the relevant systems became final enough that the optimizations do not
impede current new feature development work. Epic further responded that such
optimizations were ultimately "asymptotic in nature," and thus the word "done" should
not be used in conjunction with them.

**Response**

     Epic admits that, in creating the Unreal Engine 3, it added new features first and

then began optimization, which by its nature is always evolving. Epic denies the

remaining allegations in paragraph 64 of the Complaint.

     65.    In other words, Epic would not provide any information about how the
Engine would work with the Xbox 360, itself a multi-processor system, unless Epic could
do so without hindering the development of *Gears of War*. And, even once Epic did
furnish those details, a licensee could not rely on them as Epic considered such a
fundamental characteristic of the Engine mutable and thus subject to constant alteration.

**Response**

     Epic denies the allegations in paragraph 65 of the Complaint. Epic's duties and

responsibilities are set forth in the License Agreement, and Epic has fully complied with

the License Agreement.

     66.    Prior to May, 2006, when Silicon Knights was forced to begin creation of
its own game engine, Silicon Knights also experienced a number of other problems,
including, but not limited to long load times and memory-spikes during loading, both of
which cause a game that employs the Engine to slow down significantly (so much so that
in many instances it becomes unplayable in any realistic sense of the word), and neither
of which should have been issues pursuant to Epic's promises and express warranties.
Silicon Knights is informed and believes and, based thereon, alleges that Epic had been
well informed and aware of those problems since at least October of 2004. In fact, in and
around that time (October, 2004), Epic promised all licensed users a solution by the first
quarter of 2005, with the purported solution being a single loading path for console game
systems, and no memory spikes. As of May of 2006, however, that promise still has not
been fulfilled by Epic: the Engine still experienced memory spikes during loading, and
console games loaded across multiple paths.

**Response**

Epic denies that Silicon Knights "was forced to begin creation of its own game engine." Epic admits that Silicon Knights complained about long load times and memory spikes, but denies that those problems were attributable, in any material respect, to the Unreal Engine 3 as distinguished from the specific content of Silicon Knights' game. Epic did advise Silicon Knights and its other licensees that it was working to speed up the Unreal Engine 3, but it did not promise a complete solution to game specific issues, as Silicon Knights implies. Epic denies the remaining allegations in paragraph 66 of the Complaint.

67.    Another issue that plagued the Engine until at least May, 2006 was its performance of "garbage collecting," a term of art used in the industry for the process by which systems within the Engine free up memory from tasks that are no longer necessary. Given the pace of game-play, the "universe" of the game changes several times a second, and if a system does not collect its "garbage" information adequately, the computer must waste memory "remembering" anachronistic settings, rather than using that memory for any number of other tasks that are currently at hand.

**Response**

Epic admits that it intended to and did increase the speed of garbage collecting. Epic denies that garbage collection speed "plagued" the Unreal Engine 3 or that it adversely affected Silicon Knights' ability to develop games. Epic denies the remaining allegations in paragraph 67 of the Complaint.

68.    Upon information and belief, the target for garbage collection in the Engine is that that [sic] it will run for 5 milliseconds every 30 seconds to 2 minutes. Prior to May, 2006, when Silicon Knights was forced to begin creation of its own game engine, Silicon Knights had to run the Engine's garbage collector every 25 seconds for 30 to 50 milliseconds. Those additional garbage collection processes — which would not be present in any commercially reasonable pre-built engine of the type Epic advertised and solicited licensees, and certainly should not be present in any videogame engine that comported with Epic's express warranties in the Agreement — would equate directly to slower game-play.

**Response**

Epic admits that its target for garbage collection in the Unreal Engine 3 was, at

one point during development,  5 milliseconds.  This target changed throughout

development.  Performance targets for garbage collection are a function of many factors,

including each individual game's content and process development.  To the extent Silicon

Knights had to run the garbage collector every 25 seconds for 30 to 50 milliseconds, it

was due to Silicon Knights' content and programming, not to any failure or breach of

obligation by Epic.  Epic's real-time garbage collection technology has successfully

shipped many games, including *Gear of War* in November 2006.  Epic denies the

remaining allegations in paragraph 68 of the Complaint.


69.     Those are just some of the major issues Silicon Knights experienced with
the Engine while Silicon Knights attempted to use it in developing **Too Human**.  Upon
information and belief [sic], Epic is well aware of the host of other problems that have
existed (and currently exist) with the Engine.  Incredibly, while Silicon Knights was still
working with the Engine prior to May, 2006, Epic would refuse to act on even the
simplest of Silicon Knights' requests to correct those problems, often on the specious
assertion that if Epic could not use the fix for development of its own game (**Gears of
War**), the request somehow was not a valid one.

**Response**

Epic denies the allegations in paragraph 69 of the Complaint.


Epic's Improper Withholding of Updates, Improvements, and Enhancements

70.     As indicated above, shortly after Silicon Knights executed the Agreement,
there was a fundamental dispute between the parties as to what was a "game specific"
enhancement — and therefore not available to licensees — versus what was "engine
level," and thus available to licensees.  That dispute was drawn into even sharper focus
by the showing of **Gears of War** at E3.

**Response**

Epic admits that after *Gears of War* showed well at E3, it and Silicon Knights

occasionally disagreed as to whether an enhancement was game specific. Epic further

admits, as Silicon Knights knew from the time it evaluated the Unreal Engine 3, that

Silicon Knights was being offered a license for Unreal Engine 3, and not a license for the

game *Gears of War* or the game-play code specific to it. Epic denies the remaining

allegations in paragraph 70 of the Complaint.

71.     As mentioned above, when ***Gears of War*** showed so well at E3 and
walked off with Best Game honors from the show, ***Gears of War*** was ostensibly running
the same engine as Silicon Knights' ***Too Human***, even though the version that Silicon
Knights had been provided by Epic was nothing but problematic. The aspects of the two
games that were clearly "engine level" functions (load times, frame rates, multi-processor
support, implementation, and multithreading, to name only a few) performed radically
better in ***Gears of War*** as displayed at E3 than in Silicon Knights' own game. Similarly,
at E3 the vast majority of all other developers whom Epic had announced as "licensed
users" of the Engine, showed only unplayable demos of their games, and then only
behind closed doors.

**Response**

Epic admits that (i) *Gears of War* showed well at E3 and received "Best Game"

honors, (ii) that *Gears of War* and other games were running the Unreal Engine 3 at E3,

and (iii) that, at E3, *Gears of War* performed better than *Too Human*. Epic is without

knowledge or information sufficient to form a belief as to the truth of the allegation

relating to "unplayable demos," and therefore denies that allegation. Epic denies the

remaining allegations in paragraph 71 of the Complaint.

72.     After E3, and as Epic's ***Gears of War*** approached its release date, Epic
continued to improperly designate clearly necessary functionalities as "game specific"
instead of "engine level." For example, as of May, 2006, Silicon Knights was
consistently unable to achieve acceptable frame rates from the Engine's graphics
renderer. A functional graphics renderer is crucial to ensuring seamless game-play for
the end-user, since it is the renderer that is responsible for translating the digital

information created during game-play into the visual images shown to the end-user. A renderer is therefore judged on two bases: the accuracy of the image (e.g., the texture of the image, the effect of lighting, etc.) and the speed with which the renderer displays the image (i.e., framerates and load times). The slower the processing (e.g., when lower frame rates occur), and/or the more delay there is between discrete sections of the game (i.e., when long load times occur), the less compelling the game-play.

**Response**

Epic admits the allegations in the sentence that begins with "A functional graphics renderer . . . ." Epic denies the remaining allegations in paragraph 72 of the Complaint.

73.    The Engine's inadequate rendering system damaged Silicon Knights, led directly to bad press for it at E3, created skepticism in the marketplace (both by the press and potential buyers of the game), and have unquestionably made the potential for advanced and post-launch sales more difficult.

**Response**

Epic denies the allegations in paragraph 73 of the Complaint.

74.    Prior to May, 2006, Silicon Knights had also asked Epic for support in optimizing the Engine's renderer. Epic, however, refused to provide such support, and moreover declined to even provide a timeline for further optimization of the Engine at all. Upon information and belief, Epic was then "mostly done" with its work on the renderer as used in its own game, *Gears of War*.

**Response**

Epic admits that Silicon Knights asked Epic for support in optimizing the renderer. Epic denies the remaining allegations in paragraph 74 of the Complaint.

75.    Nonetheless, Epic improperly withheld the renderer optimizations from Silicon Knights and its other licensees, despite Epic's obligations and the basic necessity of the renderer to commercially feasible performance of the Engine. Instead, when asked what optimizations Epic had used to get *Gears of War* to work, Epic responded that the optimizations were "game specific" and entailed "very specialized knowledge that is hard to transfer." Upon information and belief, the renderer that was eventually supplied to licensees by Epic on or about the end of July, 2006, dubbed "Gemini," was incompatible with functions supported by the previous version of the renderer, which licensees had already used in developing their games. When at least one licensee pointed that out to Epic, Epic's response was that "fringe" features (i.e., those not being used by Epic in

*Gears of War*) would not be implemented in Gemini until Epic had completed its work on its own game, including the "little polish items" needed to bring *Gears of War* into a "shippable state." Moreover, Epic suggested that its Licensees "fix them up on [their] end" and then forward those patches on to Epic.

**Response**

     Epic admits that it provided a multi-threaded renderer to Silicon Knights. Epic further admits that it did not provide to Silicon Knights (i) code in *Gears of War* that dealt with *Gears of War* gameplay-specific functions, and (ii) non-core bits of code from Microsoft and other companies that did not affect rendering load times, and the like. Epic denies that it had any obligation to provide to Silicon Knights anything other than Unreal Engine 3 in accordance with the License Agreement, and states that it complied with that obligation. Epic further denies the remaining allegations in paragraph 75 of the Complaint.

     76.    The problems created by Epic's withholding of such enhancements and optimizations on the dubious grounds of them being "game-specific" became especially pronounced when such withholding impacted the specific benchmarks known as "Technical Certification Requirements" (or "TCRs") that every videogame must meet before it can be played on a particular game console. For example, Microsoft imposes certain TCR's for games that are to be run on the Xbox 360. One very basic TCR is simply how long it takes the videogame to start-up. For Silicon Knights, as of May, 2006, the Engine had been unable to meet even that simple start-up requirement, still taking over twice as long as Microsoft requires in its Xbox 360 TCRs.

**Response**

     Epic admits that Microsoft has Technical Certification Requirements for video games. Epic denies that it has any obligation to ensure that Silicon Knights' games meet those or any other TCRs. Epic further denies that it improperly withheld enhancements or optimizations from Silicon Knights or that it created "problems" for Silicon Knights. Loading performance varies according to the amount and type of game-specific content being loaded. Silicon Knights had complete access to Epic's latest loading code at all

times; any difference in loading performance between Epic's and Silicon Knights' games

reflected differences in game content, not code.  Epic is without knowledge or

information sufficient to form a belief as to the remaining allegations in paragraph 76 of

the Complaint, and therefore denies those allegations.

77.    Another of Microsoft's TCRs is that the system User Interface ("UI") can
be rendered at least every 66 milliseconds at all times.  As of at least as late as May,
2006, it was clear to Silicon Knights that the Engine and its renderer could not satisfy that
TCR.

**Response**

Epic denies that it has any obligation to provide to Silicon Knights a renderer that

would ensure that Silicon Knights' game meets Microsoft's TCRs.

78.    However, when Epic was asked what was being done to bring the Engine
into compliance with these fundamental TCR requirements from the Xbox 360
manufacturer (which again, Epic warranted to Silicon Knights it would meet), Epic
responded that, though it was at that very time working toward meeting the TCRs in
***Gears of War***, that level of functionality would not "make it to the engine level, as it is
custom to the game."

**Response**

Epic denies that it has any obligation to provide Silicon Knights an engine that

would ensure that Silicon Knights' game meets Microsoft's TCRs.  Nonetheless, Epic

worked toward meeting Microsoft's TCRs in *Gears of War* and, to the extent the TCRs

were "engine level" TCRs, made them available to Silicon Knights.  Epic denies the

remaining allegations in paragraph 78 of the Complaint.

79.    In other words, Epic has refused to even release code, tools, and/or
information to Silicon Knights that would be sufficient to provide simply the
manufacturer-necessitated performance levels of the Engine on the Xbox 360, let alone
code, tools, and/or information sufficient to meet the promises and warranties Epic made
to Silicon Knights in connection with the Agreement.  Epic all the while has kept to itself
the code, tools, and/or information necessary to make the Engine functional, so that in

addition to bilking its licensees of millions of dollars in ill-gotten license fees, Epic was able to gain an unfair advantage within the videogame market with respect to those same licensees, because its own game - the only one with the coding and tools sufficient to function on the Xbox 360 — was able to be "first out of the gate" and run off to rampant market success since Epic had effectively eliminated all competition through its fraudulent scheme.

**Response**

Epic denies the allegations in paragraph 79 of the Complaint.

80.     Epic's misconduct has created an industry-wide uproar because of its hoarding all of the necessary functionalities of the Engine for **Gears of War**, and the other breaches and misrepresentations by Epic referenced herein.  In response, Epic belatedly represented near the end of 2006 that it would release to Engine licensees the "code bases" for several "systems" in the game so that the developers could see how to make the Engine work with the Xbox 360.  Epic immediately hedged even further on that promise, by saying that Epic would remove much of the code for some unspecified "middleware" *that Epic itself apparently had to use* to get the Engine to perform on the Xbox 360 as mandated by Microsoft.  Epic's refusal to provide its Licensees, Silicon Knights included, with such essential middleware is a further breach of the Agreement, which obligates Epic to provide Silicon Knights third-party software products that have been integrated into the Unreal Engine.

**Response**

Epic denies the allegations in paragraph 80 of the Complaint.

81.     Despite its own refusal to provide the necessary code, tools, and/or information to its licensees, Epic has continued to tout the purported cost savings and efficiency gains that developers stand to benefit from by using the Engine.  Among other examples, as recently as October 30, 2006, Mark Rein was reported as extolling the Engine's abilities to allow games to be developed cheaper, faster, and with smaller teams, Likewise, on February 5, 2007, Mark Rein was still lauding the Engine's "great tools for building content and a great pipeline that makes [a developer's] team more productive" and Epic's devotion to its licensees:  "[s]o we're really good at helping our licensees figure out how to attack problems and do things that we're not even doing in our own games."  (From February 5, 2007 Interview with Wired GameLife at http://blog.wired.com/games/2007/02/interviewepics.htm].)

**Response**

Epic admits that the Unreal Engine 3 is a cutting-edge tool for game development

and that Epic has touted that fact.  Epic also admits that Mark Rein made the statements

quoted in paragraph 81 of the Complaint, and that those statements were and are accurate.

Epic denies that it improperly refused to provide Licensed Technology to Silicon

Knights, and further denies the remaining allegations in paragraph 81 of the Complaint.

Epic's Release of Gears of War Code

82.    On November 7, 2006, Epic made available to its licensees a "snapshot" of the Xbox 360-specific code as used in *Gears of War* along with four games [sic] levels with which the licensee that code applied.  Epic informed its licensees that the snapshot represented "100% of the shipping code" for *Gears of War*.  Even that snapshot was incomplete, however, as Epic, in further violation of the Agreement with Silicon Knights, again refused to provide essential third-party software - this time a full-motion video player - that apparently had been integrated into the Engine by Epic.

**Response**

Epic admits that on or about November 7, 2006, it voluntarily released to all of its

licensees a snapshot of the Xbox 360 code as used in *Gears of War,* along with four

*Gears of War* game levels.  Epic provided 100% of Epic's code that shipped in *Gears of*

*War.*  Epic did not provide, and had no obligation to provide, code created and owned by

third parties, which shipped in *Gears of War*.  Epic denies the remaining allegations in

paragraph 82 of the Complaint.

83.    Moreover, in Epic's message to its licensees accompanying that snapshot [sic] it represented that the snapshot would be useful to licensees "as a reference for examining full-performance, ship-quality content."  However, at the same time, Epic included the caveat that the snapshot also contains "*Gears*-specific game-play code" and that such code was not readily "extensible or retargettable," and Epic would not be providing "in-depth support for" that code.  Finally, Epic concluded with the instruction that its licensees should not, in fact, use the "particular version" of the Engine represented in the snapshot, but should continue using only "official approved builds" of the Engine.

**Response**

The "message" alleged in paragraph 83 of the Complaint speaks for itself.  To the

extent the allegations in paragraph 83 differ from the message, the allegations are denied.

84.     A review of Epic's "snapshot" reveals that not only were there significant differences between the *Gears*-engine described in the snapshot and the Engine code released by Epic prior to November 7, 2006, but that Epic had in fact built the *Gears*-engine to perform certain in-game tasks in a manner that was the exact opposite of what it had been telling its licensees, including Silicon Knights, while secretly developing *Gears of War* and not sharing the time working code and other Xbox 360 solutions with its licensees.

**Response**

Epic admits that the *Gears* engine differed in some respects from the engine code

that it released prior to November 7, 2006.  There is nothing unusual or improper about

that.  Epic denies the remaining allegations in paragraph 84 of the Complaint.

85.     For example, a game engine uses what is called a "particle system" to emulate "fuzzy" atmospheric effects, which constantly change in appearance (e.g., the flicker of a flame, snowfall, a stream of water, etc.).  In determining how a game will render its particles, a developer can choose to either "pool" particles or employ a "dynamic allocating system."  A dynamic system allocates memory to particles only as needed, whereas a pooled system reserves a set amount of memory for particles whether the game-play requires it or not at any given time, thereby reducing on aggregate the amount of memory available for other engine functions.  Thus, one clear advantage of a dynamic system is that it potentially optimizes memory usage and thereby improves game-play, provided that the memory cost of creating and destroying particles on demand does not outweigh the burden of maintaining a pool of memory for particles, and provided that the game engine can collect its garbage without imposing a further significant memory cost.  How a game represents particles is not something that is "game-specific" or even "genre specific," but rather reflects a developer's decision regarding how to ration the resources available for a given game based on the hardware and software available to him or her.

**Response**

Epic admits the allegations in paragraph 85 of the Complaint, except that the last

sentence is unintelligible and, on that basis, denied.

86.     Upon information and belief, throughout Epic's development of the Engine, it has advised its licensees to use the "dynamic allocating system" for particle effects, despite the fact that such a system requires the game engine to be more discriminating in its use of memory and further complicates garbage collection (which process was already problematic with the Engine, as described above).  The snapshot of

the *Gears*-engine, though, reveals that Epic itself resorted to using pools of particles for its game, a game that supposedly demonstrates the "full performance" of the Engine.

**Response**

Epic admits that it believes that a dynamic allocating system is an appropriate system for the Unreal Engine 3. Epic admits that it included a dynamic system in the Unreal Engine 3. Epic also admits that after May 2006, it decided to use pools in *Gears of War*. Epic denies the remaining allegations in paragraph 86 of the Complaint.

> Epic's Misrepresentations in Connection With the Unreal Engine 3 and the Agreement

87.    As indicated and described above, prior to execution of the Agreement, as well as concurrently with and following its execution, Epic made numerous oral, written, express, and/or implied, misrepresentations regarding the capabilities of the Engine, the ability of Epic to support the Engine, and Epic's intention to provide such support.

**Response**

Epic denies the allegations in paragraph 87 of the Complaint.

88.    In addition to all of the omissions and misrepresentations already set forth herein, Silicon Knights also is informed and believes and, based thereon, alleges that such oral and written misrepresentations and false and misleading statements of fact by Epic include, but are not limited to, at least the following omissions and misrepresentations:

**(a)**    In a visit to Silicon Knights' offices (in St. Catharines, Ontario, Canada), on or about August 12, 2004, Tim Sweeney of Epic represented that the Engine would be able to render both indoor and outdoor terrain. Mark Rein touted that feature of the Engine as well in his visit to Silicon Knight on December 15, 2004. That feature of the Engine was crucial to Silicon Knights because *Too Human* makes extensive use of outdoor terrain. However, those representations were false: as Epic continued to work on *Gears of War* rather than further develop the Engine and provide code, tools, and/or support to its licensees like Silicon Knights, Epic apparently decided that the terrain-creating portion of the Engine would need to be completely rewritten in order to create outdoor terrain. Moreover, Epic informed its licensees the re-write would not be available until after *Gears of War* was complete. As noted above, Epic's continued misrepresentations and breach of its obligations under the Agreement forced Silicon Knights to begin the process of creating its own game

engine as of May, 2006. At that time, almost two years after those representations were first made, and four months after the deadline for successful implementation of the Engine on the Xbox 360, as provided by paragraph 5(a)(iv)(B) of the Agreement, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill its promise of providing an Engine that would render both indoor and outdoor terrain.

## Response

Epic admits that on or about August 12, 2004, Mr. Sweeney stated accurately that Epic intended that Unreal Engine 3 would be able eventually to render indoor and outdoor terrain. In addition, Epic admits that, as the Unreal Engine 3 evolved in development, Epic rewrote some or all of the terrain system, and advised its licensees that most of that work would be completed after the release of *Gears of War*. Epic is without knowledge or information sufficient to form a belief as to the truth of the allegation relating to Mr. Rein's statement on or about December 15, 2004, and therefore denies that allegation. Epic denies that it made any misrepresentation to Silicon Knights relating to "terrain" or otherwise, and further denies the remaining allegations in paragraph 87(a) of the Complaint.

      **(b)** Also during the August 12, 2004 meeting at Silicon Knights' offices, Tim Sweeney described the lighting model that the Engine would make available. According to Sweeney, the model was to be mostly dynamic with three or four lights affecting each object, and with only a small amount of pre-calculation needed for static lights. Lighting is a key component to any game designer's efforts to create a realistic scene, and the ability of a game engine to create a scene whose lighting is constantly shifting by virtue of a number of light sources is integral to that effort. However, that promise by Epic also turned out to be untrue. Prior to May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing **Too Human** and possibly going out of business altogether, Epic's recommended model and means of using the Engine for lighting had changed repeatedly and without warning. As of May, 2006,, [sic] Epic and its Engine had been unable to deliver the lighting model on which Sweeney had sold Silicon Knights the license. Upon information

and belief, at the time Epic shipped its own game, *Gears of War* — over
seven months after the deadline for successful implementation of the
Engine on the Xbox 360, as provided by paragraph 5(a)(iv)(B) of the
Agreement — the prescribed lighting model for the Engine was to pre-
calculate as much of the scene as possible and consolidate the light effects
into three light vectors per vertex while lighting the character from a
single point light that approximates the overall scene lighting.  The net
effect of those restrictions, simply put, is to dramatically limit the dynamic
nature of the lighting and the creativity with which that lighting can be
used throughout the game; limitations that Epic plainly represented at the
outset of is [sic] relationship with Silicon Knights would not be present in
"the Engine" it was going to, and did, license to Silicon Knights.

## Response

Epic admits that, between 2004 and 2006, the Unreal Engine 3 improved

significantly.  Epic further admits that, in late 2005, it shifted from dynamic to

predominantly static lighting within the Unreal Engine 3, but Unreal Engine 3 continued

to support dynamic lighting.  By the time *Gears of War* shipped, the lighting component

of the Unreal Engine 3 supported most platforms.  Epic denies that it had any obligation

to deliver a "dynamic" lighting system, and further denies the remaining allegations in

paragraph 88(b) of the Complaint.

> **(c)** During that same August 12, 2004 visit to Silicon Knights' offices, Tim
> Sweeney also represented on behalf of Epic that the Engine would allow
> many tens of characters on the screen at the same time.  That
> representation was reinforced by Joe Graf on behalf of Epic on or about
> January 3, 2005, when he stated that the Engine would allow 40-50
> characters on the screen at the same time.  As of May, 2006, when Silicon
> Knights had to begin creation of its own engine to avoid losing *Too
> Human* and possibly going out of business altogether, Epic had not
> delivered software, code, tools, and/or information sufficient to, and had
> otherwise failed to, fulfill those promises.  In fact, as of October 30, 2006,
> Epic had conceded that it was only placing 8-10 "pawns" on the screen at
> one time in the version of its own *Gears of War* that it was (as of that
> time) hoping Microsoft would certify.

**Response**

Epic admits that Messrs. Sweeney and Graf said that Epic expected that the

Unreal Engine 3 would allow for numerous characters on the screen at the same time.  To

the extent Mr. Graf's statement is contained in an email, the email speaks for itself.  Epic

denies that it promised Silicon Knights any specific number of characters, and further

denies the remaining allegations in paragraph 88(c) of the Complaint.

> **(d)**      On or about January 3, 2005, Joe Graf, on behalf of Epic, also represented,
> in an e-mail to Silicon Knights, that the Engine would allow for four (4)
> player co-operative play on the Xbox 360 while at the same time still
> meeting the bandwidth specifications set by Microsoft.  As of May, 2006,
> when Silicon Knights had to begin creation of its own engine to avoid
> losing *Too Human* and possibly going out of business altogether, Epic
> had not delivered software, code, tools, and/or information sufficient to,
> and had otherwise failed to, fulfill that promise.

**Response**

Mr. Graf's email speaks for itself.  To the extent the email differs from the

allegation in paragraph 88(d) relating to Mr. Graf's statement, that allegation is denied.

Epic denies the remaining allegations in paragraph 88(d) of the Complaint.

> **(e)**      On or about February 21, 2005, Joe Graf, on behalf of Epic, further
> represented, in an e-mail to Silicon Knights that the Engine would operate
> on final hardware at 30 frames per second with more than 30 characters on
> the screen.  As of May, 2006, when Silicon Knights had to begin creation
> of its own engine to avoid losing *Too Human* and possibly going out of
> business altogether, Epic had not delivered software, code, tools, and/or
> information sufficient to, and had otherwise failed to, fulfill that promise.

**Response**

Mr. Graf's email speaks for itself.  To the extent the email differs from the

allegation in paragraph 88(e) relating to Mr. Graf's statement, that allegation is denied.

Epic denies the remaining allegations in paragraph 88(e) of the Complaint.

(f)     On or about October 24, 2004, Tim Sweeney on behalf of Epic [sic] represented to Silicon Knights in an e-mail that the general asynchronous streaming framework of the Engine would come "on-line" (i.e., would be made available to licensees like Silicon Knights) at the end of the first quarter of 2005.  As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

**Response**

Mr. Sweeney's email speaks for itself.  To the extent the email differs from the allegation in paragraph 88(f) relating to Mr. Sweeney's statement, that allegation is denied.  Epic denies the remaining allegations in paragraph 88(f) of the Complaint.

(g)     On or about October 27, 2004, Tim Sweeney made the following representations on behalf of Epic in an e-mail to Silicon Knights:

(i)     Loading or pre-defined level-content would be "seek free," and levels will typically load with 2-5 "seeks."  As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

(ii)    Memory spikes would be limited, and unpredictable memory spikes will be eliminated when loading.  As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

(iii)   Console games would load with a single loading path.  As of May, 2006, when Silicon Knights had to begin creation of its own engine to avoid losing *Too Human* and possibly going out of business altogether, Epic had not delivered software, code, tools, and/or information sufficient to, and had otherwise failed to, fulfill that promise.

**Response**

Mr. Sweeney's email speaks for itself. To the extent the email differs from the allegations in paragraph 88(g) relating to Mr. Sweeney's statements, those allegations are denied. Epic denies the remaining allegations in paragraph 88(g) of the Complaint.

Further Breaches of the Agreement By Epic

89.     Epic utterly failed to make "commercially reasonable" efforts to support, update, and enhance the Engine as required by the Agreement.

**Response**

Epic denies the allegations in paragraph 89 of the Complaint.

90.     Epic further failed to present Silicon Knights with a workable product within 6 months of the release of the final development kit for the Xbox 360, that kit having been released in early September, 2005, although Epic knew from the outset that Silicon Knights is in partnership with Microsoft (and others) to develop Xbox 360 games, just as Epic is a partner with Microsoft. Indeed, the pre-existing relationship between Epic and Microsoft further encouraged Silicon Knights to take a license for the Engine, since, among other reasons, Microsoft itself had already taken a license for the Engine for its own internal developing house, Microsoft Games Studios.

**Response**

Epic admits that, in section 5(a)(iv) of the License Agreement, it warranted that "it can demonstrate that the Licensed Technology . . . (B) will operate on the Xbox 2 platform within six (6) months following the release of a final development kit by Microsoft for the Xbox 2 platform. . . ." Epic fully complied with that obligation. Epic further admits that it has licensed the Unreal Engine 3 to Microsoft, which is using it to develop its own games. Epic denies that it has breached any obligation to Silicon Knights or is otherwise liable to Silicon Knights. Epic is without knowledge of information sufficient to form a belief as to the truth of the remaining allegations in paragraph 90 of the Complaint, and therefore denies those allegations.

91.    Epic has likewise failed to provide Silicon Knights with a working Engine for the PS3 within 6 months of the release of the final development kits for that console, and has thus breached the Agreement in that regard.

**Response**

Epic admits that, in section 5(a)(iv) of the License Agreement, it warranted that

"it can demonstrate that the Licensed Technology . . . (C) will operate on the PlayStation

3 platform within six (6) months following the release of a final development kit by Sony

for the PlayStation 3 platform." Epic fully complied with that obligation. Epic denies

that it breached the License Agreement "in that regard" or in any other way.

92.    As a direct result of Epic's actions and misrepresentations, Silicon Knights has been forced to rework its contractual obligations with its business partners and accept less favorable financial and other contractual terms in those relationships in order to obtain the financing necessary to see Too Human through to completion and publication. None of those delays, financial losses, and contractual harms would have occurred but for Epic's illegal and wrongful conduct.

**Response**

Epic denies that it has engaged in any misrepresentations or wrongful action.

Epic is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegation in paragraph 92 of the Complaint, and therefore denies those

allegations. Any harm suffered by Silicon Knights is the result of its own intentional or

negligent acts, and has not been caused by any act or omission of Epic.

CAUSES OF ACTION
FIRST CAUSE OF ACTION.

Fraud/Fraudulent Inducement

93.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

**Response**

      Epic incorporates its responses to paragraphs 1 through 92 of the Complaint.

      94.    Epic has made numerous oral and written misrepresentations and false and misleading statements of fact to Silicon Knights as set forth above, including, but not limited to, those set forth in paragraph 96(a)-(g).  Silicon Knights reserves its rights to, and hereby does incorporate by reference any and all additional or different fraudulent statements, and/or further information related to same, which may be obtained in the course of investigation and discovery in this action.

**Response**

      Epic denies the allegations in paragraph 94 of the Complaint.  Epic further denies

that Silicon Knights has any right to "reserve its rights" with respect to, or to "incorporate

by reference," any statement or information not alleged in its Complaint.

      95.    Upon information and belief, Epic knew those statements and misrepresentations were in fact false at the time they were made, and/or Epic made such statements and misrepresentations with reckless disregard as to their truth or falsity.

**Response**

      Epic denies the allegations in paragraph 95 of the Complaint.

      96.    The material misrepresentations made by Epic before the parties executed the Agreement were made with the intention of inducing Silicon Knights to enter into an agreement with Epic to license the Engine.  Upon information and belief [sic] Epic knew those statements were false or made such statements and misrepresentations with reckless disregard as to their truth or falsity.  Silicon Knights is informed and believes and, based thereon, alleges that, at the time they were made, Epic intended to induce reliance by Silicon Knights on those misrepresentations and false and misleading statements of fact.

**Response**

      Epic denies the allegations in paragraph 96 of the Complaint.

      97.    Silicon Knights reasonably and justifiably relied on Epic's misrepresentations and false and misleading statements of fact.

**Response**

Epic denies making misrepresentations or false or misleading statements. Epic

further denies the remaining allegations in paragraph 97 of the Complaint.

98.     As a result of the misrepresentations and false and misleading statements
by Epic, Silicon Knights has suffered, and will continue to suffer, money damages in an
amount to be proven at trial.

**Response**

Epic denies making misrepresentations or false or misleading statements. Epic

further denies the remaining allegations in paragraph 98 of the Complaint.

99.     Upon information and belief, the above alleged acts were committed by
Epic intentionally, fraudulently, maliciously, and oppressively, and in conscious
disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to
exemplary and punitive damages, including pursuant to North Carolina General Statute §
1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

**Response**

Epic denies the allegations in paragraph 99 of the Complaint.

SECOND CAUSE OF ACTION

Negligent Misrepresentation

100.     Silicon Knights realleges and incorporates by reference the allegations in
the forgoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1 through 99 of the Complaint.

101.     Epic made numerous negligent misrepresentations in the course of its
various business and professional dealings with Silicon Knights. Silicon Knights
reserves its rights to, and hereby does incorporate by reference any and all additional or
different negligent misrepresentations, and/or further information related to same, which
may be obtained in the course of investigation and discovery in this action.

**Response**

Epic denies the allegations in paragraph 101 of the Complaint.  Epic further

denies that Silicon Knights has any right to "reserve its rights" with respect to, or to

"incorporate by reference," any statement or information not alleged in its Complaint.

102.    Upon information and belief, at the time such negligent misrepresentations and false and misleading statements of fact were made, it was reasonably foreseeable to Epic that Silicon Knights would rely on those negligent misrepresentations and false and misleading statements of fact.

**Response**

Epic denies making negligent misrepresentations or false or misleading

statements.  Epic further denies the remaining allegations in paragraph 102 of the

Complaint.

103.    Silicon Knights has, in fact, justifiably relied on Epic's negligent misrepresentations and false and misleading statements of fact.

**Response**

Epic denies making negligent misrepresentations or false or misleading

statements.  Epic further denies the remaining allegations in paragraph 103 of the

Complaint.

104.    As a result of the aforementioned negligent misrepresentations and false and misleading statements of fact by Epic, Silicon Knights has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

**Response**

Epic denies making negligent misrepresentations or false or misleading

statements.  Epic further denies the remaining allegations in paragraph 104 of the

Complaint.

## THIRD CAUSE OF ACTION

### Intentional Interference with Contractual Relations

105.     Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1 through 104 of the Complaint.

106.     Silicon Knights is informed and believes and, based thereon, alleges that Epic knew of Silicon Knights contracts with its business partners to develop games for the Xbox 360 video game console, and that for Silicon Knight to perform under those contracts, its games had to meet specific performance standards and progress according to specific timelines.

**Response**

Epic denies the allegations in paragraph 106 of the Complaint.

107.     By misrepresenting the capabilities of the Engine and Epic's ability and willingness to support the Engine, and by inducing Silicon Knights to agree to exclusively use the Engine in developing games for use on the Xbox 360, PS 3, and PC, Epic intended and intends to harm Silicon Knights by interfering with its ability to perform under its contracts with its business partners.  Likewise, Epic's actions were intended to and did cause one or more of Silicon Knights' business partners to rescind their contracts with Silicon Knights and replace them with contracts whose terms were substantially less favorable to Silicon Knights, but which Silicon Knights had to accept as a result of Epic's malfeasance.

**Response**

Epic denies making misrepresentation to, or inducing, Silicon Knights.  Epic

further denies the remaining allegations in paragraph 107 of the Complaint.

108.     Epic's interference with Silicon Knights' contracts with its business partners is unlawful, improper, and unjustified.

**Response**

Epic denies that it interfered with Silicon Knights' contracts. Epic further denies

the remaining allegations in paragraph 108 of the Complaint.


109.    Silicon Knights has suffered damages and consequential damages in an
amount not yet ascertained, but including, though not limited to:  (a) increased costs
associated with performing the contracts with its business partners as a direct and
proximate result of Epic's unlawful acts, (b) lost profits which it otherwise would have
realized but for Epic's interference, and (c) other related damages.  Silicon Knights is
therefore entitled to recover compensatory damages in an amount to be determined at
trial.

**Response**

Epic denies the allegations in paragraph 109 of the Complaint.


110.    Upon information and belief, the above alleged acts were committed by
Epic intentionally, fraudulently, maliciously, and oppressively, and in conscious
disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to
exemplary and punitive damages, including pursuant to North Carolina General Statute §
1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

**Response**

Epic denies that it committed any wrongful acts.  Epic further denies the

remaining allegations in paragraph 110 of the Complaint.


FOURTH CAUSE OF ACTION

Intentional Interference With Prospective Economic Advantage

111.    Silicon Knights realleges and incorporates by reference the allegations in
the foregoing paragraphs, inclusive, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1 through 110 of the Complaint.


112.    Silicon Knights had an existing relationship with various business partners
premised upon the prospect of Silicon Knights supplying games for the Xbox 360 video

game console.  The future economic benefit to Silicon Knights included, but was not limited to, a prospective relationship with those business partners for the development and funding of additional games for the Xbox 360 and other game platforms.

**Response**

Epic is without knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 112 of the Complaint, and therefore denies those

allegations.

113.    Epic was aware of the economic relationship between Silicon Knights and its business partners and the probable future benefit to Silicon Knights arising therefrom. As set forth more fully above, Defendants engaged in intentional acts designed to disrupt Silicon Knights' economic relationship with its business partners and to cause damage in Silicon Knights' business.  In particular, Epic's actions were intended to and did cause one or more of Silicon Knights' business partners to rescind their contracts with Silicon Knights and replace them with contracts whose terms were substantially less favorable to Silicon Knights, but which Silicon Knights had to accept as a result of Epic's malfeasance.

**Response**

Epic denies the allegations in paragraph 113 of the Complaint.

114.    Epic's acts have in fact disrupted that economic relationship by jeopardizing Silicon Knights ability to design a game that meets the specifications for use with the Xbox 360.

**Response**

Epic denies the allegations in paragraph 114 of the Complaint.

115.    Epic's interference with Silicon Knights' economic relationship with its business partners was done without right or justifiable cause and was accomplished through improper means, including, but not limited to:  interference with contract, unfair competition, fraud, and other acts described more fully above.

**Response**

Epic denies that it interfered with Silicon Knights' relationship with its business

partners.  Epic further denies the remaining allegations in paragraph 115 of the

Complaint.

116.    As a direct and proximate result of Epic's interference with Silicon
Knights' prospective economic advantage with its business partners, Silicon Knights has
lost profits and incurred other damages in an amount not yet ascertained.  Silicon Knights
is therefore entitled to recover compensatory damages in an amount to be determined at
trial.

**Response**

Epic denies that it interfered with Silicon Knights' relationship with its business

partners.  Epic further denies the allegations in paragraph 116 of the Complaint.

117.    Upon information and belief, the above alleged acts were committed by
Epic intentionally, fraudulently, maliciously, and oppressively, and in conscious
disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to
exemplary and punitive damages, including pursuant to North Carolina General Statute §
1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

**Response**

Epic denies that it committed any wrongful acts.  Epic further denies the

remaining allegations in paragraph 117 of the Complaint.

FIFTH CAUSE OF ACTION

Breach of Warranty

118.    Silicon Knights realleges and incorporates by reference the allegations in
the foregoing paragraphs, inclusive, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1 through 117 of the Complaint.

119.    In connection with the Agreement, Epic expressly warranted (including in Section 5(a)(iv)(B)) that Epic would "demonstrate that the Licensed Technology will operate on the [Xbox 360] platform within six (6) months following the release of a final development kit by Microsoft for the [Xbox 360] platform."

**Response**

Epic admits that, in section 5(a)(iv)(B) of the License Agreement, it warranted

that "it can demonstrate that the Licensed Technology . . . will operate on the Xbox 2

platform within six (6) months following the release of a final development kit by

Microsoft for the Xbox 2 platform." Epic further admits that the "Xbox 2 platform" is

also referred to as the "Xbox 360 platform." Epic denies the remaining allegations in

paragraph 119 of the Complaint.


120.    The final Xbox 360 development kit was released in or about September, 2005. To date, one year later and six months after the deadline to which Epic expressly agreed, the Licensed Technology does not function in a commercially reasonable or feasible fashion.

**Response**

Epic admits that Microsoft released the final Xbox 360 development kit in or

about September 2005. Epic denies the remaining allegations in paragraph 120 of the

Complaint.


121.    Epic is and has been on notice of its breach as result of both oral and written communications for Silicon Knights and others, as well as from the self-evident failure by Epic to deliver a working Engine as of the time Epic warranted it would. In addition, Epic's repeated and consistent inability and unwillingness to meet its obligations under the Agreement made any further and/or additional notice by Silicon Knights moot and/or futile. In particular, based on Epic's conduct prior to and since its failure to provide a commercially reasonable and operable engine as warranted and at the time warranted, Silicon Knights had no reasonable basis on which to believe Epic could or would remedy that breach. In fact, Silicon Knights is informed and believes and, on that basis, alleges that Epic did not disclose an operable engine to its Engine licensees until its November 7 code posting, and, as noted above, that code is not for the Engine that Silicon Knights licensed and that code will not even be supported by Epic.

**Response**

Epic denies that it breached any of its warranty obligations. Epic further denies

the remaining allegations in paragraph 121 of the Complaint.

122.   As a direct and consequential result of Epic's material breaches of its
warranty to Silicon Knights, Silicon Knights has suffered, and continues to suffer, loss of
business reputation, good will, monetary damages, and stature in the business
community.

**Response**

Epic denies that it breached any of its warranty obligations. Epic further denies

the remaining allegations in paragraph 122 of the Complaint.

SIXTH CAUSE OF ACTION

North Carolina Unfair and Deceptive Trade Practices Act
N.C.G.S. § 75-16

123.   Silicon Knights realleges and incorporates by reference the allegations in
the foregoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1 through 122 of the Complaint.

124.   Upon information and belief, Epic knowingly and maliciously performed
numerous unfair or deceptive acts and practices, including, but not limited to:  (a)
misappropriating funds from Silicon Knights based on misrepresentations and fraud; (b)
misappropriating to Epic the reputation for video game development superiority that
Silicon Knights has spent many years and hundreds of thousands of dollars attempting to
achieve; and (c) wrongfully and maliciously misrepresenting to Silicon Knights the
capabilities of the Engine and the capacity, intention, and ability of Epic to support its
product.  Moreover, on information and belief, Epic has conducted and continues to
conduct, a campaign to frustrate the ability of Silicon Knights to complete development
of and bring to market a competing product.

**Response**

Epic denies the allegations in paragraph 124 of the Complaint.

125.     Epic's wrongful acts set forth herein occurred in the course of commerce or affect commerce.

**Response**

Epic denies committing any wrongful act.  Epic further denies the remaining allegations in paragraph 125 of the Complaint.

126.     Epic's wrongful acts set forth herein have and continue to benefit Epic, and continue to irreparably harm Silicon Knights.

**Response**

Epic denies committing any wrongful act.  Epic further denies the remaining allegations in paragraph 126 of the Complaint.

127.     Epic's conduct constitutes unlawful, unfair and fraudulent business practices and unfair competition under North Carolina General Statute § 75-16.

**Response**

Epic denies the allegations in paragraph 127 of the Complaint.

128.     As a direct and proximate result of Epic's conduct, Silicon Knights has suffered, and continues to suffer, monetary damages in an amount to be proven at trial, and said damages should be trebled pursuant to North Carolina General Statue [sic] § 75-16.

**Response**

Epic denies the allegations in paragraph 128 of the Complaint.

SEVENTH CAUSE OF ACTION

Common Law Unfair Competition

129.     Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1 through 128 of the Complaint.

130.    Upon information and belief; Epic knowingly and maliciously performed numerous wrongful and unfairly competitive acts, including, but not limited to:  (a) misappropriating funds from Silicon Knights based on misrepresentations and under fraudulent circumstances; (b) misappropriating to Epic the reputation for video game development superiority that Silicon Knights has spent many years and hundreds of thousands of dollars attempting to achieve; (c) wrongfully and maliciously misrepresenting to Silicon Knights the capabilities of the Engine and the capacity, intention and ability of Epic to support its product; and, (e) engaging in all of the other fraudulent and wrongful conduct alleged herein.. [sic] Moreover, on information and belief, Epic has conducted and continues to conduct, a campaign to frustrate the ability of Silicon Knights to complete development of and bring to market a competing product.

**Response**

Epic denies the allegations in paragraph 130 of the Complaint.

131.    As a direct and proximate result of Epic's actions, Silicon Knights has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**Response**

Epic denies the allegations in paragraph 131 of the Complaint.

132.    Upon information and belief, the above alleged acts were committed by Epic intentionally, fraudulently, maliciously and oppressively, and in conscious disregard of Silicon Knights' rights, and that Silicon Knights is therefore entitled to exemplary and punitive damages, pursuant to North Carolina General Statute § 1D-10 *et seq.*, in an amount sufficient to punish, deter and make an example of Epic.

**Response**

Epic denies the allegations in paragraph 132 of the Complaint.

EIGHTH CAUSE OF ACTION

Unjust Enrichment

133.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

**Response**

Epic incorporates in responses to paragraphs 1-132 of the Complaint.

134.    Epic has been unjustly enriched as a result of Epic's wrongful conduct as alleged above.  The property and other benefits Epic has wrongfully gained at Silicon Knights' expense include, but are not limited to, the money paid by Silicon Knights to Epic for a license to use the Engine to develop games for the Xbox 360 video game console.

**Response**

Epic denies the allegations in paragraph 134 of the Complaint.

135.    It would be unjust for Epic to retain the benefits it has gained through its wrongful conduct.  Unless the Court orders restitution, Epic will unjustly benefit and Silicon Knights will suffer a loss at the hands of Epic.

**Response**

Epic denies the allegations in paragraph 135 of the Complaint.

NINTH CAUSE OF ACTION

Rescission or Reformation of Alleged Contract

136.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, inclusive, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1-135 of the Complaint.

137.    Any and all alleged contracts or agreements between Silicon Knights and Epic regarding the use of the Engine in the development of games by Silicon Knights were based on material misrepresentations by Epic regarding its intended role with

respect to the capabilities of the Engine and Epic's commitment to support Silicon Knights' use of the Engine.

**Response**

Epic denies the allegations in paragraph 137 of the Complaint.

138.    Had Silicon Knights been aware of the true facts regarding Epic's representations, Silicon Knights would not have entered into the Agreement.

**Response**

Epic denies the allegations in paragraph 138 of the Complaint.

139.    Epic has failed to perform, and has prevented Silicon Knights from performing, material duties purportedly arising under the Agreement, to such a degree that the Agreement should be rescinded, and/or deemed void and unenforceable, and any and all obligation and duty by Silicon Knights to exclusively use the Engine should be rescinded.

**Response**

Epic denies the allegations in paragraph 139 of the Complaint.

TENTH CAUSE OF ACTION

Breach of Contract

140.    Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1-139 of the Complaint.

141.    In the alternative, Epic and Silicon Knights have a valid, enforceable contract regarding Silicon Knights license to exclusively use the Engine in the development of games for the Xbox 360, which contract was supported by good and valuable consideration.

**Response**

Epic admits that the License Agreement is valid and is supported by adequate

consideration.  The License Agreement speaks for itself.  To the extent the allegations in

paragraph 141 of the Complaint differ from the terms of the License Agreement, those

allegations are denied.

142.    Silicon Knights has performed all conditions, covenants, and promises
required to be performed by Silicon Knights in accordance with the terms of the
Agreement, except those which Silicon Knights was prevented or legally excused from
performing because of Epic's own acts or omissions.

**Response**

Epic denies the allegations in paragraph 142 of the Complaint.

143.    As set forth above, Epic has materially breached its aforementioned
contract with Silicon Knights.

**Response**

Epic denies the allegations in paragraph 143 of the Complaint.

144.    Epic is and has been on notice of its breach as result of both oral and
written communications for Silicon Knights and others, as well as from the self-evident
failure by Epic to deliver a working Engine as of the time Epic warranted it would.  In
addition, Epic's repeated and consistent inability and unwillingness to meet its
obligations under the Agreement made any further and/or additional notice by Silicon
Knights moot and/or futile.  In particular, based on Epic's conduct prior to and since its
failure to provide a commercially reasonable and operable engine as warranted and at the
time warranted, Silicon Knights had no reason to believe Epic could or would remedy
that breach.  In fact, Silicon Knights is informed and believes and on that basis alleges,
that Epic did not disclose an operable engine to its Engine licensees until its November 7
code posting, and, as noted above, that code is not for the Engine that Silicon Knights
licensed and that code will not be supported by Epic.

**Response**

Epic denies the allegations in paragraph 144 of the Complaint.

145.     As a direct and consequential result of Epic's material breaches of its contract with Silicon Knights, Silicon Knights has suffered, and continues to suffer, loss of business reputation, good will, sales, and stature in the business community.

**Response**

Epic denies the allegations in paragraph 145 of the Complaint.

ELEVENTH CAUSE OF ACTION

Breach of Contract
N.C. Gen. Stat. § 25-2-101 *et seq.*

146.     Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1-145 of the Complaint.

147.     In the alternative, Epic and Silicon Knights have a valid, enforceable contract regarding Silicon Knights license to exclusively use the Engine in the development of games for the Xbox 360, which contract was supported by good and valuable consideration,

**Response**

Epic admits that the License Agreement is valid and is supported by adequate

consideration.  The License Agreement speaks for itself.  To the extent the allegations in

paragraph 147 of the Complaint differ from the terms of the License Agreement, those

allegations are denied.

148.     Silicon Knights has performed all conditions, covenants, and promises required to be performed by Silicon Knights in accordance with the terms of the Agreement, except those which Silicon Knights was prevented or legally excused from performing because of Epic's own acts or omissions.

**Response**

Epic denies the allegations in paragraph 148 of the Complaint.

149. As set forth above, Epic has materially breached its aforementioned contract with Silicon Knights.

**Response**

Epic denies the allegations in paragraph 149 of the Complaint.

150. Epic is and has been on notice of its breach as result of both oral and written communications for Silicon Knights and others, as well as from the self-evident failure by Epic to deliver a working Engine as of the time Epic warranted it would. In addition, Epic's repeated and consistent inability and unwillingness to meet its obligations under the Agreement made any further and/or additional notice by Silicon Knights moot and/or futile. In particular, based on Epic's conduct prior to and since its failure to provide a commercially reasonable and operable engine as warranted and at the time warranted, Silicon Knights had no reason to believe Epic could or would remedy that breach. In fact, Silicon Knights is informed and believes and on that basis alleges, that Epic did not disclose an operable engine to its Engine licensees until its November 7 code posting, and, as noted above, that code is not for the Engine that Silicon Knights licensed and that code will not be supported by Epic.

**Response**

Epic denies the allegations in paragraph 150 of the Complaint.

151. As a direct and consequential result of Epic's material breaches of its contract with Silicon Knights, Silicon Knights has suffered, and continues to suffer, loss of business reputation, good will, sales, and stature in the business community.

**Response**

Epic denies the allegations in paragraph 151 of the Complaint.

TWELFTH CAUSE OF ACTION

Declaratory Relief

152. Silicon Knights realleges and incorporates by reference the allegations in the foregoing paragraphs, as though set forth here in full.

**Response**

Epic incorporates its responses to paragraphs 1-151 of the Complaint.

153.    An actual and present controversy exists concerning the legal rights and
duties of Silicon Knights and Epic with respect to the [sic] Epic's obligations pursuant to
the Agreement.  Silicon Knights contends that Epic misrepresented the capabilities of the
Engine and Epic's ability to make the necessary improvements in the Engine to make it
ready for "next-generation" video games.  Moreover, Epic has not provided adequate and
timely support for the Engine and the [sic] Epic has arbitrarily and wrongfully designated
certain functions and abilities of the engine as "game specific" and this not subject to
Epic's duty to disclose to the Engine licensees.  Silicon Knights is informed and believes
and, based thereon, alleges that Epic disputes Silicon Knights' contention in this regard.

**Response**

Epic admits that a dispute exists between itself and Silicon Knights, but denies

that it has any liability to Silicon Knights.  In contrast, Epic contends that Silicon Knights

has committed various acts and omissions that violate Epic's rights under the License

Agreement, under the copyright laws of the United States, and under state statutory and

common law, as more fully set forth in its Counterclaim.

154.    A declaratory judgment in this case is necessary and proper.  Such a
judgment would clarify the parties' rights and eliminate the uncertainty that has been
generated with respect to the parties' rights under the Agreement.

**Response**

Epic denies the allegations in paragraph 154 of the Complaint.

155.    Accordingly, Silicon Knights requests that this Court make the following
judicial declarations:  (I) [sic] the Agreement between Epic and Silicon Knights for a
license to the Engine is null and void; (2) Silicon Knights owes no obligations to Epic
under any purported agreement by Silicon Knights to license the Engine; (3) Silicon
Knights is not required to use the Engine in developing any current or future games; (4)
Silicon Knights may alter the Engine without restriction; (5) Silicon Knights is under no
obligation to disclose or share any alterations Silicon Knights makes or causes to be made
to the Engine with anyone, including Epic; (6) Silicon Knights owes no monetary
obligations to Epic and/or any of its business partners associated with the agreement to
license the Engine; (7) the game engine developed by Silicon Knights is totally
independent of the Unreal Engine 3 and therefore is the sole property of Silicon Knights,
or, alternatively, the game engine developed by Silicon Knights constitutes an
"Enhancement" under the terms of the Agreement, and therefore is the sole property of
Silicon Knights under the terms of that Agreement; and (8) Silicon Knights owes no

obligations, financial or otherwise, to Epic in connection with and/or related to the Silicon Knights Engine.

**Response**

     Epic denies that Silicon Knights is entitled to any relief.

PRAYER

     WHEREFORE, plaintiff Silicon Knights prays that:

     A.     Epic be found to have committed fraudulent, intentional, and/or negligent misrepresentations to Silicon Knights, and that any alleged contract between Epic and Silicon Knights is and was void, and/or voidable by Silicon Knights.

     B.     Any alleged contract between Epic and Silicon Knights be rescinded, or in the alternative reformed, to provide that Silicon Knights need not use the Engine exclusively or at all in developing games.

     C.     In the alternative, Epic be found to have materially breached its contract with Silicon Knights, which breach damaged, and continues to damage, Silicon Knights.

     D.     Epic be found to have breached its express contractual warranties made to Silicon Knights.

     E.     If it is determined that a contract exists between the Epic and Silicon Knights, Epic's breaches of that contract be held to include material breaches (including, but not limited to, Epic's failure to provide adequate and timely support for the Engine to licensees of the Engine), such that Silicon Knights may use another engine or make material changes to the Engine necessary to achieve the functionality necessary for games under-development by Silicon Knights, and that all declarations in Paragraph M, below, be found to apply to Silicon Knights' benefit.

     F.     Epic be found in violation of unfair competition provision of North Carolina General Statute § 75-16, which acts damaged Silicon Knights.

     G.     Epic be found to have unfairly competed with Silicon Knights at common law, which acts damaged Silicon Knights.

     H.     A permanent injunction issue pursuant to North Carolina General Statute § 75-19:  (a) restraining and enjoining Epic its unfairly business practices against Silicon Knights; and (b) restoring to Silicon Knights any and all monies and/or other property acquired by Epic through such unfair competition.

     I.     Epic be found to have intentionally interfered with Silicon Knights' prospective economic advantage, which acts damaged Silicon Knights.

65

J.      Epic be found to have negligently interfered with Silicon Knights' prospective economic advantage, which acts damaged Silicon Knights.

K.      Epic be found to have intentionally or negligently interfered with Silicon Knights' contractual relationship with one or more of Silicon Knights' business partners.

L.      Epic be found to have been unjustly enriched by virtue of its fraudulent, deceitful, and otherwise wrongful conduct with respect to Silicon Knights, to the detriment of Silicon Knights.

M.      The Court issue the following judicial declarations: (1) the Agreement between Epic and Silicon Knights for a license to the Engine is null and void; (2) Silicon Knights owes no obligations to Epic under any purported agreement by Silicon Knights to license the Engine; (3) Silicon Knights is not required to use the Engine in developing any current or future games; (4) Silicon Knights may alter the Engine without restriction; (5) Silicon Knights is under no obligation to disclose or share any alterations Silicon Knights makes or causes to be made to the Engine with anyone, including Epic; (6) Silicon Knights owes no monetary or other obligations to Epic and/or any of its business partners associated with the agreement to license the Engine; (7) the game engine developed by Silicon Knights is totally independent of the Unreal Engine 3 and therefore is the sole property of Silicon Knights, or, alternatively, the game engine developed by Silicon Knights constitutes an "Enhancement" under the terms of the Agreement, and therefore is the sole property of Silicon Knights under the terms of that Agreement; and (8) Silicon Knights owes no obligations, financial or otherwise, to Epic in connection with and/or related to the Silicon Knights Engine.

N.      The Court award damages to Silicon Knights in an amount proved at trial for the damages as set forth above.

O.      Epic be required to disgorge all profits obtained on its Gears of War game as a result of the misconduct set forth above.

P.      Any amount awarded by this Court be trebled pursuant to North Carolina General Statute § 75-16.

Q.      Silicon Knights be awarded punitive damages, in an amount to be proven at trial.

R.      The Court award Silicon Knights its reasonable attorneys' fees, costs, expenses and prejudgment interest, as permitted by law.

S.      The Court award Silicon Knights such other relief as the Court deems necessary and proper.

**Response**

Epic denies that Silicon Knights is entitled to any relief

GENERAL DENIAL

Except as expressly admitted herein, the allegations in paragraph 1 through paragraphs 155 of the Complaint are denied.

DEFENSES

1.    The Complaint fails in whole or in part  to state a claim upon which relief may be granted.

2.    The allegations of fraud have not been stated with particularity.

3.    To the extent special damages are claimed, they have not been stated specifically.

4.    Silicon Knights' negligence claim is barred by the doctrines of assumption of risk and contributory negligence.

5.    Silicon Knights' claims are barred in whole or in part by estoppel and unclean hands.

6.    Silicon Knights has failed to avoid or mitigate its damages.

7.    Silicon Knights' claims are barred in whole or in part by Silicon Knights' failure to provide to Epic timely notice of the alleged breach of the License Agreement.

8.    Silicon Knights' claims are barred in whole or in part by waiver and laches.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand is hereby made for trial by jury on all issues triable to a jury.

This 9th day of January, 2008.

HUNTON & WILLIAMS LLP


By: /s/ Douglas W. Kenyon
Douglas W. Kenyon
N.C. State Bar No. 13242
Robert C. Van Arnam
N.C. State Bar No.28838
HUNTON & WILLIAMS LLP
Post Office Box 109
Raleigh, NC 27602
Telephone: (919) 899-3000

William P. Andrews
N.C. State Bar No. 6484
Epic Games, Inc.
620 Crossroads Boulevard
Cary, NC 27518

*Counsel for Epic Games, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Amended Answer of Epic Games, Inc. to Complaint of Silicon Knights, Inc., was served upon the following counsel of record in this action by electronic mail and U.S. Mail to Hayden J. Silver, III, KILPATRICK STOCKTON LLP, and Christopher Holland, KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP, this 9th day of January, 2008.

>  Hayden J. Silver III
>  (jaysilver@kilpatrickstockton.com)
>  Betsy Cooke
>  (bcooke@kilpatrickstockton.com)
>  KILPATRICK STOCKTON LLP
>  3737 Glenwood Avenue, Suite 400
>  Raleigh, NC 27612
>  Telephone:  (919)420-1711
>  Facsimile: (919) 420-1800
>
>  Christopher T. Holland
>  (cholland@kksrr.com)
>  Garth A. Rosengren
>  (grosengren@kksrr.com)
>  KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
>  114 Sansome Street, 4th Floor
>  San Francisco, CA 94104
>  Telephone:  (415) 249-8330
>  Facsimile: (415) 249-8333
>
>  *Counsel for Silicon Knights, Inc.*

>                    /s/ Douglas W. Kenyon_____
>                    HUNTON & WILLIAMS LLP
>                    421 Fayetteville Street, Suite #1400
>                    Raleigh, N.C. 27601
>                    *Counsel for Defendant, Epic Games, Inc.*

49765.002548 RALEIGH 327223v5