# EXHIBIT H

**TABET | DIVITO | ROTHSTEIN**

Tabet DiVito & Rothstein LLC
The Rookery Building
209 S. LaSalle St., 7th floor
Chicago, Illinois 60604
312-762-9450 Telephone
312-762-9451 Facsimile
www.tdrlawfirm.com

Writer's direct dial:
**(312) 762-9456**

Writer's email:
dkonieczny@tdrlawfirm.com

March 3, 2008

*By E-mail (gsweeney@btlaw.com)*

Gerald O. Sweeney, Jr.
Barnes & Thornburg LLP
One North Wacker Drive
Suit 4400
Chicago, IL 60606

  Re: *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 08-cv-00782

Dear Gerald:

  In light of Judge Gettleman's directive that Midway meet and confer with us, and following up on my oral request made after the February 28 hearing, we would appreciate a written response to Anjali Kurani's e-mail dated February 7, 2008.

  Since we have heard nothing from you despite the Court's directive, I am writing in yet another attempt to meet and confer. As you know, in that e-mail, Ms. Kurani proposed several initial limitations on the subpoena in an attempt to address Midway's concerns. For your convenience, we restate those modifications below:

  First, while reserving all of our rights with respect to the subpoena, we offered to limit the scope of the subpoena to just three specific categories:

  1. Communications relating to the interpretation of the term "Enhancements" in the Epic license agreement.

  As stated in the February 7 e-mail, this category of documents is highly relevant to Silicon Knights' lawsuit with Epic, because Epic is making the claim that the course of dealing with its licensees and the industry-wide understanding of the term is different from the understanding that Silicon Knights has. Among other things, your contention that Midway's license agreement with Epic is different from Silicon Knights' agreement does not affect Epic's position in the underlying lawsuit, which is the basis for the subpoena. Silicon Knights requires this category of documents so that it may fully and effectively defend against Epic's claims.

**TABET | DIVITO | ROTHSTEIN**

Gerald O. Sweeney
March 3, 2008
Page 2

Silicon Knights is willing to specifically exclude documents or portions of documents that contain technical information regarding any actual enhancements that Midway has made with respect to the Engine, the disclosure of which we understand to be Midway's primary concern. Furthermore, as indicated in the February 7 letter, we are willing to allow Midway to designate all of its documents as "Highly Confidential: Attorneys' Eyes Only," the effect of which would be to prevent any in-house personnel at Silicon Knights from reviewing the documents. That designation is a further precaution against the inadvertent disclosure of Midway's proprietary information (which Silicon Knights is not requesting), and it precludes the possibility that any such proprietary information even could be inferred from the documents produced.

Indeed, even the publicly available redacted version of the Midway-Epic license agreement makes it clear that this category of information and documents is central to the case. That Midway-Epic license agreement was Exhibit 4.3 to the 10-Q quarterly statement that Midway Games filed with the SEC on August 2, 2007. (In addition, that filing shows that, even though Midway Home Entertainment is the actual signatory to the license agreement, Midway Games publicly filed the license agreement, which confirms that Midway Games has possession, custody and/or control of the relevant documents.) In that Exhibit 4.3, the term "Enhancements" is defined as: "any technology developed by Licensee that is derived from or modifies the Licensed Technology and corrects, enhances or improves the Licensed Technology." That definition differs from the language in Silicon Knights' license agreement and the non-privileged communications and negotiations surrounding that language go directly to refute Epic's claim that all license agreements were the same, and all licensees were treated equally. To be clear, this term is a significant part of the case and Midway itself is an important player in both the industry and in its very unique relationship with Epic (i.e. as both a Licensee of the Unreal Engine 3 and a publisher of Unreal Tournament 3).

2.   Documents relating to complaints about the performance of the Unreal Engine 3.

Epic has made the second category of documents relevant in the underlying lawsuit by alleging that other game developers and publishers, including Midway, have used the Engine successfully and that the problems that Silicon Knights experienced therefore must be due to Silicon Knights and not the Unreal Engine. Silicon Knights is entitled to test that claim through discovery relating to the delays and complaints that others in the industry have had with the Unreal Engines. Midway's involvement with the Unreal Engine is extensive: Midway worked with Epic itself in developing at least one video game during the period in which Silicon Knights experienced problems with the Unreal Engine, and we expect that Midway also worked with several other game developers using the Unreal Engine.

Furthermore, Midway's complaints and problems with the Unreal Engine have been the source of numerous public statements and comments by prominent Midway Games executives,

TABET | DIVITO | ROTHSTEIN

Gerald O. Sweeney
March 3, 2008
Page 3

including CEO and President David Zucker. Indeed, last fall when Midway Games announced the loss in quarterly earnings, Mr. Zucker specifically cited the delays in the Unreal Engine 3 games (specifically BlackSite, Stranglehold, and Unreal Tournament). Zucker blamed those delays on problems with the performance and capabilities of the Unreal Engine 3. (For your convenience a sample article from gamespot.com is attached to this letter.) It is therefore disingenuous for Midway to continue to claim that such complaints "do not exist" or perhaps are not relevant to the case with Silicon Knights; Midway's delays and dealings with the Engine go to the core of Silicon Knights' claim – that the Engine did not perform as promised. The history of Midway's games, the statements of its executives and the tight relationship Midway has with Epic all contribute to the integral nature of Midway in this case and the importance that Midway fulfills its obligations under the subpoena.

Once again, Silicon Knights is willing to exclude from this category any documents or portions of documents containing actual code or other such technical information regarding Midway's own proprietary efforts to overcome the problems with the Engine, the disclosure of which we understand to be your principal immediate concern. Silicon Knights seeks only documents describing the problems that Midway had with the Engine and the complaints that Midway made regarding the Engine. Furthermore, as stated above, Silicon Knights is willing to agree to the designation "Highly Confidential: Attorney's Eyes Only" for all of Midway's documents produced pursuant to the subpoena.

> 3. The final, executed license agreement between Epic and Midway (or the Midway Home Entertainment division), including all amendments, revisions, terminations and/or contracts.

The third "category" of documents is relevant to the underlying lawsuit because Epic has alleged that Silicon Knights' license agreement should be interpreted based on Epic's course of dealing with all of its licensees and based on the industry-wide understanding of the terms in other licenses, such as Midway's.

Midway Games' claim that Silicon Knights can find the License Agreement on the internet is untenable since plainly an un-redacted and fully executed version of the License Agreement is within Midway's possession, custody and/or control. Silicon Knights has also sought the License Agreement from Epic, but because there are often times different versions of documents, different document retention policies and different saving conventions, Silicon Knights is also seeking that document from Midway in order to ensure that the most current and most accurate version of those license agreement materials (including amendments, revisions, etc.) are produced for discovery in this case. Because Silicon Knights has narrowed the scope significantly and Midway is, obviously, aware of the documents that Silicon Knights needs, neither the volume nor the burden is too overwhelming for Midway to comply.

**TABET | DIVITO | ROTHSTEIN**

Gerald O. Sweeney
March 3, 2008
Page 4


      In sum, we believe that these proposed modifications are more than adequate to address Midway's concerns. Please provide us with your written response as soon as possible, and by no later than Wednesday, March 6, so that we may advise the Court Thursday morning as to our progress with respect to the subpoena.

                                  Very truly yours,

                                  Daniel I. Konieczny

DIK/maslwg

Cc:    Christopher T. Holland
        Anjali Kumar Kurani
        Garth A. Rosengren