# Exhibit 1

# BARNES & THORNBURG LLP

Suite 4400
One North Wacker Drive
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

www.btlaw.com

Gerald O. Sweeney, Jr.
(312) 214-4858
gerald.sweeney@btlaw.com

September 4, 2008

Timothy Hudson, Esq.
Tabet DiVito & Rothstein LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604

RE:     Silicon Knights vs. Epic Games Inc.

Dear Tim:

Upon a technical and IT review of Silicon Knights recently provided finalized list of "UE3 Problems", its suggested six-page list of proposed search terms and Midway's current capabilities, it became obvious that Midway does not have the resources to perform these searches and will be required to outsource some or all of the tasks. From an HR standpoint alone, these searches include accessing individual computers being used day and night by employee programmers who are working each day and night on entertainment software scheduled for release which is currently in the final phases of development at Midway's facilities in Chicago, San Diego, Austin, Moorpark/L.A., and Newcastle, U.K.

To address the most effective response to the subpoena, I have met with representatives of Midway Games Inc. and Huron Consulting Group to determine the most reasonable and efficient manner to collect, extract and stage the material from Midway's six facilities.

Huron Consulting Services LLC ("Huron") was asked to review the scope of the work necessitated to collect, inventory, extract, and stage the data collected and to prepare it for data processing and to provide an estimate of the costs for doing so based on three scenarios that are intended to give Silicon Knights cost options based on the extent of the search.

To be clear, the estimates set forth herein are the activities to be performed by Huron to get the data to the point where it is searchable. These steps are preliminary to the actual search and review, but necessary to create the universe of materials that will then be searched using a modification of the six-page list of search terms submitted by Silicon Knights. That list was evaluated and deemed unreasonable for efficiently obtaining the materials sought in the subpoena. It will be adjusted to eliminate the unreasonably broad searches which would have resulted.

Before this phase of the process can be commenced, a written commitment must be made by Silicon Knights to bear all costs of the Huron activities to collect, extract and stage the

Timothy Hudson, Esq.
September 4, 2008
Page 2

material from Midway's facilities in Chicago, San Diego, Austin, Moorpark/L.A., and Newcastle, U.K.

In the event that Silicon Knights does not expressly agree to pay for all of these costs, Midway will file a motion with the Court explaining the process undertaken; the costs associated with the collection, extraction, and staging and seek appropriate direction and relief.

### *Huron's Services*

Huron will collect electronically stored information from the following: custodian hard drives, Exchange email server(s), file server directories, a listserv, a TWiki, and server backup tapes.

Huron will also inventory, extract, and stage the data collected and prepare it for data processing.

### *Fees and Expenses*

Below are Huron's fee estimates for each of the collection components. As indicated, these estimates do not include any processing, review or production services.

### Custodian Hard Drives

- $500 per hard drive for collection
- $695 per hard drive for data inventory, data extraction from images, and staging for processing

### File Server, listserv, TWiki

- $2,200 per server for collection
- $5,500 per server for data inventory, data extraction from collection media, and staging for processing

### Backup Tapes

- $300 per tape for restoration
- $825 per tape for data inventory, data extraction from restoration media, and staging for processing

### Exchange Email Server

- $1,375 to provide direction to Midway Games in the collection of custodian mailboxes

BARNES & THORNBURG LLP

Timothy Hudson, Esq.
September 4, 2008
Page 3

For additional time incurred outside the above tasks, Huron will bill on an hourly basis based on the actual hours worked and the following hourly billing rates (which may be subject to adjustment from time to time):

| *Title* | *Hourly Rate* |
| --- | --- |
| Managing Director | $590 |
| Director | $450 |
| Manager | $385 |
| Associate | $320 |
| Analyst | $230 |

Huron's out of pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred.

Huron will bill on a semi-monthly basis. Its invoices are due upon presentation. Amounts remaining overdue for more than 20 days (past due) will be subject to an interest charge of 1.5% per month from the date of invoice. Huron reserves the right to suspend further services until payment is received on past due invoices, in which event Huron will not be liable for any resulting loss, damage or expense connected with such suspension.

In addition to the fee detail set forth above in Huron's proposal, Huron estimated the total cost for three scenarios we discussed. Those scenarios are:

I.  **35 custodians** consisting of upper management, team leads to tech leadership, but excluding design and art leadership on the teams (*Stranglehold, Area51, TNA Wrestling, MK vs. DC, Vegas, Wheelman and Criminal*):
    a. 4 Exec Management
    b. 8 Senior Management (CTO and Studio Heads)
    c. 6 Studio Tech Directors
    d. 5 Team leads
    e. 12 Technology Leadership on Teams and ATG

II. **75 custodians** consisting of upper management to all discipline leaderships (team leads, art, programming, and design) including 10 programmers and artists from Stranglehold and Area51:
    a. 35 From I
    b. 8   Art Directors
    c. 7   Design Directors
    d. 10  Programmer staff from Stranglehold and Area51
    e. 10  Artist staff from Stranglehold and Area51

BARNES & THORNBURG LLP

Timothy Hudson, Esq.
September 4, 2008
Page 4

III.    **200 custodians** consisting of upper management to randomly selected programmers
        and artists from all teams:
        a. 75 from II
        b. 63 Programmers from all teams (Vegas, Wheelman, TNA, MK, Criminal)
        c. 62 Artists from all teams (Vegas, Wheelman, TNA, MK, Criminal)

   The table below summarizes these estimates.  Based on in-person consultation at Midway
and follow up information provided to Huron, the following assumptions were utilized to create
the estimates:

- Two hard drives for 60% of the custodians, four hard drives for 40% of the custodians,
  and time for inventory, extraction and staging;

- One file server per location for six locations

- One listserv and one TWiki; and

- Four backup tapes from each year 2005-2008 for a total of 16 backup tapes

|  | Number of Custodians | | |
|---|---|---|---|
|  | 35 | 75 | 200 |
| Hard Drives | $122,010 | $261,450 | $697,200 |
| File Servers | $46,200 | $46,200 | $46,200 |
| Listserv | $7,700 | $7,700 | $7,700 |
| TWiki | $7,700 | $7,700 | $7,700 |
| Backup Tapes | $18,000 | $18,000 | $18,000 |
| Email Server | $1,375 | $1,375 | $1,375 |
|  | $202,985 | $342,425 | $778,175 |

Very truly yours,

BARNES & THORNBURG LLP

Gerald O. Sweeney, Jr.

GOS/tmb
cc:    Daniel I. Konieczny, Esq.
       Garth Rosengren, Esq.
       Chris Holland, Esq.
       Anjali Kurani, Esq.

CHDS01 GSWEENEY 496008v1

BARNES & THORNBURG LLP

# Exhibit 2

**From:**      Gerald Sweeney
**To:**        THudson@TDRLAWFIRM.com
**Date:**      9/5/2008 8:03:43 PM
**Subject:**   Re: Silicon Knights Subpoena

Midway's position is both reasonable and clear. Silicon Knights either does not understand what it has requested and/or Silicon Knights is unwilling or incapable of meeting its obligations under FRCP 45. SK has consistently deemed our suggestions unreasonable and inadequate while entirely ignoring the explanations offered.

Short of Midway bearing the burden of disrupting its business and all the costs associated with the search of multiple servers and PC's at six facilities, I'm certain SK will continue to object. As stated, we have reviewed the scope of the matter with outside experts and have provided three options for data collection. We do not have any further means or suggestions to accomplishing what has evolved as an enormous task.

-------------------------------------------------------
Sent from my BlackBerry Wireless Handheld
-------------------------------------------------------


-----Original Message-----
From: "Timothy Hudson" <THudson@TDRLAWFIRM.com>
To: Gerald Sweeney <GSWEENEY@BTLaw.com>
CC: akurani@kksrr.com
cholland@kksrr.com
grosengren@kksrr.com
Daniel I. Konieczny <DKonieczny@TDRLAWFIRM.com>
Creation Date: 9/5 7:21 pm
Subject: RE: Silicon Knights Subpoena

Gerry,



We have reviewed your email below and the attached letter in which you demand a "written commitment" from Silicon Knights to bear "all costs" set forth in the three scenarios set forth in your letter, which range in value from $202,985 - $778,175. We reject your demand as it is (1) inconsistent with the Federal Rules of Civil Procedure, (2) contrary to Magistrate Judge Schenkier's statements during the July 23, 2008 hearing, (3) inconsistent with the representations made to the Magistrate Judge by Midway's Dr. Weilbacher during the July 23, 2008 hearing, and (4) yet another obstreperous attempt by Midway to obstruct discovery.

We expect Midway to comply with the discovery schedule set forth in the Court's July 23, 2008 and August 26, 2008 Orders.

Tim

Timothy Hudson
Attorney

Tabet DiVito & Rothstein LLC
The Rookery Building

209 South LaSalle St., 7th Floor
Chicago, Illinois 60604
(312) 762-9476 Telephone
(312) 762-9451 Facsimile
thudson@tdrlawfirm.com

This message is for the sole use of the intended recipient and may
contain information that is privileged and/or confidential. If you are
not the intended recipient of this message, please delete the message
immediately and contact the sender. Thank you.

_____

From: Gerald Sweeney [mailto:Gerald.Sweeney@BTLaw.com]
Sent: Thursday, September 04, 2008 7:17 PM
To: Timothy Hudson
Cc: akurani@kksrr.com; cholland@kksrr.com; grosengren@kksrr.com; Daniel
I. Konieczny
Subject: RE: Silicon Knights Subpoena

Please see the attached letter.

The parties representatives have discussed this matter extensively and I
have engaged in multiple discussions with Midway Games Inc. and Huron
Consulting Group. This proposal represents our best effort to respond to
Silicon Knights' subpoena. I do not believe it will be productive to
engage in further debate at this point about what you consider to be
reasonable or unreasonable. That has been a moving target. We have
considered the reasonable options taking all of your comments into
consideration and this proposal for the costs to collect, extract and
stage the material for searching is our final proposal based on your
prior comments and our analysis of the issues.

If one of the three options suggested is not acceptable, this matter
will require further direction from the Court. If necessary, we are
prepared to support our position with the affidavit of disinterested
third party computer forensic experts wh have considered this matter and
offered their professional opinion of what is reasonably required based
on your request and Midway's IT. As stated in the attached letter, the
costs set forth include only the third party costs to collect, extract
and stage the material from Midway's six facilities and does not include
the subsequent cost of the search and review.

However, regardless of the cost of the subsequent search and review,
this is the starting point that is required to get to the search stage.

Regards,

Gerald O. Sweeney, Jr.

BARNES & THORNBURG LLP
Suite 4400
One North Wacker Drive
Chicago, IL 60606-2809

(312) 214-4858 Direct
(630) 363-4565 Cell
(312) 357-1313 Main
(312) 759-5646 Fax

gsweeney@btlaw.com
www.btlaw.com

_____

CONFIDENTIALITY NOTICE: This email and any attachments are for the
exclusive and confidential use of the intended recipient. If you are not
the intended recipient, please do not read, distribute or take action in
reliance upon this message. If you have received this in error, please
notify us immediately by return email and promptly delete this message
and its attachments from your computer system. We do not waive
attorney-client or work product privilege by the transmission of this
message. TAX ADVICE NOTICE: Tax advice, if any, contained in this e-mail
does not constitute a "reliance opinion" as defined in IRS Circular 230
and may not be used to establish reasonable reliance on the opinion of
counsel for the purpose of avoiding the penalty imposed by Section 6662A
of the Internal Revenue Code. The firm provides reliance opinions only
in formal opinion letters containing the signature of a partner.

**CC:**          DKonieczny@TDRLAWFIRM.com, grosengren@kksrr.com, cholland@kksrr.com,
akurani@kksrr.com

# Exhibit 3

**TABET | DiViTo | ROTHSTEIN**

Tabet DiVito & Rothstein LLC
The Rookery Building
209 S. LaSalle St., 7th floor
Chicago, Illinois 60604
312-762-9450 Telephone
312-762-9451 Facsimile
www.tdrlawfirm.com

Writer's direct dial:
  (312) 762-9476

Writer's email:
  thudson@tdrlawfirm.com

September 9, 2008

**By Electronic Mail**

Gerald O. Sweeney, Jr.
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL  60606

Re:   *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 08-cv-00782
      **(subpoena directed to Midway Games Inc. by Silicon Knights, Inc.)**

Dear Gerald:

I am writing in response to your September 5, 2008 e-mail. Contrary to your representations, Silicon Knights has consistently made every effort to work cooperatively with Midway to satisfy Silicon Knights' entitlement to relevant information and to avoid unreasonable (and unnecessary) expense.

Midway's demand that Silicon Knights make a "written commitment" to bear "all costs" relating to the scenarios set forth in your September 4, 2008 letter – which range from $202,985 to $778,175 – is unacceptable and inconsistent with the Federal Rules of Civil Procedure, the Court's July 23, 2008 ruling, and the representations made by Midway's Dr. Weilbacher during the July 23 hearing. Midway is not entitled to simply demand that Silicon Knights pay all costs (no matter how unreasonable or excessive) and that unless Silicon Knights agrees to do so (which we do not), Midway may then continue its efforts to avoid its obligations with respect to document production. The July 23 Order clearly indicated that Silicon Knights may be responsible only for participating in "reasonable" attorneys fees and costs associated with Midway's document production. Moreover, Magistrate Judge Schenkier made clear at the hearing that the Court would determine what was reasonable in that regard at some point in the future.

**TABET | DIVITO | ROTHSTEIN**

Gerald O. Sweeney
September 9, 2008
Page 2

      Nor do we believe that Midway's demand is made in good faith. Midway had every opportunity to present its arguments in response to the subpoena issued by Silicon Knights. It did so, and the Court denied in part Midway's motion to quash and ordered Midway to produce responsive documents. We expect Midway to comply with the discovery schedule set forth in the Court's July 23, 2008 and August 26, 2008 Orders.

                    Very truly yours,

                    Timothy A. Hudson

cc:    Christopher T. Holland (by e-mail)
       Anjali Kumar Kurani (by e-mail)
       Garth A. Rosengren (by e-mail)
       Daniel I. Konieczny (by e-mail)

# Exhibit 4

**TABET | DiVITO | ROTHSTEIN**

Tabet DiVito & Rothstein LLC
The Rookery Building
209 S. LaSalle St., 7th floor
Chicago, Illinois 60604
312-762-9450 Telephone
312-762-9451 Facsimile
www.tdrlawfirm.com

Writer's direct dial:
   (312) 762-9476

Writer's email:
   thudson@tdrlawfirm.com

September 10, 2008

*By Electronic Mail*

Gerald O. Sweeney, Jr.
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL  60606

Re:    *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 08-cv-00782
       **(subpoena directed to Midway Games Inc. by Silicon Knights, Inc.)**

Dear Gerry:

I am writing in connection with our recent correspondence. To date, you have never indicated or otherwise confirmed that Midway has circulated among its employees a standard, third-party document production e-mail requesting that employees who have worked with Epic collect e-mails, correspondence and other documents in their possession relating to the Alleged UE3 Problems (*i.e.*, complaints, concerns, and/or issues with UE3), and send those documents to a central location for processing. Such a self-collection of potentially responsive material is a standard practice in the discovery process.

Although Silicon Knights is in no way waiving or otherwise limiting its entitlement to all responsive material as reflected in the list of Alleged UE3 Problems and suggested search terms that we already have provided to you, circulating an e-mail and collecting documents as described above is both a low-cost and easily-accessible manner for Midway to begin to satisfy its discovery obligations. Given the many months that have passed, we certainly would be surprised if you have not commenced this process. Please confirm that you (or Midway) have done so, by starting that basic production in a rolling fashion.

Very truly yours,

*Tim*

Timothy A. Hudson

**Tabet | DiVito | Rothstein**

Gerald O. Sweeney
September 10, 2008
Page 2

cc:    Christopher T. Holland (by e-mail)
       Anjali Kumar Kurani (by e-mail)
       Garth A. Rosengren (by e-mail)
       Daniel I. Konieczny (by e-mail)

Exhibit 6

**Alleged UE3 Problems**
**<u>Suggested Search Terms</u>**

720p
Access
Accuracy
Alignment
Allocated particles
Allocator
Alu
Antialiasing
Asset management
Assets
ATI
Autogenerat!
Autogenerated
Backwards
Bake
Bandwidth
Binary file data
Binary files
Binary package files
Bind
Bsp
Build process
Cache
Cell
Chicken and the egg
Code base/ codebase
Code churn
Code drop
Collision
Collision detection
Command buffer
Command line
Commandlet
Compatible
Compile
Console
Content
Content cooker
Contention
Cook
Cook!
Cooker
CPU

Cpu core
CPU DirectX
Data import!
Dataflow!
Dcbt
Debug console
Debug!
Decl
Deprecat!
Designer
DirectX
Directx
Dirty components
Dlc
Download
Draw!
Dynamic light!
Dynamic particles
Dynamically allocated particles
Edge
Editor
Encapsulat!
Engine-level
Epic
Error message!
Error!
Fail!
Fillrate
Flag!
Floating point
Format
Fpu
Fragmentation
Frame rates
Functionalit!
Functionality
Game level feature!
Game-level
Garbage collect!
Garbage collection latency
Gcm
Gears
Gears of War
Gemini
GoW
GPU

Graphics pipeline
Guard rail!
Header autogeneration
i/o
Immatur!
Implements stream!
Impract!
Inadequ!
Incompat!
Incomplete!
Inter-package dependen!
io
Keyframing
Kismet
Legacy
Libgcm
Library
Light map!
Lighting model
Line checks
Linecheck
LIVE
Load path!
Load time!
LOD
LOD
Manual data import!
Mark and sweep
Matinee
Measure
Memory
Memory allocation!
Memory cleanup
Memory fail!
Memory overwrite!
Memory spike!
Memory track!
Memory waste!
Metrics
Mip
Mip level
Modif!
Modular!
Msaa
Multithread
Multithreaded console architecture

Multithreading
Multithreading
Novodex
NVIDIA
Object overhead
Object render call overhead
Octree
Ops
Optimiz!
Overhead
Parent functions
Parse
Particle
Patch
Path!
Pdlc
Platform
Pointer access!
Pooled particles
Ppu
Precision
Prefetch
Problem!
PS3
Psgl
Pushbuffer
Pushbuffers
Raycast
Registers
Remove!
Remove!
Render!
Resolution
Restrict!
Revis!
Roadmap/roadmapped
Run-time
Sample builds
Script perform!
SDK
Seamless
Seek
Seek
Seek free load!
Seek free load! Path
Shader

Shader
Shader patching
Shadow casting
Small block
Spu
SPU utilization
Spurs
Spus
State code
Stream!
Streaming
Streams
Target platform!
Tasks
Tasks
TCR
Terrain
Threaded renderer
Threading
Throughput
Time slice
Time slice
UE
UE3
Unpredict!
Unreal Engine
Unreal Tournament 3
Unrealscript
Unstable
Update
Update order
UT3
Vertex format
Vertex light!
Vertex stream
Virtual function
Workflow!
Xbox360
XDK
Xenos

Exhibit 7

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 3.2.1
### Eastern Division

Silicon Knights Inc

                Plaintiff,

v.

                                        Case No.: 1:08−cv−00782

Epic Games Inc

                                        Honorable Robert W. Gettleman

                Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, August 26, 2008:

      MINUTE entry before the Honorable Sidney I. Schenkier: Midway's unopposed motion for extension of time (doc. # 36) is granted; no appearance on the motion is required. By 09/10/08, Midway shall produce responsive documents as required by the Court's order of 07/23/08. By 09/19/09, the parties shall meet and confer concerning any disputes about the production. By the close of business on 09/25/08, the parties shall submit a joint letter to chambers identifying any disputes about production that require resolution by the Court, and in the joint letter state their respective positions concerning those disputes. The status hearing set in this case for 09/04/08 is reset to 10/01/08 at 10:00 a.m. Mailed notice(mmm, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SILICON KNIGHTS, INC.,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀)⠀⠀Case No. 08 C 782
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Judge Gettleman
⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Magistrate Judge Schenkier
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
EPIC GAMES, INC.,⠀⠀⠀⠀⠀⠀⠀)⠀⠀Related to Case No. 5-07-00275-D
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀(Eastern District of North Carolina,
⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)⠀⠀Western Division)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## AFFIDAVIT OF MICHAEL WEIL

1.⠀⠀⠀I am currently a Director of Huron Consulting Group.  I have had more than 10 years of computer forensics and investigations experience.  I previously was Section Chief and Computer Forensic Examiner for the Department of Defense Computer Forensics Laboratory in Linthicum, Maryland.  I have a Master of Business Administration from the University of Baltimore and a Bachelor of Science, Mathematics from Loyola University, Chicago, Illinois.  I have personal knowledge of the facts set forth in this affidavit and can testify to them if called upon to do so based on the information received to date.

2.⠀⠀⠀Huron are experts in E-discovery and work to design, formulate, and implement corporate electronic data discovery; provide expertise and infrastructure coordination to execute processing of electronic evidence and data analysis; and provide project management and access to the resources needed to assimilate electronic source data management into the overall discovery plan with internal departments and counsel.

3.⠀⠀⠀On Thursday, August 28, 2008, counsel for Midway Games Inc., Gerald Sweeney, arranged a conference call with me and Adam Farber (also of Huron); James Norman, Manager of Barnes & Thornburg LLP's Technology Services; Rosemary Hackett, Midway Director of IT; and Michael Weilbacher, Midway Chief Technology Officer.

4.    The subject of the consultation was the most efficient, expedient, and complete method (including cost options based on the scope of collection) for collecting, inventorying, extracting, staging and preparation for data processing the electronically stored information from the following existing Midway sources implicated in Silicon Knights' subpoena at six geographic locations both in and outside of the United States: custodian hard drives, Exchange email servers, file server directories, a listserv, a TWicki, and server back up tapes.  The discussion was about the collection of electronically stored information pertaining to the final list of alleged "UE3" terms utilizing the five pages of search terms (or a modified version thereof) provided by Silicon Knights.

5.    It was determined that the process for collection, inventorying, extraction, staging and preparation for processing required further discussion at Midway's Chicago headquarters. The subsequent meeting started at 8:30 a.m. on the following Tuesday, September 2, 2008, after the Monday Labor Day Holiday.  That meeting was attended by Scott Curtis and Adam Farber (Huron), Rosemary Hackett, Michael Weilbacher, and Gerald Sweeney.  I was informed by Adam Farber and Scott Curtis as to the results of the meeting.

6.    Technical and Human Resources analysis of the requirements of the data collection, based on the breadth of Silicon Knights' subpoena as embodied in the final list of "UE3" problems and the five page search term list, revealed that achieving the electronic discovery required by Silicon Knights' subpoena would be virtually impossible for Midway to reasonably accomplish without third party assistance.  Based on multiple factors, including the ability to preserve the integrity and chain of custody of electronic data accessed during the collection process, I concluded that the data collection required could not be reasonably achieved independently by Midway.  More specifically, the data is located in six diverse physical locations:  Chicago; San Diego; Austin; Moorpark/LA; and Newcastle, U.K.  Midway does not

have sufficient employees with the requisite technical expertise to collect, inventory, extract, stage and prepare the data for processing or to access hard drives of game designers outside of working hours (which were reported to be from early morning to late night hours) to complete consumer video game products in the final phases of development and scheduled for release.

7.     For these reasons, Huron provided a proposal based on a review of the subpoena, search terms and Midway's IT as described herein.  As stated, Huron met with Midway representatives on the issues of Midway's IT, the collection technology and expertise implicated by the subpoena, and the human resources required to accomplish the necessary tasks.  Huron presented proposals to Midway's counsel, a copy of which is attached hereto.  (Exhibit A). Huron was asked to provide proposals that included cost options based on narrow top level employees in various groups to more extensive groups and employees which are described in the proposals.  Huron was specifically requested to provide a proposal for electronic data collection based on accepted and reasonable protocols that provided cost options.

8.     Huron offered three cost options based on the scope of the collections.  Huron's proposals are based on our professional analysis of what is required at Midway's facilities to respond to the subpoena.

9.     Huron has considered the requirements of this E-discovery matter and made proposals that reflect standard and accepted methodologies for the collection of electronic data in response to subpoenas of the type at issue in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 12, 2008.

_____
Michael Weil

SUBSCRIBED TO AND SWORN

before me this 12ᵗʰ day of September 2008.

_____
Notary Public

OFFICIAL SEAL
REBECCA MENDEZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/12/09

CHDS01 GSWEENEY 497549v1

Exhibit A

## Tracy Bulow - Fwd: Midway Games Proposal

**From:**    Gerald Sweeney
**To:**      Bulow, Tracy
**Date:**    9/11/2008 2:47 PM
**Subject:** Fwd: Midway Games Proposal

Please copy this and the attachment for the file

>>> <afarber@huronconsultinggroup.com> 9/4/2008 12:52 PM >>>
Gerry,

Attached is our proposal for Midway Games.

In addition to the fee detail on page two of the proposal, we estimated the total cost for the three scenarios we discussed. The table below summarizes these estimates.

Also, the following assumptions were utilized to create the estimates:
1. Two hard drives for 60% of the custodians, four hard drives for 40% of the custodians, and time for inventory, extraction and staging
2. One file server per location for six locations
3. One listserv and one TWiki
4. Four backup tapes from each year 2005-2008 for a total of 16 backup tapes

|  | Number of Custodians | | |
|---|---|---|---|
|  | 35 | 75 | 200 |
| **Hard Drives** | $122,010 | $261,450 | $697,200 |
| **File Servers** | $46,200 | $46,200 | $46,200 |
| **listserv** | $7,700 | $7,700 | $7,700 |
| **TWiki** | $7,700 | $7,700 | $7,700 |
| **Backup Tapes** | $18,000 | $18,000 | $18,000 |
| **Email Server** | $1,375 | $1,375 | $1,375 |
|  | $202,985 | $342,425 | $778,175 |

Please let me know when you would like to discuss in further detail.

Thanks,
Adam

Adam Farber
Huron Consulting Group
550 West Van Buren Street
Chicago, Illinois 60607
312.880.3623 - Direct
773.677.0022 - Mobile

DISCLAIMER:
The information transmitted in this e-mail message and attachments, if any, may be attorney-client information, including privileged and confidential matter, and is intended only for the use of the individual or entity named above. Distribution to, or review by, unauthorized persons is strictly prohibited. All personal messages express views solely of the sender, which are not to be attributed to any organization. If you have received this transmission in error, immediately notify the sender and permanently delete this transmission including attachments.



September 4th, 2008

Gerald Sweeney
Barnes & Thornburg
One North Wacker Drive
Chicago, Illinois 60606-2809

Re: Silicon Knights

Dear Gerald:

I am pleased to confirm Huron Consulting Services LLC's engagement by Barnes & Thornburg in its capacity as legal counsel for Midway Games, Inc. ("you" or "your") to provide certain services related to the above-referenced matter (the "Matter").

*Our Services*

We will perform those services or tasks you request which are within our scope or practice.

We have discussed collecting electronically stored information from the following: custodian hard drives, Exchange email server(s), file server directories, a listserv, a TWiki, and server backup tapes.

We will also inventory, extract, and stage the data we collect and prepare it for data processing.

Please keep in mind that, to the extent you ask us to reach conclusions or form opinions, we are obligated to do so without regard to the impact that such conclusions may have upon the Matter. You agree to comply with all of our reasonable requests and to provide us timely access to all information and locations reasonably necessary to our performance of the services.

The services we provide are intended solely for your use in connection with the Matter and should not be used or relied upon for any other purpose. Any written work product we prepare for you is to be used solely for purposes of this Matter and may not be published or used, in whole or in part, for any other purpose without our written permission.

We understand that you intend our work, opinions, conclusions and communications to be covered by the attorney-client and work product privileges to the extent provided by law, and we will comply with any requests you make of us that are designed to preserve these privileges. In addition, we understand that you will provide us with instructions regarding any document retention or document production procedures you expect us to follow.

Huron is not a public accounting firm; any accounting related services that we may provide you will be in our role as business advisor to you. We will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.



*Fees and Expenses*

Below are fee estimates for each of the collection components we discussed. As indicated, these estimates do not include any processing, review or production services.

Custodian Hard Drives
- $500 per hard drive for collection
- $695 per hard drive for data inventory, data extraction from images, and staging for processing

File Server, listerv, TWiki
- $2,200 per server for collection
- $5,500 per server for data inventory, data extraction from collection media, and staging for processing

Backup Tapes
- $300 per tape for restoration
- $825 per tape for data inventory, data extraction from restoration media, and staging for processing

Exchange Email Server
- $1,375 to provide direction to Midway Games in the collection of custodian mailboxes

For additional time incurred outside the above tasks, we will bill on an hourly basis based on the actual hours worked and the following hourly billing rates (which may be subject to adjustment from time to time):

| *Title* | *Hourly Rate* |
|---|---|
| Managing Director | $590 |
| Director | $450 |
| Manager | $385 |
| Associate | $320 |
| Analyst | $230 |

Out of pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred.

We will bill on a semi-monthly basis. Our invoices are due upon presentation. Amounts remaining overdue for more than 20 days (past due) will be subject to an interest charge of 1.5% per month from the date of invoice. We reserve the right to suspend further services until payment is received on past due invoices, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

Our bills will be issued to Barnes & Thornburg and addressed to the attention of Gerald Sweeney at the following address: Barnes & Thornburg LLP, 1 North Wacker Drive, Chicago, Illinois 60607-2809



If you request that we issue a report or testify, we will require you to pay us in full and in advance of such report or testimony for all services performed and expenses incurred through the date of the report or testimony (or for estimated time and expenses through such date).

In the event that you disagree with or question any amount due under any invoice, you agree to communicate such disagreement to us in writing within 30 days of the invoice date. Any claim not made within the time period will be deemed waived.

We do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes.

*General Business Terms*

We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security and other applicable employee withholdings.

Our fees and payment terms are set out above. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices). We reserve the right to suspend services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, then you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax. You will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services and deliverables, excluding taxes on our income generally.

With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on the subject matter or the circumstances of its disclosure, the other party agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed or (v) disclosed pursuant to legal requirement or order.

Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other



archival copies for recordkeeping and quality assurance purposes and receiver shall make no unauthorized use of such copies.

Upon full and final payment of all amounts due to us in connection with this engagement, all right, title and interest in any deliverables we provide to you will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know how and software ("Huron Property"), including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services. To the extent our reports or other documents delivered to you contain Huron Property, we grant you a non-exclusive, non-assignable, royalty-free license to use it in connection with the subject of the engagement. As discussed more fully elsewhere in this letter, your use of deliverables is limited to the matter and should not be published, used or relied on for any other purpose.

Our engagement with you is not intended to shift risk normally borne by you to us. In the event of a legal proceeding or other claim brought against us by a third party, including a subpoena or court order, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities, including reasonable defense costs and legal fees, associated with such third-party claim arising from or relating to any services or work product that you use or disclose to others, or this engagement generally. The provisions of this section for indemnification will not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact. We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event exceed an amount equal to the fees we receive from you for the portion of the engagement giving rise to such liability. Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

You may terminate this Agreement for convenience at any time on 15 days' prior written notice to us. We may terminate this Agreement for convenience at any time on 30 days' prior written notice to you. We may terminate this Agreement if, within 15 days' notice, you fail to cure a material breach of this Agreement including in the event of non-payment of amounts due us. Further, we reserve the right to terminate the Agreement at any time, upon providing written notice to you, if conflicts of interest arise or become known to us that, in our sole judgment would impair our ability to perform the services objectively. To the extent you terminate this Agreement for convenience, you will pay us for all services rendered, expenses incurred or commitments made by us to the effective date of termination. To the extent you terminate this Agreement for breach, you will pay us for all conforming services rendered and reasonable expenses incurred by us to the effective date of the termination. The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.



Within 30 days after the conclusion of this engagement, you may request that we (a) return to you all documents or copies of documents that you provided to us as well as work papers, reports or other documents we prepared in the course of this engagement or (b) destroy such materials provided we may retain other archival copies for recordkeeping or quality assurance purposes and we will make no unauthorized use of such copies.   If you do not timely request one of these options for disposition of materials, we may elect either option.

This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement.

No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to conflict of law rules.  The parties hereto agree that any and all disputes or claims arising hereunder or under any Engagement letter shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association.  Any arbitration will be conducted in Chicago, Illinois.  Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Illinois for purposes of any enforcement of any arbitration award. Except as may be required by law, neither party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.

If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

This engagement letter constitutes the entire understanding and agreement between us with respect to the services described above, supersedes all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by both parties.

*    *    *    *    *    *

Please indicate your agreement to these terms by signing and returning to me the enclosed copy of this letter.      We appreciate the opportunity to be of service to you and look forward to working with you on this project.

Sincerely,



HURON CONSULTING SERVICES LLC


By:    _____


Acknowledged:

Barnes & Thornburg

By:    _____

Title:   _____

Date:   _____


Acknowledged and Accepted:

Midway Games, Inc.

By:    _____

Title:   _____

Date:   _____

# Exhibit 9

## Tracy Bulow - Fwd: Midway Games Proposal

**From:** Gerald Sweeney
**To:** Bulow, Tracy
**Date:** 9/11/2008 2:47 PM
**Subject:** Fwd: Midway Games Proposal

Please copy this and the attachment for the file

>>> <afarber@huronconsultinggroup.com> 9/4/2008 12:52 PM >>>
Gerry,

Attached is our proposal for Midway Games.

In addition to the fee detail on page two of the proposal, we estimated the total cost for the three scenarios we discussed. The table below summarizes these estimates.

Also, the following assumptions were utilized to create the estimates:
1. Two hard drives for 60% of the custodians, four hard drives for 40% of the custodians, and time for inventory, extraction and staging
2. One file server per location for six locations
3. One listserv and one TWiki
4. Four backup tapes from each year 2005-2008 for a total of 16 backup tapes

|  | Number of Custodians | | |
|---|---|---|---|
|  | 35 | 75 | 200 |
| **Hard Drives** | $122,010 | $261,450 | $697,200 |
| **File Servers** | $46,200 | $46,200 | $46,200 |
| **listserv** | $7,700 | $7,700 | $7,700 |
| **TWiki** | $7,700 | $7,700 | $7,700 |
| **Backup Tapes** | $18,000 | $18,000 | $18,000 |
| **Email Server** | $1,375 | $1,375 | $1,375 |
|  | $202,985 | $342,425 | $778,175 |

Please let me know when you would like to discuss in further detail.

Thanks,
Adam

Adam Farber
Huron Consulting Group
550 West Van Buren Street
Chicago, Illinois 60607
312.880.3623 - Direct
773.677.0022 - Mobile

DISCLAIMER:
The information transmitted in this e-mail message and attachments, if any, may be attorney-client information, including privileged and confidential matter, and is intended only for the use of the individual or entity named above. Distribution to, or review by, unauthorized persons is strictly prohibited. All personal messages express views solely of the sender, which are not to be attributed to any organization. If you have received this transmission in error, immediately notify the sender and permanently delete this transmission including attachments.

# Huron

## CONSULTING GROUP

September 4th, 2008

Gerald Sweeney
Barnes & Thornburg
One North Wacker Drive
Chicago, Illinois 60606-2809

Re: Silicon Knights

Dear Gerald:

I am pleased to confirm Huron Consulting Services LLC's engagement by Barnes & Thornburg in its capacity as legal counsel for Midway Games, Inc. ("you" or "your") to provide certain services related to the above-referenced matter (the "Matter").

*Our Services*

We will perform those services or tasks you request which are within our scope or practice.

We have discussed collecting electronically stored information from the following: custodian hard drives, Exchange email server(s), file server directories, a listserv, a TWiki, and server backup tapes.

We will also inventory, extract, and stage the data we collect and prepare it for data processing.

Please keep in mind that, to the extent you ask us to reach conclusions or form opinions, we are obligated to do so without regard to the impact that such conclusions may have upon the Matter. You agree to comply with all of our reasonable requests and to provide us timely access to all information and locations reasonably necessary to our performance of the services.

The services we provide are intended solely for your use in connection with the Matter and should not be used or relied upon for any other purpose. Any written work product we prepare for you is to be used solely for purposes of this Matter and may not be published or used, in whole or in part, for any other purpose without our written permission.

We understand that you intend our work, opinions, conclusions and communications to be covered by the attorney-client and work product privileges to the extent provided by law, and we will comply with any requests you make of us that are designed to preserve these privileges. In addition, we understand that you will provide us with instructions regarding any document retention or document production procedures you expect us to follow.

Huron is not a public accounting firm; any accounting related services that we may provide you will be in our role as business advisor to you. We will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.



*Fees and Expenses*

Below are fee estimates for each of the collection components we discussed. As indicated, these estimates do not include any processing, review or production services.

Custodian Hard Drives
- $500 per hard drive for collection
- $695 per hard drive for data inventory, data extraction from images, and staging for processing

File Server, listerv, TWiki
- $2,200 per server for collection
- $5,500 per server for data inventory, data extraction from collection media, and staging for processing

Backup Tapes
- $300 per tape for restoration
- $825 per tape for data inventory, data extraction from restoration media, and staging for processing

Exchange Email Server
- $1,375 to provide direction to Midway Games in the collection of custodian mailboxes

For additional time incurred outside the above tasks, we will bill on an hourly basis based on the actual hours worked and the following hourly billing rates (which may be subject to adjustment from time to time):

| *Title* | *Hourly Rate* |
| --- | --- |
| Managing Director | $590 |
| Director | $450 |
| Manager | $385 |
| Associate | $320 |
| Analyst | $230 |

Out of pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred.

We will bill on a semi-monthly basis. Our invoices are due upon presentation. Amounts remaining overdue for more than 20 days (past due) will be subject to an interest charge of 1.5% per month from the date of invoice. We reserve the right to suspend further services until payment is received on past due invoices, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

Our bills will be issued to Barnes & Thornburg and addressed to the attention of Gerald Sweeney at the following address: Barnes & Thornburg LLP, 1 North Wacker Drive, Chicago, Illinois 60607-2809



If you request that we issue a report or testify, we will require you to pay us in full and in advance of such report or testimony for all services performed and expenses incurred through the date of the report or testimony (or for estimated time and expenses through such date).

In the event that you disagree with or question any amount due under any invoice, you agree to communicate such disagreement to us in writing within 30 days of the invoice date. Any claim not made within the time period will be deemed waived.

We do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes.

<u>*General Business Terms*</u>

We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security and other applicable employee withholdings.

Our fees and payment terms are set out above. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices). We reserve the right to suspend services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, then you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax. You will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services and deliverables, excluding taxes on our income generally.

With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on the subject matter or the circumstances of its disclosure, the other party agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed or (v) disclosed pursuant to legal requirement or order.

Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other



archival copies for recordkeeping and quality assurance purposes and receiver shall make no unauthorized use of such copies.

Upon full and final payment of all amounts due to us in connection with this engagement, all right, title and interest in any deliverables we provide to you will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know how and software ("Huron Property"), including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services. To the extent our reports or other documents delivered to you contain Huron Property, we grant you a non-exclusive, non-assignable, royalty-free license to use it in connection with the subject of the engagement. As discussed more fully elsewhere in this letter, your use of deliverables is limited to the matter and should not be published, used or relied on for any other purpose.

Our engagement with you is not intended to shift risk normally borne by you to us. In the event of a legal proceeding or other claim brought against us by a third party, including a subpoena or court order, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities, including reasonable defense costs and legal fees, associated with such third-party claim arising from or relating to any services or work product that you use or disclose to others, or this engagement generally. The provisions of this section for indemnification will not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact. We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event exceed an amount equal to the fees we receive from you for the portion of the engagement giving rise to such liability. Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

You may terminate this Agreement for convenience at any time on 15 days' prior written notice to us. We may terminate this Agreement for convenience at any time on 30 days' prior written notice to you. We may terminate this Agreement if, within 15 days' notice, you fail to cure a material breach of this Agreement including in the event of non-payment of amounts due us. Further, we reserve the right to terminate the Agreement at any time, upon providing written notice to you, if conflicts of interest arise or become known to us that, in our sole judgment would impair our ability to perform the services objectively. To the extent you terminate this Agreement for convenience, you will pay us for all services rendered, expenses incurred or commitments made by us to the effective date of termination. To the extent you terminate this Agreement for breach, you will pay us for all conforming services rendered and reasonable expenses incurred by us to the effective date of the termination. The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.



Within 30 days after the conclusion of this engagement, you may request that we (a) return to you all documents or copies of documents that you provided to us as well as work papers, reports or other documents we prepared in the course of this engagement or (b) destroy such materials provided we may retain other archival copies for recordkeeping or quality assurance purposes and we will make no unauthorized use of such copies.   If you do not timely request one of these options for disposition of materials, we may elect either option.

This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement.

No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to conflict of law rules.  The parties hereto agree that any and all disputes or claims arising hereunder or under any Engagement letter shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association.  Any arbitration will be conducted in Chicago, Illinois.  Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Illinois for purposes of any enforcement of any arbitration award. Except as may be required by law, neither party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.

If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

This engagement letter constitutes the entire understanding and agreement between us with respect to the services described above, supersedes all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by both parties.

*   *   *   *   *   *

Please indicate your agreement to these terms by signing and returning to me the enclosed copy of this letter.        We appreciate the opportunity to be of service to you and look forward to working with you on this project.

Sincerely,



HURON CONSULTING SERVICES LLC


By:    _____


Acknowledged:

Barnes & Thornburg

By:    _____

Title:    _____

Date:    _____


Acknowledged and Accepted:

Midway Games, Inc.

By:    _____

Title:    _____

Date:    _____